# EXHIBIT 1

Colorado Memorandum of Activity, Seizure Inventory, and Cryptocurrency Forensic Documentation (December 10, 2019)

**Description:**
Government-generated documentation dated December 10, 2019 reflecting seizure activity at 11627 West 74th Way, Arvada, Colorado, including inventory listings and digital asset forensic reporting.

**Purpose:**
To document property seized and related contemporaneous custodial and forensic records.

# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

# Memorandum of Activity

**Investigation #:** 1000293264
**Investigation Name:** Jobadiah Weeks

**Location:** Residence of Jobadiah Weeks
11627 W. 74th Way
Arvada, CO

**Date:** December 10, 2019
**Time:** Various
**Participant(s):** Adam Rutkowski, Special Agent
Victor Vanacore, Special Agent

Attached are documents containing screenshots representative of the cryptocurrency seizures Special Agent Vanacore (witnessed by SA Rutkowski) were able to affect at the Weeks' Residence during the Search Warrant on December 10, 2019. This document and its related attachments should be preserved as an official account of the activities associated with these seizures:

1. There were multiple assets left in the Exodus Wallet, which were not seized, as there were no seizure wallet addresses which had been provided to send the funds to. Additionally, the dollar amounts were deemed to be below the threshold after speaking with the Command Post.
    a. A Final Screenshot showing the balances in these accounts is included in the .pdf file.
    b. The Exodus wallet was restored based upon a .png picture file located on an SD card which was found during the Search Warrant on the room which had been identified as belonging to Joby Weeks. The .png file was a picture of the backup seed phrase.
    c. The seed phrase was used to restore the Exodus Wallet onto a cold computer.
    d. After the transfers were affected by SA Vanacore, the Exodus Wallet was deleted from the Cold Computer.
    e. Any further access to the remaining funds on the Exodus Wallet can only be gained by using the .png seed phrase picture.
2. One Bitclub Club Coin Ledger Nano S was located. Two hand-written seed phrase cards, manufactured by Ledger, were located.
    a. Attempts were made to restore the Ledger Nano S using the seed phrase. Agents were successful in that they could see the device potentially contained Bitcoin, Ethereum, Club Coin, and possibly two other assets. However, the agents were unable to determine the quantity of these assets using the device without plugging the device into the cold computer.
    b. Agents attempted to plug the device into a cold computer using the required software, Ledger Live.
    c. It was determined that the firmware on the device needed to be updated. Agents were unsuccessful in upgrading the firmware.

d. Therefore, agents used the wallet software, Electrum, to attempt recovery of the Bitcoin assets associated with each of the two seed phrases. This attempt only provides potential access to the Bitcoin. Access to the other potential cryptocurrencies associated with these wallets was not attempted.
e. For one of the two seed phrases, agents were successful in finding bitcoin. Agents transferred this bitcoin to the seizure addresses provided in advance of the enforcement action.

3. Access to the Bitcoin using Electrum has to be conducted by creating three separate wallets – One Legacy Wallet, a P2SH SegWit Wallet (containing bitcoin addresses starting with the number 3), and a bech32 SegWit Wallet (containing bitcoin addresses starting with "bc1".
   a. Given time constraints while on site, agents are unsure if they tried all three methods using each seed phrase. Also, there are additional configuration settings which must be used in order to properly gain access to any of these assets. If the configuration settings are not put in place correctly, the assets would not appear, even if they are actually present.
   b. Therefore, it is recommended that at a later date in time, the government use another Ledger Device to restore each of the seed phrase cards to. Once the restore has occurred successfully, all assets available that are connected with that seed phrase (which represents a private key) should become viewable and accessible.
4. Other potential physical cryptocurrency assets were seized. Most of these were things like actual physical coins which contained either public or private Bitcoin keys, or both. Because of time constraints involved with the search, these items were physically seized, and no attempt was made to quantify their value, or to seize any potential funds which may be present. As such, a separate attempt should be made at a later date to determine whether there are any funds associated with these physically seized items.
5. Each of the aforementioned seizures was conducted by the Seizing Agent at our Site – SA Vanacore. SA Rutkowski and SA Vanacore were each present and watching during the entire analysis and seizure process.
6. The attached screenshots are considered to be the evidence of the activities conducted related to the items discussed in this memorandum.

Adam Rutkowski
Special Agent

Victor Vanacore
Special Agent


EXODUS
Home
Wallet
Exchange
Backup
Settings
Help
Portfolio
Transactions
What's New
$43,955.57
15 Assets
NOW
1M
6M
1Y
ALL

$43,932.63

Home

Wallet

Exchange

Backup

Settings

Help

Aragon
492.694 ANT

Augur
103.65077 REP

Basic Attention Token
4,922 BAT

Bitcoin

492.694 ANT
$247.55 USD

Send

Receive

PRIVATE KEYS

# Exodus Aragon Private Keys

Close

| Address | Path | Balance | Private Key |
|---|---|---|---|
| 0x0707CDe7374269BC45074c7984092CF8D4dbe43B | m/0/0 | 492.6939984 | 02a5ab16e98eb3dd1fde25b8a5281e6b0ed03ed2aff507da6daa5a20567d904( |

Close


$44,002.47
Home
Wallet
Exchange
Backup
Settings
Help
Aragon
103.89077 REP
Basic Attention Token
Bitcoin
103.89077 REP
$1,037.41 USD
Send
Receive
PRIVATE KEYS
Exodus Augur Private Keys
Close
Address
Path
Balance
Private Key
0x0707CDe7374269BC45074c7984092CF8D4dbe43B
m/0/0
103.89076767
02a5ab16e98eb3dd1fde25b8a5281e6b0ed03ed2aff507da6daa5a20567d904
Close


$44,002.47
Home
Wallet
Exchange
Backup
Settings
Help
Aragon
Augur
Basic Attention Token
4,922 BAT
Bitcoin
4,922 BAT
$863.88 USD
Send
Receive
PRIVATE KEYS
Exodus Basic Attention Token Private Keys
Close
Address
Path
Balance
Private Key
0x0707CDe7374269BC45074c7984092CF8D4dbe43B
m/0/0
4922
02a5ab16e98eb3dd1fde25b8a5281e6b0ed03ed2aff507da6daa5a20567d904d
Close


$17,410.88
Home
Wallet
Exchange
Backup
Settings
Help
Aragon
Augur
Basic Attention Token
Bitcoin Cash
2.9765462 BCH
Dash
Decred
Dogecoin
Ethereum
Ethereum Classic
Golem
Litecoin
OmiseGo
SALT
2.9765462 BCH
$618.24 USD
Send
Receive
+ 2.97654615
PRIVATE KEYS
Exodus Bitcoin Cash Private Keys
Close
Address
Path
Balance
Private Key
qzcszz6ysdu7d5p2tu5xlh4njlavnx8yku0zf7pzz7
m/0/0
2.97654615
L3fR9shvfp3ns5AQ35MUFxP2mkLhCt3XYrqUwgH9zcTgF4xoV8tf
Close


12tsacDyVoiDAva1dUFYTkUGhtTZPYRniN
2.97653485
HALF
ALL
BCH
618.58
USD
Send
You are sending 2.97653485 BCH ($618.58)
Bitcoin Cash Network Fee
Remaining Balance
0 BCH


Are you sure you want to
Send 618.58 USD?
Sending: 2.97653485 BCH
Value: 618.58 USD
Address: 12tsacDyVoiDAva1dUFYTkUGhtTZPYRniN
Back
Send


Success!
Your Bitcoin Cash has been sent
OK


$16,804.76
Home
Wallet
Exchange
Backup
Settings
Help
Aragon
Augur
Basic Attention Token
Dash
Decred
Dogecoin
Ethereum
Ethereum Classic
Golem
Litecoin
OmiseGo
SALT
Tron (old)
0 BCH
$0.00 USD
Send
Receive
Sent a minute ago
2.97653485
Date
12/10/2019 7:28 PM
Transaction ID
Fee
0.0000113 BCH
To
qq2v0raet5ls89m9hj7q6h2795nj...
Now
$618.37 USD
Personal note
Received
+ 2.97654615

# Exodus Bitcoin Private Keys

lose

| Address | Path | Balance | Private Key |
|---|---|---|---|
| uKvjJAYPWHXCn8SyR7k8Px7dWXTTjGaB | m/0/0 | 0 | Ky797MHpvu7Ar1eN7LhuVsEBSwFFqomip8zgJzaka1hp5gSHgPoc |
| 1qqad2mvfn2wewd8cavn7602h9g06r6hfk0g5n6c | m/0/0 | 0 | KwVs4krgY78p81rfzn3b4ssK3kQf23ZjzCcpUhaDTVnDxpFYcvuw |
| UhenKVdMzkAHewusS3rBHENJjZEK8ook | m/1/0 | 0 | L2rSz6Yu7PRa3JCLmxSqMvq87Aq5ihsKmwBzNKmQfDcLUdEGEc8s |
| g5vsZd42uwTwsQc18dCzJ9cgxXmBCsXg | m/1/1 | 0 | L5aTKjk8FUba9VDP9bWfA9DTVEtK4imBLzYe8zghSkQtPf7KGtXS |
| FZqnSRdsWmn95NHGja8kJteihmCnwJdb | m/1/2 | 0 | KwDos6dx5Vh33MVVoB6AxitkEBwMwr6ackSCcynagePaZa8ACmvM |
| sjQDq1QgGjt1DVe5y9QFLJBv1RsLHg6 | m/1/3 | 0 | L2cpAXQkZmb7dU7KuaCVDCi3WMGWZmjVoYKWJppc7N8SBtafUtBq |
| jzSRGaXDkoUWkA99gPDJ4vSmCVD1TBTB | m/1/4 | 0 | Kyt21dydc68zg3qUrZL5W2kEUwdw6bxxck3kU1LHPNqkZMJMpur7 |
| 8MiVcaPM74MBaCVJAbWBTgHfYoEGYf6o | m/1/5 | 0 | L1WEQECwg5wYDZyE1WXpsxHhjQLP5bucEwufUW7MCusZtCzxj8TZ |
| VTnkccSo9F1ho3qcm589nPsmx7S8gwZe | m/1/6 | 0 | KxcNNbMvNszcjmPbPGWGL2oKYrWswKcS7JRFv9nSwxrMZN5RP4gg |
| cG5ndUUCpu7977PRHM8AJPv1D3BsocAG | m/1/7 | 0 | L4QWNEj8HcrBSViMmfN8TjFDoRDZE41gxKhECSFBNRDoSPrT8Hxe |
| Dq3gnpx71igXhhiFKCR7x3eWKbfhcc1t | m/1/8 | 0 | L4eTYbQES3KPZHzUDJMGzmEyVxEvZK8otxXqsrw1KUvxc5FyvpD4 |
| rwZ7mZHT1zhnnppDqTgMvSRnMRFVtuEF | m/1/9 | 0 | KxKKXmQriqNUsS3MHTBmxakGLkmDVFZVMShWPGozfzxKqrRCToRh |
| zq5h94BHK32awJchuAjWP3EtGKyEhCqf | m/1/10 | 3.67046219 | L4AcAu2Bpot5dgCmwg8PwzPm5uUAnxhvFEhGCEbc6NrDvVz2GANa |

lose


$44,002.47
Home
Wallet
Exchange
Backup
Settings
Help
Bitcoin
3.6704622 BTC
Bitcoin Cash
Dash
Decred
Dogecoin
899,543.45 DOGE
Ethereum
Ethereum Classic
Golem
Litecoin
3.6704622 BTC
$26,573.26 USD
Send
Receive
DESCRIPTION
Exchanged for Aragon
0.10
Exchanged for Decred
0.10
Exchanged for Basic Attention Token
0.10


14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi
3.67041619
HALF
ALL
BTC
26,544.74
USD
Send
You are sending 3.67041619 BTC ($26,544.74)
Bitcoin Network Fee ( 0.230 KB )
0.000046 BTC
$0.33
Remaining Balance
0 BTC
$0.00


Are you sure you want to
Send 26,544.74 USD?
Sending: 3.67041619 BTC
Value: 26,544.74 USD
Address: 14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi
Back
Send


Success!
Your Bitcoin has been sent
OK



0 BTC
$0.00 USD
Send
Receive
Sent a minute ago
3.67041619
12/10/2019 7:14 PM
Transaction ID
47b721857e826dadaa2261d0c61ad40ef1ca1...
Fee
0.0000444 BTC
14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi
$26,565.26 USD


$16,801.63
Home
Wallet
Exchange
Backup
Settings
Help
Aragon
Augur
Basic Attention Token
Dash
18.643134 DASH
Decred
Dogecoin
Ethereum
48.916573 ETH
Ethereum Classic
Golem
Litecoin
OmiseGo
SALT
Tron (old)
79 TRX
48.916573 ETH
$7,110.64 USD
Send
Receive
PRIVATE KEYS
Exodus Ethereum Private Keys
Close
Address
Path
Balance
Private Key
0x0707CDe7374269BC45074c7984092CF8D4dbe43B
m/0/0
48.916572894984693906
02a5ab16e98eb3dd1fde25b8a5281e6b0ed03ed2aff507da6daa5a20567d904d
Close


0x09d0FDb66e815F33A2133315dDeC9F0C2922e250
48.916404894984693906
ALL
ETH
7,115.68
USD
Send
You are sending
($7,115.68)


Are you sure you want to
Send 7,115.68 USD?
Sending: 48.916404894984694 ETH
Value: 7,115.68 USD
Address: 0x09d0FDb66e815F33A2133315dDeC9F0C2922e250
Back
Send


Ethereum Token Warning
CONTINUE


Success!
OK


$9,682.48
Home
Wallet
Exchange
Backup
Settings
Help
Aragon
Augur
Basic Attention Token
Dash
Decred
Dogecoin
Ethereum
0.0000105 ETH
Ethereum Classic
Golem
Litecoin
OmiseGo
SALT
Tron (old)
0.0000105 ETH
$0.00 USD
Send
Receive
Sent a few seconds ago
48.916404894984694
Date
12/10/2019 7:46 PM
Transaction ID
Fee
0.0001575 ETH
To
0x09d0fdb66e815f33a2133315d...
Now
$7,101.62 USD
Sent
4.338959517507702


$9,685.17
Home
Wallet
Exchange
Backup
Settings
Help
Aragon
Augur
Basic Attention Token
Dash
18.643134 DASH
Decred
Dogecoin
Ethereum
Ethereum Classic
Golem
Litecoin
91.851854 LTC
OmiseGo
SALT
Tron (old)
79 TRX
91.851854 LTC
$4,037.72 USD
Send
Receive
PRIVATE KEYS
Exodus Litecoin Private Keys
Close
Address Path Balance Private Key
LY8WZZopmF888pJSpfABTdMsER84XRyhMv m/0/0 91.85185398 T8rZ6Xzvz72LCWJ77ZM7AxxiHjWJEqGb53WXnp9WVixnxfTqbYkN
Close


LeNUmQpSPfMkbZffVRizeaZULHs45rmGsk
91.85073198
ALL
LTC
4,037.67
USD
Send
You are sending 91.85073198 LTC ($4,037.67)


Are you sure you want to
Send 4,037.67 USD?
Sending: 91.85073198 LTC
Value: 4,037.67 USD
Address: LeNUmQpSPfMkbZffVRizeaZULHs45rmGsk
Back
Send


Success!
OK


$5,648.91
Home
Wallet
Exchange
Backup
Settings
Help
Aragon
Augur
Basic Attention Token
Dash
18.643134 DASH
Decred
Dogecoin
Ethereum
Ethereum Classic
Golem
OmiseGo
SALT
Tron (old)
Binance Coin
0 LTC
$0.00 USD
Send
Receive
DESCRIPTION
Sent a few seconds ago
91.85073198
Date
12/10/2019 7:55 PM
Transaction ID
Fee
0.001122 LTC
To
LeNUmQpSPfMkbZffVRizeaZUL...
Now
$4,037.67 USD
Personal note
Received
+ 2.39295514


EXODUS
Portfolio
Transactions
What's New
Home
Wallet
Exchange
Backup
$5,637.16
12 Assets
NOW
24H Change
- $39,254.90
Highest Balance
$344,801.42
Portfolio Age
2 Years, 6 Months, 10 Days
Best 24H Asset
Augur +1.82%
Worst 24H Asset
SALT -7.79%
VALUE
PORTFOLIO %
Settings
Help
Dogecoin
DOGE
$0.002158
+1.4%
$264M
899,543.45 DOGE
$1,941.62
34.44%
Augur
$9.92
+1.82%
$109M
$1,030.08
18.27%


$5,640.73
Home
Wallet
Exchange
Backup
Aragon
492.694 ANT
Augur
Basic Attention Token
Dash
Decred
Dogecoin
Ethereum
Ethereum Classic
Golem
OmiseGo
SALT


Tron (old)
Binance Coin
Help

istory | Send | Receive | Addresses | Coins

| Date | Description | Amount | Balance | USD Value | USD Acquisition price | USD Capital Ga |
|---|---|---|---|---|---|---|
| 2017-05-21 22:29 | | +5. | 5. | No data | | |

Wallet View Tools Help

istory | Send | Receive | Addresses | Coins

| | Address | Label | Balance | USD Balance | Tx |
|---|---|---|---|---|---|
| ving | 1A9D3wX764NRiA4avR6mA4khirosbLvzwS | | 5. | No data | 1 |
| ving | 1tKtC98FxPwUTtxMDX1MREdbdP[illegible]CF6nt5 | | 0. | No data | 0 |
| ving | 1H7txnfHKJJdzBEk1QWdYZgF7ZQeJumB7m | | 0. | No data | 0 |
| ving | 1KLjf7XYzawX7yNQUcfn8B3TntQw7cCKEo | | 0. | No data | 0 |
| ving | 178Z3mNrtYGLhFdGk2pV4L63JxR4fvuPHP | | 0. | No data | 0 |
| ving | 16vA8Lj2k2vHAXDGBzFSQHiimknudoMbXq | | 0. | No data | 0 |
| ving | 1FYqjeU1zMbkD78qkJCjmatzAcLwswsbpK | | 0. | No data | 0 |
| ving | 1GW2KShQdEK2BCtbYmrmf9pGqy25NyGByb | | 0. | No data | 0 |
| ving | 13raYMcgzBBtqKF252WBJ1dkck7LURexez | | 0. | No data | 0 |
| ving | 13LnC1pRYmmRZF8TyjpWxqkpZP9mm6Xgnz | | 0. | No data | 0 |
| ving | 1C2EkERuMuC7Z3zXid3RvtxUJYXbMFzk6S | | 0. | No data | 0 |
| ving | 144uDPS4QVugzGmrEqiQLSL9zkNyc9MxiQ | | 0. | No data | 0 |
| ving | 1CNdKeoN2j5wxS82DdkYtsi8aWZqVmNrEU | | 0. | No data | 0 |
| ving | 1MZsXBfSTeeXWDA64xAGmnrZAXTDSHRCYN | | 0. | No data | 0 |
| ving | 1FfDdP1azARQXWUNRG3ivJjZLyrs7CoGAy | | 0. | No data | 0 |
| ving | 1DUFKs8wA8R2Yk9pYw35P8Q4XRg1rdCJHM | | 0. | No data | 0 |
| ving | 1JKWDUUTHvKFbrPiojKSWEVcuwGtawrJ28 | | 0. | No data | 0 |
| ving | 1CYemnUHyFWDURNGuFaZUkwYVC9xP4R4YZ | | 0. | No data | 0 |
| ving | 1A7uZMB5JvbZZTeuFF6zJfQdgCPKF5uWAY | | 0. | No data | 0 |
| ving | 1862BmeMAHofpBsnro9qsDtWUZ5wbsAWYV | | 0. | No data | 0 |
| ving | 1TuMRotDG8Sj8Q2tqiEqSrhyxxSrRJtGe | | 0. | No data | 0 |
| ge | 1JZKbNgNoEhuGQMyNHj7jvrsmAWeDLozme | | 0. | No data | 0 |
| ge | 1Aa7nYbbTPVRxPXVsHGv9qfanzKK2W1LcU | | 0. | No data | 0 |
| ge | 13WTgTJFt8rAEPw564gf3g5prdAb8EJj3Z | | 0. | No data | 0 |
| ge | 1FHVvDG5PGsTo63XoNjuvKVNPz4ow9chEe | | 0. | No data | 0 |
| ge | 13PYqf3qQpoR5fPyFKnBsQFBdjMnzqvt1a | | 0. | No data | 0 |
| ge | 12qcsncpLqcdPDs9d6XFUucpZp1k6iC1jt | | 0. | No data | 0 |


Wallet View Tools Help
History
Send
Receive
Addresses
Coins
14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi
Clear
Preview
Send


ransaction ID:
Unknown
escription:
tatus: Unsigned
mount sent: 4.99995661 BTC
ize: 192 bytes
ee: 0.00004339 BTC ( 22.6 sat/byte )
ockTime: 607544
nputs (1)
f880c6e991178cbc9044d875cb14697c6e9637fac550f7b8186ca4c28339172e:0
LA9D3wX764NRiA4avR6mA4KhirosbLvzwS 5.
utputs (1)
14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi 4.99995661
Copy
Export
Sign
Close


e Wallet View Tools Help
History Send Receive Addresses Coins
ay to 14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi
escription
mount 4.99995661C USD
ee
Clear Preview Send
Enter Passw... ?
Amount to be sent: 4.99995661 BTC
Mining fee: 0.00004339 BTC
Enter your password to proceed
Password ••••
Cancel OK


Wallet View Tools Help
History
Send
Receive
Addresses
Coins
y to
14YyAfHJRgv8TkoHfzuHDLQcnZGGx8aRZi
escription
mount
4.99995631
USD
Clear
Preview
Send
Information
Payment sent.
e35a17a53824b703bd72d556d3457a147d5a9bfe91d12d6b0d5064696d74fb7b
OK

e Wallet View Tools Help

History Send Receive Addresses Coins

| Date | Description | Amount | Balance | USD Value | USD Acquisition price | USD Capital Gains |
|---|---|---|---|---|---|---|
| 2019-12-10 18:30 | | -5. | 0. | No data | No data | No data |
| 6 confirmations 22:29 | | +5. | 5. | No data | | |

ance: 0. BTC (No FX rate available)

# Inventory Listing of All Items Seized at Search Warrant Site

**Site Name:**
11627 W 74TH WAY

SINGLE FAMILY HOME

**Investigation Number:**
1000293265
**Starting Date and Time:**
12/10/2019 07:30 AM
**Ending Date and Time:**
12/10/2019 01:30 AM

**Report Date:**
Tuesday, December 10, 2019

---

**Control #:** 1 **Evidence Box:** 1
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** DRESSER
**Description:** Seized per Warrant STOCK CERTIFICATES

---

**Control #:** 2 **Evidence Box:** 1
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** DESK
**Description:** Seized per Warrant CORPORATE RECORDS

---

**Control #:** 3 **Evidence Box:** 1
**Location:** DINING ROOM (NE) **Locator Code:**
**Found:** ON TOP OF DESK
**Description:** Seized per Warrant FOLDER LABELED "BLACKCHAIR" W/ DOCS IN IT; DEBIT CARDS; HANDWRITTEN NOTES ON BITCOIN

---

**Control #:** 4 **Evidence Box:** 1
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** DRESSER
**Description:** Seized per Warrant CORPORATE RECORDS

---

**Control #:** 5 **Evidence Box:** 2
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** UNDER DESK
**Description:** Seized per Warrant WESTERN DIGITAL MYBOOK USB HARDDRIVE (SERIAL NUMBER: WCC7K1LSFTTP)

---

**Control #:** 6 **Evidence Box:** 2
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** ON SHELF ABOVE DESK
**Description:** Seized per Warrant GENERIC USB THUMBDRIVE (SERIAL NUMBER: Y1178-T48L-B52L-V3)

---

**Control #:** 7 **Evidence Box:** 2
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** IN SMALL GUN SAFE
**Description:** Seized per Warrant SANDISK EXTREME SD CARD (SERIAL NUMBER: BM1235222025G)

---

**Control #:** 8 **Evidence Box:** 2
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** ON TOP OF DRESSER
**Description:** Seized per Warrant HUAWEI CELLPONE UNKNOWN SERIAL NUMBER

---

**Control #:** 9 **Evidence Box:** 2
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** ON THE FLOOR BY SHELF
**Description:** Seized per Warrant APPLE MACBOOK PRO (SERIAL NUMBER: W8944JH766E)

---

**Control #:** 10 **Evidence Box:** 3
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** CABINET
**Description:** Seized per Warrant MISC COINS

---

**Control #:** 11 **Evidence Box:** 3
**Location:** BASEMENT HIDDEN ROOM **Locator Code:**
**Found:** ON TOP OF DESK
**Description:** Seized per Warrant BTC COLD STORAGE COIN

---

**Control #:** 12 **Evidence Box:** 3
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** NEXT TO BED
**Description:** Seized per Warrant POSSIBLE SILVER COINS

---

**Control #:** 13 **Evidence Box:** 4
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** UNDER FUTON BED
**Description:** Seized per Warrant BOX OF COINS

---

**Control #:** 14 **Evidence Box:** 4
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** WATER TIGHT CONTAINER
**Description:** Seized per Warrant POSSIBLE GOLD SILVER COPPER COINS & BARS

---

**Control #:** 15 **Evidence Box:** 5
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** CLOSET BOX LABELED "GOLD DOLLARS"
**Description:** Seized per Warrant GOLDEN CURRENCY STYLE BARS

---

**Control #:** 16 **Evidence Box:** 5
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** CLLOSET
**Description:** Seized per Warrant BOX OF COINS

---

**Control #:** 17 **Evidence Box:** 6
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** CLOSET GUN SAFE
**Description:** Seized per Warrant US CURRENCY

---

**Control #:** 18 **Evidence Box:** 6
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** CLOSET HAND GUN SAFE
**Description:** Seized per Warrant POSSIBLE SILVER/GOLD COINS

---

**Control #:** 19 **Evidence Box:** 6
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** CLOSET GUN SAFE
**Description:** Seized per Warrant POSSIBLE SILVER COINS

---

**Control #:** 20 **Evidence Box:** 6
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** CLOSET HAND GUN SAFE
**Description:** Seized per Warrant POSSIBLE SILVER/GOLD COINS

---

**Control #:** 21 **Evidence Box:** 6
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** DESK, SMALL GUN SAFE
**Description:** Seized per Warrant POSSIBLE SILVER/GOLD COINS
USB "BITCOIN" STORAGE DRIVE
PASSWORD RECOVERY CARDS FOR BITCOIN
RING, EARRINGS, CHAIN

---

**Control #:** 22 **Evidence Box:** 5
**Location:** BEDROOM (S) UP JOBYS **Locator Code:**
**Found:** DESK
**Description:** Seized per Warrant BTC CRTYPTO CURRENCY INDICIA
STORAGE CARDS

---

# EXHIBIT 2

Florida Memorandum of Activity (Transfer Documentation)

**Description:**
Government-generated Memorandum of Activity reflecting custodial processing and transfer documentation following the Florida seizure.

**Purpose:**
To document referenced evidence bags and inter-district custodial processing.

# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

# Memorandum of Activity

**Investigation #:** [redacted] **Location:** **See Below**
**Investigation Name:** JOBADIAH WEEKS
**Date:** December 10, 2019
**Time:** Approx. 9:10 a.m. - 8:30p.m.
**Participant(s):** JOBADIAH S. WEEKS, Arrestee
Amjad Qaqish, Special Agent
Jonathan Helmstetter, Special Agent

At approximately 9:10 a.m., JOBADIAH WEEKS was arrested by agents in the courtyard of the Marriott hotel located at 1001 Okeechobee Blvd, West Palm Beach, FL 33401. Immediately after WEEKS was placed in handcuffs by S/A Helmstetter, S/A Helmstetter read WEEKS his Miranda Rights. Agents seized a cell phone, an Apple laptop computer, and two passports pursuant to an FBI search warrant issued in the Southern District of Florida. After the arrest, the following events occurred:

1. WEEKS was transported by TFO Norma Young, TFO Manny Espinosa, and IRS-CI S/A Dave Keyes to the IRS-CI office located at 1700 Palm Beach Lakes Blvd, Suite 500, West Palm Beach, FL 33401.

2. WEEKS waived his right to counsel via Form 5228 and consented to a video and audio recorded interview with S/A Amjad Qaqish and S/A J. Helmstetter. The interview lasted from approximately 9:45 a.m. to 3:24 p.m.

3. WEEKS asked agents to send a message to his friend Enzo who was supposed to meet WEEKS in West Palm Beach in the evening. S/A CIS Jason Leighton provided S/A Helmstetter with a number for Enzo from the digital evidence seized from WEEKS of +39 366 4091068. WEEKS told agents that Enzo was from the Vatican. S/A Qaqish sent a message to Enzo that WEEKS would not be able to meet him.

4. Agents placed WEEKS' personal effects, which he had at the time of his arrest, in a sealed evidence bag. WEEKS, S/A Qaqish, and S/A Helmstetter initialed the bag where it was sealed. WEEKS agreed to have these items returned to his attorney at his court appearance.

5. At approximately 4:01 p.m., WEEKS consented to a search of his Facebook account, his email accounts (jobyweeks@gmail.com and jobyweeks@me.com), his cell phone (phone number 619-519-2208), his telegram account, his

WhatsApp account, and his Skype account. WEEKS told agents that these were all located on his phone which was seized earlier in the day pursuant to the Southern District of Florida search warrant. The Skype account is also on his laptop computer which was also seized. WEEKS consented to this via Form RCFL-105 (Rev. 1.1). WEEKS told agents that MATT GOETTSCHE sometimes deletes conversations and therefore he took screenshots of some of his conversation with GOETTSCHE to preserve the contents.

6. At approximately 4:38 p.m., WEEKS consented to a search of his rental car located at the West Palm Beach Marriott. WEEKS consented to this via Form 6884.

7. At approximately 5:30 p.m., WEEKS consented to a search of the Air B&B where he was staying to locate, seize, and image his 2FA (2 factor authentication) cell phone. The Air B&B was not rented in WEEKS' name but he told agents that the doors would most likely be unlocked. Agents discussed this with AUSA Aurora Fagan and received verbal approval to conduct this consent search through Acting SSA Scott Johnson. WEEKS would need to accompany agents to this search to confirm the location of the Air B&B as well as to identify the room where he was staying. WEEKS gave consent to agents via Form 6884.

8. At approximately 5:53 p.m., S/A Alisa Watkins, S/A Amjad Qaqish, S/A Jonathan Helmstetter, and WEEKS departed the IRS-CI office. The beginning mileage was 23,356. Acting SSA Scott Johnson was in a separate lead vehicle.

9. At approximately 6:13 p.m., S/As Watkins, Qaqish, and Helmstetter arrived with WEEKS at his Air B&B located at 195 Pershing Way in West Palm Beach, FL. The ending mileage was 23,361.7. Acting SSA Johnson arrived in his vehicle at the same time.

10. At approximately 6:22 p.m., upon arrival of local marked West Palm Beach PD, agents escorted WEEKS from the vehicle and approached the Air B&B. Upon inspection, the front doors and windows were open. West Palm Beach Police Officer Frank Nelli, West Palm Beach Police Officer Yanko Abreu, Acting SSA Johnson, and S/A Helmstetter cleared the house prior to escorting WEEKS inside. No one appeared to be home and the back doors were open. WEEKS told agents that they had been doing this because there was no air conditioning and the house smelled musty. WEEKS also told agents that no one would likely be home because they were attending the Tony Robbins event at the Convention Center until midnight. WEEKS led Acting SSA Johnson, S/A Qaqish, and S/A Helmstetter to the upstairs back left bedroom where he was staying. He identified the 2FA phone and provided it to agents. S/A Qaqish also located a SD card, S/N 9114ZVNL C3W2, which WEEKS also provided consent to search. WEEKS acknowledged this on the same Form 6884 and initialed next to the SD card serial number. While at the Air B&B, WEEKS asked agents to put his clothing in his bag for his friend to take. WEEKS requested that S/A Qaqish unplug his iPhone charger from the extension cord.

At that time, there was a small spark from an extension cord next to the bed. S/A Qaqish stepped on the spark and extinguished it. The extension cord appeared to have been previously damaged. WEEKS also asked agents to put his Maui Jim sunglasses, located in the kitchen, in his bag. WEEKS identified them in the kitchen and Acting SSA Johnson and S/A Qaqish placed the sunglasses in WEEKS' bag. Agents exited the Air B&B at approximately 6:41 p.m. and closed the outside door per WEEKS' instructions. Photographs were taken by S/A Qaqish prior to entry and after exit. Acting SSA Johnson took a video on his cell phone exiting the property as well. Agents then departed the Air B&B.

11. At approximately 6:56 p.m., agents arrived at the Palm Beach County Jail – Gun Club. The ending mileage for the vehicle was 23,365.6. At that time, WEEKS asked to call his wife however he did not recall her number. An attempt was made to call her at (808) 796-6694 however that was the wrong number. WEEKS then asked to call his mother at (303) 808-7882. WEEKS spoke with her on speaker phone with S/A Watkins, S/A Qaqish, and S/A Helmstetter via S/A Helmstetter's government cell phone.

12. While being processed at the Palm Beach County Jail, WEEKS was found to be in possession of a belt with a hidden pocket containing an undetermined amount of U.S. Currency. When asked why WEEKS did not tell agents about this, he said "no one asked." The belt and cash were put in evidence bags provided by the Palm Beach County Jail and sealed.

13. Agents transported the items located from the Air B&B and the Palm Beach County Jail back to the IRS-CI West Palm Beach office. It should be noted that the cell phone seized from the Air B&B had a case containing US currency, credit/debit cards, a Mexican National Electoral card and other miscellaneous cards. The items were photographed, placed in an evidence bag, and sealed. The sealed evidence bags from both the Air B&B and the Palm Beach County Jail were placed in the SSA safe at the IRS-CI West Palm Beach office.

14. S/A Qaqish and S/A Helmstetter proceeded to the West Palm Beach Marriott where WEEKS was arrested earlier in the day for the purposes of conducting the consent search of his rental vehicle. S/A Helmstetter was in possession of the evidence bag containing WEEKS' personal effects, including his rental car keys. It should be noted that the number written on the consent form was located on the back of the rental car key keychain but it did not match the license plate of the car. S/A Helmstetter photographed the vehicle prior to unlocking the car. The key fob opened the vehicle and a rental car receipt in WEEKS' name was located in the vehicle. It was photographed by S/A Helmstetter. No additional items were located in the rental vehicle. S/A Helmstetter locked the vehicle and photographed the vehicle after the consent search was completed.

15. The activity was concluded at approximately 8:30 p.m.

I prepared this memorandum on December 10, 2019, after refreshing my memory from notes made during and immediately after the activity with JOBADIAH WEEKS.

Jonathan Helmstetter
Special Agent

Amjad Qaqish
Special Agent

# EXHIBIT 3

Chain-of-Custody Form (Bag 1)

**Description:**
Government chain-of-custody documentation for one identified evidence container.

**Purpose:**
To document custodial handling of at least one referenced evidence bag.

# Transfer of Evidence
# Chain of Custody

Date Obtained: 12/10/19 Investigation Name: JOBADIAH WEEKS

Investigation Number: [redacted]

Source of Items: Arrest Warrant · JOBADIAH Weeks

List the item numbers on the attached inventory which are included in this Chain of Custody. OR: Briefly describe the property being transferred via this Chain of Custody.

Property in Sealed Evidence Bag, initialed by WEEKS
- One wedding band
- Two car key fobs + keychain
- Nametag lanyard
- Pen
- Chase Southwest Visa Card
- James Foster business card
- wristband
- US Currency

**Keep Original with Evidence**

| | | |
|---|---|---|
| From: (printed name) Jonathan Helmstetter | To: (printed name) Michael Galdys | Purposes: Transfer |
| From: (signature) [signature] | To: (signature) [signature] | Date: 12/11/19 |
| From: (printed name) Michael Galdys | To: (printed name) SCOTT JOHNSON | Purposes: Transfer |
| From: (signature) [signature] | To: (signature) [signature] | Date: 12/11/19 1300 |
| From: (printed name) | To: (printed name) | Purposes: |
| From: (signature) | To: (signature) | Date: |
| From: (printed name) | To: (printed name) | Purposes: |
| From: (signature) | To: (signature) | Date: |
| From: (printed name) | To: (printed name) | Purposes: |
| From: (signature) | To: (signature) | Date: |

# EXHIBIT 4

Denver Holding Inventory Documentation

**Description:**
Custodial intake documentation reflecting property recorded at the Denver Holding Office.

**Purpose:**
To document current inventory records within this District.

# SCHEDULE A

I. Items Removed by the IRS from 11627 West 74th Way, Arvada, Colorado, on December 10, 2019, and Apparently Stored in the Denver Holding Office.[1]

| ITEM # | DESCRIPTION | |
|---|---|---|
| 1B192 | (U) Item 104 | "20 Trillion Dollar" Silver (colored) piece. |
| 1B191 | (U) Item 103 | Ron Paul 1 oz copper (colored) coin. |
| 1B190 | (U) Item 102 | Approximately 80 collector quarter dollar coins. |
| 1B189 | (U) Item 101 | (3) NTR Metals 10oz silver (colored) bars. |
| 1B186 | (U) Item 98 | Approximately 22 gold (colored) coins. |
| 1B185 | (U) Item 97 | Approximately 150 dimes. |
| 1B184 | (U) Item 96 | Approximately 72 silver (colored) coins. |
| 1B180 | (U) Item 92 | (20) 1/10 gram gold (colored) certificates in collector cases. |
| 1B179 | (U) Item 91 | 20 cannisters containing approximately 500 silver (colored) coins in plastic case. |
| 1B177 | (U) Item 89 | Ethereum cold storage coin. |
| 1B176 | (U) Item 88 | Trezor Bitcoin wallet hardware. |
| 1B175 | (U) Item 87 | Ledger HW.1 wallet hardware(cryptocurrency) |
| 1B169 | (U) Item 81 | Cash $100.00 x 34 = $3,400, $50.00 x 20 = $1,000, $2.00 x 1 = $2.00, Coins $1.00 x 8 = 8.00 for a total of $4,410.00 in US Currency. |
| 1B166 | (U) Item 78 | 23 cannisters copper (colored) coins. |
| 1B165 | (U) Item 77 | (1) Academy silver (colored) bar, 10 troy oz. |
| 1B164 | (U) Item 76 | (1) NTR 10 troy oz silver (colored) bar. |
| 1B163 | (U) Item 75 | (1) d'Anconia 1oz copper (colored) coin. |
| 1B162 | (U) Item 74 | (1) Rob Gray 1oz copper (colored) coin. |
| 1B161 | (U) Item 73 | (1) AOCS approved 1oz copper (colored) coin. |
| 1B160 | (U) Item 72 | (1) Hunk Papa Lakota 1/2oz copper (colored) coin. |
| 1B158 | (U) Item 70 | (5) 1oz Silver (colored) coins. |
| 1B155 | (U) Item 67 | (1) pouch containing 2 pair gold (colored) earrings, (1) gold (colored) ring, (1) gold (colored) necklace. |
| 1B154 | (U) Item 66 | 1 pair earrings, (3) loose .156 carat diamonds. |

[1] See **Attachment A** (a PDF file provided by AUSA Jamie Hoxie to defense counsel); and, **Attachment B** (an Inventory Listing of All Items Seized at Search Warrant Site).

| | | |
|---|---|---|
| 1B151 | (U) Item 63 | 45 canisters containing approximately 889 silver (colored) coins. |
| 1 | Evidence Box 1 | Stock Certificates |
| 3 | Evidence Box 1 | Folder labeled "Blackchair" with documents in it; debit cards; handwritten notes on bitcoin. |
| 10 | Evidence Box 3 | Miscellaneous coins. |
| 11 | Evidence Box 3 | BTC cold storage coin. |
| 12 | Evidence Box 3 | Possible silver coins. |
| 13 | Evidence Box 4 | Box of coins. |
| 14 | Evidence Box 4 | Possible gold silver copper coins and bars. |
| 15 | Evidence Box 5 | Golden currency style bars. |
| 16 | Evidence Box 5 | Box of coins. |
| 17 | Evidence Box 6 | United States Currency |
| 18 | Evidence Box 6 | Possible silver/gold coins. |
| 19 | Evidence Box 6 | Possible silver coins. |
| 20 | Evidence Box 6 | Possible silver/gold coins. |

II. Items Seized by the IRS Incident to Arrest on or about December 10, 2019, in West Palm Beach, Florida.[2]

| **ITEM #** | **DESCRIPTION** |
|---|---|
| 1 | One wedding band. |
| 2 | United States Currency. |

[2] See **Attachment C** (a Transfer of Evidence and Chain of Custody form, dated December 10, 2019).

# EXHIBIT 5

Email Confirmation – Transfer to Denver Holding Office

**Description:**
Email correspondence from Douglas Fowler confirming internal system notation reflecting transport of seized materials to the Denver Holding Office.

**Purpose:**
To document confirmation of custodial transfer to Denver.

Gmail **Silence Weeks <silenceweeks1@gmail.com>**

---

## Follow-Up – Custodial Clarification re Seized Assets (December 10, 2019)

2 messages

---

**Silence Weeks** <silenceweeks1@gmail.com> Wed, Feb 11, 2026 at 1:33 PM
To: Douglas.fowler@usdoj.gov
Bcc: Brad Geyer <brad@formerfedsgroup.com>, Wim Jagtenberg <miwjagtenberg@gmail.com>

Dear Mr. Fowler,

Thank you again for speaking with me today regarding the assets seized on December 10, 2019.

As discussed, you indicated that the system reflects prior inquiries, that no assets remain recorded at the Tampa office, and that all seized assets were transmitted to the Denver Holding Office.

The Memorandum of Activity reflects transfer of four bags. I currently possess chain-of-custody documentation confirming receipt in Florida for one bag, which I have attached for ease of reconciliation. However, three additional bags referenced in the transfer documentation do not appear in the Denver Holding Office inventory records available to me.

To ensure accurate record reconciliation, could you please confirm:

1. The transfer date and receiving office for all four bags;
2. Any available transfer or intake documentation for the remaining three bags; and
3. The evidence or control numbers assigned upon receipt.

I am seeking only custodial clarification and documentation reconciliation at this stage.

Thank you for your assistance.

Respectfully,

Jobadiah Sinclair Weeks

---

**Chain of Custody FL.PDF**
1157K

---

**Silence Weeks** <silenceweeks1@gmail.com> Wed, Feb 18, 2026 at 1:17 PM
To: Douglas.fowler@usdoj.gov

Dear Mr. Fowler,

Thank you again for taking the time to speak with me yesterday regarding the assets seized on December 10, 2019.

For clarity of record, my understanding from our conversation is as follows:

- The system reflects prior inquiries;
- No assets remain recorded at the Tampa office;
- All seized assets were transmitted to the Denver Holding Office; and
- For information regarding transport documentation, the appropriate point of contact is the U.S. Marshals Service in West Palm Beach, as the arresting district.

Please let me know if any of the above does not accurately reflect your understanding.

I appreciate your assistance.

Respectfully,

Jobadiah Sinclair Weeks

[Quoted text hidden]

# EXHIBIT 6

Opinion & Order – District of New Jersey (Rule 41(g) Venue)

**Description:**
Judicial ruling addressing Rule 41(g) venue.

**Purpose:**
To document procedural history concerning the district of seizure.

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JOBADIAH SINCLAIR WEEKS,<br><br>Defendant. | Criminal Action No. 19-877<br><br>**AMENDED OPINION & ORDER**[1] |

**CECCHI, District Judge.**

Before the Court are numerous motions filed by pro se defendant Jobadiah Sinclair Weeks ("Weeks" or "Defendant"), including: a motion to dismiss and an amended motion to dismiss (ECF Nos. 396, 400), a second motion to dismiss count one of the indictment (ECF No. 451), a second motion to dismiss count two of the indictment (ECF No. 453), a motion to withdraw his plea of guilty (ECF No. 401), motions to compel discovery (ECF Nos. 402, 403, 406, 477), a motion to expedite a ruling on a motion to compel discovery (ECF No. 404), a motion to stay (ECF No. 430), a motion to withdraw the motion at ECF No. 396 (ECF No. 442), a motion for return of seized assets (ECF No. 446), a motion for leave to file supplemental memorandum (ECF No. 452), a motion to seal (ECF No. 466), a motion to compel "prompt ruling on limited disclosure relief" as described in ECF No. 448 (ECF No. 467), a motion to compel a ruling on the motion at ECF No. 446 (ECF No. 469), a motion to declare a continuance order invalid (ECF No. 482), letter requests to unseal Defendant's prior sealed filings (ECF No. 484, 489), and a motion to compel accounting of seized assets (ECF No. 486). The Government filed a letter and a brief in opposition

[1] This Amended Opinion and Order supersedes and replaces the Court's original Opinion and Order issued on October 8, 2025 (ECF No. 497).

to eight of Defendant's motions at ECF Nos. 396, 400, 401, 402, 403, 404, 406, and 407. *See* ECF Nos. 399, 417. Defendant filed two replies (ECF Nos. 420, 421) and numerous supplemental submissions (ECF No. 432, 441, 443, 471, 474, 475, 480, 481, 483, 485). The Court has considered the parties' submissions, and for the reasons expressed below, Defendant's motions are denied.

## I. BACKGROUND

On December 5, 2019, Defendant was charged in a two-count, multi-defendant Indictment with wire fraud conspiracy in violation of 18 U.S.C. § 1349 (Count One) and conspiracy to offer or sell unregistered securities in violation of 18 U.S.C. § 371 (Count Two). ECF No. 1. On November 5, 2020, Defendant was charged by Information with one count of tax evasion, in violation of 26 U.S.C. § 7201. ECF No 145.

The Indictment alleges that from 2014 through 2019, Defendant was a promoter for the BitClub Network ("BCN"), a scheme in which investors bought shares in "mining pools" that funded BCN's Bitcoin mining operations.[2] ECF No. 1 at 1–2, 12–13. BCN represented that investors would receive returns based on each pool's mining success. *Id.* at 13–14. Despite selling shares to investors, BCN did not file a registration statement to register shares of BCN with the U.S. Securities and Exchange Commission ("SEC"). *Id.* at 15. The Indictment further alleges that Defendant's role in the operation involved promoting the sale of BCN shares through materially false representations and promises, and conspiring to take money from investors in exchange for BCN membership and shares. *Id.* at 4, 16–17, 19–23. The Information asserts that Defendant earned approximately $18 million through his affiliation with BCN, but did not report those earnings on a U.S. Individual Income Tax Return, Form 1040 ("Form 1040") and took steps to

[2] "Mining" is the complex computer process by which new Bitcoin is produced. ECF No. 1 at 2.

avoid detection by U.S. law enforcement. ECF No. 145 at 2. Defendant ultimately failed to pay approximately $7 million in federal income taxes to the United States. *Id.*

On December 10, 2019, Defendant was arrested in Florida and was detained following a bail hearing in the Southern District of Florida. ECF No. 399 at 1. On February 14, 2020, Magistrate Judge Michael A. Hammer denied Defendant bail, and on March 30, 2020, denied Defendant's motion for temporary release. ECF Nos. 45, 48, 68, 79.

On November 5, 2020, Defendant waived his right to indictment on the tax evasion count (ECF No. 146) and entered a guilty plea to both Count Two of the Indictment and the one-count Information (ECF No. 149). The Government agreed to move for dismissal of Count One of the Indictment at the time of sentencing if Defendant fully complied with the plea agreement. ECF No. 417-1 at 11:1–4. At the plea hearing, the Court asked Defendant, who was counseled by his prior attorney, whether he understood that any false statements he makes during the hearing may be used against him in a prosecution for perjury. *Id.* at 13:1–4. Defendant confirmed his understanding. *Id.* at 13:5. After a lengthy colloquy confirming Defendant's understanding of the Plea Agreement and his rights, Defendant entered a plea of guilty:

> THE COURT: Why did you decide to enter the plea of guilty, because you're, in fact, guilty or for some other reason?
>
> THE DEFENDANT: Because I'm guilty.
>
> THE COURT: How do you plead to the charge, sir, or the charges rather: Guilty or not guilty?
>
> THE DEFENDANT: Guilty.

*Id.* at 42:7–13. Defendant further admitted, under oath, that he understood the essential elements of the crimes to which he pleaded guilty: conspiring to offer or sell unregistered securities and tax evasion. *Id.* at 22:12–24:12.

On November 6, 2020, Defendant was released on a $2 million bond secured by various property. ECF No. 153. Defendant was subjected to home incarceration with electronic monitoring, restricted travel, and was directed to provide a full accounting of all financial holdings, including domestic and foreign bank accounts, and any and all cryptocurrency holdings. ECF No. 399 at 2. The Government consented to Defendant's release. *Id.* On March 19, 2021, the conditions of Defendant's release were modified from home incarceration to home detention to allow Defendant to seek employment. ECF No. 189. However, on August 6, 2021, the Government moved to revoke Defendant's bail based on Weeks' promotion of certain unregistered securities. ECF No. 399 at 2. In lieu of revocation, the parties agreed to modified bail conditions, which included several restrictions such as revoking Defendant's possession of a smart phone and limiting Defendant's internet communications. *Id.*; ECF No. 220.

On February 22, 2024, Pre-Trial Services petitioned for a violation of Defendant's supervised release based on unauthorized travel, use of electronic devices, and unauthorized financial transactions. ECF No. 320. Defendant also moved to relax the conditions of his release. ECF No. 317. Judge Hammer denied the request for revocation and Defendant's motion to relax the conditions, and imposed more restrictive modifications to the conditions of release based on his conclusion that Defendant violated the prior conditions. ECF No. 331; ECF No. 370 at 14:11–21:17.

On February 5, 2025, Judge Hammer held a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), at which Defendant moved to proceed pro se. ECF No. 393. Judge Hammer granted Defendant's motion, and Defendant's counsel were terminated from the case. ECF Nos. 393, 394. On February 10, 2025, the Court appointed stand-by counsel to assist Defendant. ECF No. 395.

On May 20, 2025, Judge Hammer held another bail violation hearing in response to the Government's motion to revoke bail and numerous submissions by Defendant seeking to relax the conditions of his release. ECF No. 447 at 5:2–10. Judge Hammer found that Defendant violated the conditions by using an internet-connected device to solicit investments in an investment fund through the Signal app under an alias. *Id.* at 35:11–44:1. Accordingly, Judge Hammer denied Defendant's requests and reinforced his release conditions. *Id.* at 48:15–49:12.

Since the hearing on February 5, 2025, Defendant has submitted twenty-one motions before this Court, in addition to several motions to modify the conditions of his release. Defendant has also filed over a dozen letters and supplemental submissions. The Court notes that several of Defendant's motions are repetitive and/or seek to amend or supplement prior submissions. Nonetheless, the Court has reviewed all of Defendant's submissions.

## II. DISCUSSION

The Court turns first to Defendant's motion to withdraw his guilty plea. As discussed in detail below, Defendant's motion to withdraw his guilty plea is denied, which consequently renders most of his other motions moot.

### A. Motion to Withdraw Guilty Plea

A defendant may withdraw his guilty plea after the Court has accepted his plea if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R Crim. P. 11(d)(2)(B). There is no absolute right to withdraw a guilty plea, *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001), and the defendant bears a "substantial burden" of showing a fair and just reason for withdrawing a plea, *United States v. King*, 604 F.3d 125, 139 (3d Cir. 2010). To determine whether a defendant has made this showing, the Court considers whether: "(1) the defendant asserts his innocence; (2) the defendant proffered strong reasons justifying the

withdrawal; and (3) the government would be prejudiced by the withdrawal." *United States v. Napper*, 767 F. App'x 271, 273 (3d Cir. 2019) (quoting *United States v. Siddons*, 660 F.3d 699, 703 (3d Cir. 2011)).

**1. Innocence**

To satisfy the first factor, Defendant must make a credible showing of innocence supported by a factual record. *U.S. v. Ho-Man Lee*, 664 F. App'x 126, 128 (3d Cir. 2016). In his motion to withdraw his guilty plea, and in his supplemental submissions in support of his motion, Defendant appears to make five arguments in support of his innocence: (1) he is not guilty of trading unregistered securities because Bitcoin and Bitcoin mining equipment are not securities, and shares purchased with Bitcoin are not securities; (2) Defendant did not have notice that the charged activities were securities transactions; (3) Defendant is not aware of any victims of his conduct; (4) BCN is a private membership association, not a company, and so the Government has no authority over it; and (5) Defendant was living abroad at the time of alleged tax evasion, and so he was not required to pay taxes.

First, Defendant argues that he is not guilty of conspiring to trade unregistered securities because "computer equipment" and "Bitcoin" are not securities. ECF No. 401 at 42–47. However, Defendant is not charged with conspiring to trade computer equipment or Bitcoin; he is charged with, and pleaded guilty to, conspiring to promote and sell shares in BCN mining pools. ECF No. 1 at 12, 18–20 (Weeks explaining in promotion video that "whatever the mine finds each day is evenly disbursed in a daily dividend to our shareholders"); ECF No. 417-1 at 36:17–19 (THE GOVERNMENT: "Do you agree that these [BCN] shares were, in fact, securities?" THE DEFENDANT: "Yes."); ECF No. 417-1 at 36:24–37:2 (THE GOVERNMENT: "Did you also

take money from investors as an investment for shares of mining pools that [BCN] purported to own and operate?" THE DEFENDANT: "Yes.").

BCN shares are securities as defined by 15 U.S.C. § 77b(a)(1) and *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946) (the "*Howey* test"). *See* ECF No. 1 at 15 ("Shares in BCN were 'securities' as that term is defined by Title 15, United States Code, Section 11b(a)(1)"); *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301 (1946) (holding that an investment contract qualifies as a security if it meets four requirements: (i) an investment of money; (ii) in a common enterprise; and (iii) an expectation of profits; (iv) to be derived solely from the efforts of individuals other than the investor). Courts have found that investments in Bitcoin-mining programs are securities under the *Howey* test. *See SEC v. Teshuater, LLC*, No. 20-01187, 2024 WL 1348432, at *4–5 (S.D. Tex. Mar. 29, 2024) (holding that investments in a Bitcoin-mining program are securities); *SEC v. Shavers*, No. 13-416, 2014 WL 12622292, at *7 (E.D. Tex. Aug. 26, 2014) (same). This Court agrees. BCN shareholders (i) invested money; (ii) in a common enterprise (BCN) in which BCN funded its mining operations with shareholders' investments; (iii) shareholders had a reasonable expectation of profits based on the representations of BCN; (iv) to be derived solely from the efforts of the BCN mining program. *See Howey*, 328 U.S. at 301; *Teshuater*, 2024 WL 1348432, at *4; ECF No. 1 at 12–14.

Defendant also appears to argue that BCN shares are not securities because investors bought shares in exchange for Bitcoin, not money, and so there was no "investment of money," as the *Howey* test requires. ECF No. 401 at 37 ("[BCN] didn't use money."); *Howey*, 328 U.S. at 301 ("The test is whether the scheme involves an *investment of money* in a common enterprise with profits to come solely from the efforts of others.") (emphasis added). However, "it is well established that cash is not the only form of contribution or investment that will create an

investment contract." *See Uselton v. Com. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991); *see also Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979) (holding that the investment of money prong is satisfied when an investor "[chooses] to give up a specific consideration in return for a separable financial interest with the characteristics of a security"). Courts have found that an investment of Bitcoin, rather than money, satisfies the "investment of money" prong of the *Howey* test. *See Shavers*, 2014 WL 12622292, at *6 (finding that an investment of Bitcoin constitutes an "investment of money" under *Howey*); *In re BitConnect Sec. Litig.*, No. 18-80086, 2019 WL 9104318, at *7 (S.D. Fla. Aug. 23, 2019) (same). This Court agrees, and finds that shares of BCN are securities even if investors purchased them with Bitcoin.

Second, Defendant contends that he had no "clear advance notice" that his conduct was illegal, because Count Two of the Indictment was "based on interpretations of federal securities law that did not exist at the time of the alleged conduct." ECF No. 471 at 1. Defendant argues that "[n]o federal agency had issued formal rules, notices, or policy statements applying securities registration requirements to cooperative mining pools." ECF No. 452 at 3. This position fails for two reasons. First, as discussed in detail above, Defendant was not indicted based on a novel theory of securities law; he was charged with conspiring to offer and sell unregistered shares of BCN, which are securities as defined by 15 U.S.C. § 77b(a)(1) and the *Howey* test, established in 1946. *See Howey*, 328 U.S. at 301; *Teshuater*, 2024 WL 1348432, at *4; *Shavers*, 2014 WL 12622292, at *7.

Moreover, Defendant's sworn testimony shows that he knew he was violating the law at the time of his conduct. Defendant agreed, under oath, that (1) he "[took] money from investors as an investment for shares of mining pools that [BCN] purported to own and operate;" (2) that "[BCN] shares were, in fact, securities;" (3) that BCN did not "file a registration statement with

the U.S. Securities and Exchange Commission;" (4) that he "encourage[d] U.S. investors to utilize a virtual private network, or 'VPN,' to obscure their true US-based IP addresses" so that he "could avoid detection and regulation by U.S. law enforcement;" and (5) that he "*knew at the time [he] and others were selling these shares that the sale of those shares was wrongful*;" ECF No. 417-1 at 36:4–39:6 (emphasis added). Defendant, thus, testified that his acts satisfied the criminal elements of conspiracy to offer and sell unregistered securities, including that he knew his conduct was unlawful at the time it occurred.[3] ECF No. 417-1 at 23:7–24:8; 39:3–6. Given that Defendant has not presented any evidence to convince the Court that his testimony was untruthful, Defendant's argument that he had no notice of the illegality of his conduct is unavailing.

Third, Defendant contends that he is innocent of Count Two because he is "not aware of anyone [he has] ever harmed in the context of [BCN]." ECF No. 401 at 24; *see also* ECF No. 421 at 23–25. However, Section 5 liability does not hinge on proof of harm, loss, or victimization—the mere willful offer or sale of unregistered securities is sufficient. *See* 15 U.S.C. § 77e, 77x. Section 5 of the Securities Act makes it "unlawful for any person, directly or indirectly, to make use of . . . interstate commerce . . . to offer to sell . . . any security, unless a registration has been filed as to such security." 15 U.S.C. § 77e. Section 77x makes it a criminal offense to "willfully violate" section 77e. 15 U.S.C. § 77x ("Any person who willfully violates any of the provisions

---

[3] The elements of Count Two's underlying violation of 15 U.S.C. §§ 77e, 77x are:

(1) "the securities which the Defendant sold were not registered with the Securities and Exchange Commission;"
(2) "the securities sold were required to be registered with the Securities and Exchange Commission; that is, the transactions were not exempt from registration;"
(3) "knowing that the securities were not registered and not exempt, . . . the Defendant willfully sold them or caused them to be sold to the public;" and
(4) "the Defendant used or caused to be used the mails or the means and instrumentalities of interstate commerce to sell the securities."

ECF No. 417-1 at 23:7–20; *see also* 15 U.S.C. §§ 77e, 77x.

of this subchapter . . . shall upon conviction be fined not more than $10,000 or imprisoned not more than five years, or both."). Neither provision makes harm an element of criminal liability. Accordingly, whether Defendant's conduct caused harm to any victims is irrelevant to his innocence.

Fourth, Defendant argues that BCN "was a Private Membership Association (PMA) that handles its own legal affairs and doesn't burden this court," and that the "SEC/Government has no right to dictate what private membership organizations do with private men and women." ECF No. 401 at 42. Defendant cites no legal authority that supports this assertion. Indeed, "it is immaterial whether a person consents to federal law; the laws of the United States apply to all persons within its border." *United States v. Reilly*, No. 15-196, 2016 WL 7335680, at *1 (W.D. Pa. Dec. 16, 2016) (quoting *United States v. James*, 328 F.3d 953, 954 (7th Cir. 2003)) (internal quotation marks omitted).

Fifth, Defendant argues that he is not guilty of tax evasion because he "was living abroad at the time of the alleged offense and situated as a nonresident alien and NOT a civil statutory citizen." ECF No 401 at 19, 30. He also asserts that it is "against the constitution to force Americans to file" taxes. *Id.* at 34. But Defendant stated in his plea colloquy that he is a U.S. citizen and the Information states that Defendant was a resident of Colorado at the time of the charged conduct, and Defendant provides the Court with no evidence to presume otherwise. *See* ECF No. 417-1 at 32:17–19; ECF No 145 at 1. Additionally, at the plea colloquy, Defendant agreed that he "willfully attempt[ed] to evade and defeat income taxes due and owing by you to the United States of America for the calendar years 2015, 2016, 2017, and 2018." ECF No. 417-1 at 39:7–12. Furthermore, "[t]he collection of income tax has long been deemed constitutional and arguments to the contrary will not succeed." *Johnson v. N.J., Div. of Motor Vehicles*, 134 F.

App'x 507, 509 (3d Cir. 2005) (citing U.S. Const. art. I, § 8; U.S. Const. amend XVI). For these reasons, Defendant fails to make a credible showing of innocence supported by a factual record.

**2. Justification for Withdrawal**

To satisfy the second factor, Defendant must provide "strong reasons" to justify a withdrawal of a "solemn admission" of guilt. *King*, 604 F.3d at 139; *Ho-Man-Lee*, 664 F App'x at 128. "A shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." *Brown*, 250 F.3d at 815. Defendant makes numerous arguments in support of his plea withdrawal: (1) the Court does not have jurisdiction over Defendant; (2) Defendant's plea was compelled under duress; (3) Defendant's counsel "defrauded" him and denied him meaningful access to discovery; (4) there is insufficient evidence to prove Defendant's guilt; (5) the Government and the court system are corrupt; (6) Defendant pleaded guilty under the assumption that his seized assets would be preserved, but they were not; (7) Defendant was selectively prosecuted, as other BCN members who were allegedly equally culpable were not prosecuted; (8) the Government allegedly violated *Brady* and *Giglio*; and (9) the Government violated policies promulgated by the Department of Justice ("DOJ").

First, Defendant repeatedly contends that the Court does not have jurisdiction over him because he is a "living man" named "Jobadiah-Sinclair of the family Weeks," and is not the Defendant, who is purportedly a "commercial vessel" called "JOBADIAH SINCLAIR WEEKS." ECF No. 401 at 60–61. Defendant stated he "made a mistake by autographing 'Jobadiah Weeks' in the stead of a person listed on the document by the name of JOBADIAH SINCLAIR WEEKS who he was/is not." *Id.* at 15, 25, 34–35, 51–52, 60–61. Defendant has not articulated any basis for this contention under the United States Constitution, any federal statute, case law, the Federal

Rules of Criminal Procedure, or any other binding legal authority. Courts are familiar with arguments that the court lacks jurisdiction over an individual because he is not the defendant, but is instead the "living man," and routinely find them to be meritless and "patently frivolous." *United States v. Burris*, 231 F. App'x 281, 282 (4th Cir. 2007); *see also United States v. Wiggins*, No. 21-630, 2023 WL 8876074, at *5 (D.N.J. Dec. 22, 2023); *Murakush Caliphate of Amexem Inc. v. New Jersey*, 790 F. Supp. 2d 241, 245 (D.N.J. 2011) (rejecting arguments that "live persons . . . hold 'estates' in the form of actual physical bodies"). Therefore, to the extent Defendant's submissions are understood as a challenge to this Court's jurisdiction over him, they are rejected.

Second, Defendant states that his "plea statement was compelled under illegal threat, duress, and coercion through kidnapping [and] false allegations of securities violations," and that he pleaded guilty "so that [he] could get bail." ECF No. 401 at 15–16. For these reasons, Defendant contends that his plea was "a deliberate lie under illegal duress." *Id.* at 16. However, Defendant does not point to a single instance of intimidation, threat, duress, or coercion. Instead, Defendant appears to argue that he pleaded guilty only so that he would be released from federal confinement, which he characterized as "torture." *See id.* at 17, 20, 22–23. Courts recognize that "[w]hile time in a prison is certainly not pleasant, it does not provide defendant a credible basis to withdraw a guilty plea." *United States v. Levin*, No. 19-728, 2022 WL 17811394, at *3 (E.D. Pa. Dec. 19, 2022). To the extent Defendant argues that his plea was coerced by fear of further punishment, "[i]t is well-settled that a guilty plea is not coerced when a defendant is motivated by avoiding the possibility that he will be convicted at trial and face a higher authorized penalty." *United States v. Valerio*, 541 F. App'x 174, 177 (3d Cir. 2013) (citing *Brady v. United States*, 397 U.S. 742, 750–51 (1970). Furthermore, Defendant testified under oath that he signed the Plea

Agreement free of inducement or duress, and has made no argument to convince the Court otherwise:

> THE COURT: Other than the representations which may be set forth in the Plea Agreement and in court today, did anyone offer you any inducement or make any promise to you in order to get you to sign the document?
>
> THE DEFENDANT: No.
>
> . . .
>
> THE COURT: Did anyone physically threaten you, verbally threaten you or threaten you in any way in order to have you sign the Plea Agreement and enter a plea of guilty?
>
> THE DEFENDANT: No.
>
> THE COURT: Did you sign the document voluntarily?
>
> THE DEFENDANT: I did.

ECF No. 417-1 at 17:10–14; 18:1–6. The Court finds that Defendant testified truthfully at his guilty plea hearing, that no one threatened him or induced him to plead guilty, and that his guilty plea was made of his own free will.

Third, Defendant asserts that his lawyers "defrauded" him, because they acted as "'plea bargaining specialists' to avoid the REAL work of a trial." ECF No. 401 at 18. However, Defendant does not explain how his lawyers "defrauded" him, and "a lawyer's recommendation that his client accept a guilty plea is not, on its own, improper compulsion." *Brooking v. McGinley*, No. 21-2239, 2024 WL 3237152, at *3 (E.D. Pa. June 28, 2024). Defendant also contends that counsel never granted him meaningful access to discovery before entering his plea, and so his plea was not informed. *See* ECF No. 488. But Defendant "has not shown that his argument . . . —that he wasn't timely given access to discovery by counsel which would have changed his plea decision—amounts to anything more than a 'shift in defense tactics' or 'a change of mind,' which we have held 'are not adequate' to support a motion to withdraw a guilty plea." *United States v. Hill-Johnson*, 806 F. App'x 114, 118 (3d Cir. 2020). "Moreover, even if [Defendant] was not

personally provided with discovery, he is not entitled to withdraw his guilty plea on this basis." *United States v. Parsons*, No. 13-0104, 2015 WL 857313, at *15 (E.D. Pa. Feb. 27, 2015). Furthermore, at his plea hearing, Defendant testified:

> THE COURT: Do you have any questions or concerns which you feel your attorney has not satisfactorily answered?
>
> THE DEFENDANT: No.
>
> THE COURT: Are you satisfied with your attorney's representation?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Is the decision to enter a plea of guilty your decision or is it your attorney's decision?
>
> THE DEFENDANT: It's my decision.

ECF No. 417-1 at 19:25–20:4. Accordingly, the record does not demonstrate that Defendant's lawyers "defrauded" Defendant, compelled Defendant's guilty plea, or failed to meaningfully review and provide Defendant with discovery such that withdrawal is warranted.

Fourth, Defendant argues that "[n]o evidence has been presented that demonstrates causal connection between any act or omission of the [Defendant] that directly caused any of the alleged damages to the [BCN] members." ECF No 401 at 13, 29. This argument is an impermissible basis for withdrawing a guilty plea because it appears to be a "shift in defense tactics" or "a change of mind." *Brown*, 250 F.3d at 815. Defendant had the right to go to trial if he believed the Government had "no evidence" of his guilt, but he waived that right under oath:

> THE COURT: Do you understand that you have the right to a trial by a jury, or by a court without a jury, and you would be presumed innocent until proven guilty beyond a reasonable doubt, and by entering this plea of guilty you are giving up that right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you understand that at trial the Government is required to prove each and every element of the crimes charged beyond a reasonable doubt, and that by entering this plea of guilty you are giving up that right?
>
> THE DEFENDANT: Yes.

ECF No. 417-1 at 33:19–34:3. Defendant further states, in one of his reply briefs, that "new evidence undermines the plea's factual basis." ECF No. 421 at 9. However, Defendant does not cite to or detail any "new evidence" uncovered after his plea hearing. Therefore, the Court cannot permit Defendant to withdraw his guilty plea based on a conclusory assertion that there is new evidence. *See, e.g.*, *United States v. Kwasnik*, 55 F.4th 212, 217 (3d Cir. 2022) (affirming district court's denial of motion to withdraw guilty plea because, *inter alia*, defendant failed to demonstrate that new evidence rebutted facts to which defendant testified at plea hearing).

Fifth, Defendant makes a number of unsubstantiated claims that the prosecutors, judges, and other government officials involved in his case have engaged in "massive corruption" and are "the actual criminals." *See* ECF No. 401 at 23–24, 30–31, 37–39, 41, 45–46, 49–51, 59, 67–68, 75–76. Defendant provides no evidence or credible argument to support these contentions, and "generalized, unsupported allegations about corruption of the legal profession or the courts will not do." *Courboin v. Scott*, No. 15-2639, 2016 WL 852782, at *6 (D.N.J. Mar. 3, 2016). Defendant mentions one instance of what he describes as "malicious intent," in which the Government returned Defendant's passport to him after he was released on bail after entering his guilty plea, which he implies was an attempt to "entice" him to violate bail and flee with the passport. ECF No. 401 at 23. Similarly, Defendant points to the Government's attempts to revoke his bail as evidence of contempt for him. *Id.* Even if the Court accepted these allegations as evidence of "contempt" against Defendant, Defendant does not demonstrate why the Government's described conduct warrants a withdrawal of his guilty plea.

Sixth, Defendant argues that he pleaded guilty under the assumption that his seized assets would be preserved, but they allegedly were not. However, Defendant identifies no provision in the Plea Agreement or statement in the plea colloquy that guarantees the return of his seized assets

as part of his guilty plea. And when asked whether "anyone offer[ed] [him] any inducement or [made] any promise to [him] in order to get [him] to sign the document," other than "the representations which may be set forth in the Plea Agreement and in court today," Defendant answered, "no." ECF No. 417-1 at 17:10–14. Defendant affirmed under oath that he was not relying on any representations beyond those contained in the plea agreement or made in court at the plea hearing, and he offers no basis to suggest that this statement was the product of coercion. Additionally, Defendant attested that he was pleading guilty because he is guilty, not because his assets would be returned to him:

> MR. TORNTORE: Are you pleading guilty to Count 2 of the Indictment because you are, in fact, guilty of the charged offense?
>
> THE DEFENDANT: Yes.
>
> . . .
>
> MR. TORNTORE: And are you pleading guilty to Count 1 of the Information because you are, in fact, guilty of tax evasion?
>
> THE DEFENDANT: Yes.

*Id.* at 39:3–6; 40:20–23.

Seventh, Defendant argues that the Government "left over a million [BCN] members, like me, out of the prosecution's conspiracy theory" and that those "members were doing exactly what I was doing at the time of the . . . indictment." ECF No. 401 at 22. "The Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985). However, selectivity in the enforcement of criminal laws is impermissible when based upon an "unjustifiable standard, such as race, religion, or some other arbitrary factor." *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012). Here, Defendant does not identify any unjustifiable standard on which the Government based his prosecution. He merely states that millions of other BCN members were engaged in the same conduct as him, but does not allege that the Government

singled him out for any arbitrary reason. ECF No. 401 at 22. "The mere fact that one person is prosecuted for a crime while another is not does not support a claim of selective prosecution." *Noel Pane v. Town of Greenburgh*, No. 07-3216, 2012 WL 12887036, at *18 (S.D.N.Y. Jan. 10, 2012), *aff'd sub nom. Pane v. Gramaglia*, 509 F. App'x 101 (2d Cir. 2013); *accord United States v. Johnson*, 94 F. App'x 964, 966 (3d Cir. 2004).

Moreover, even if Defendant had offered evidence of selective prosecution on unjustifiable grounds—which he has not—he has failed to show that this information was unavailable to him prior to the entry of his plea. Accordingly, even assuming selective prosecution occurred, Defendant has not demonstrated that awareness of it would have altered his decision to plead guilty. *See Mathis v. United States*, No. 20-8951, 2021 WL 1783285, at *4 (D.N.J. May 5, 2021) (finding that Defendant did not establish how the factors presented would have altered his decision to plead guilty).

Eighth, Defendant raises, for the first time in his reply brief, that the government withheld material exculpatory evidence in violation of *Brady* and *Giglio*. ECF No. 421 at 4. One "withheld" item Defendant refers to is "the October 8, 2020 Grand Jury Evaluation Memorandum," which allegedly "contains key factual assessments and characterizations relevant to discovery, plea considerations, and prosecutorial framing, was not available to the defense at the time of plea signing." *Id.* at 6. Defendant contends that "[i]ts creation after the agreement but before the formal plea hearing suggests a strategic delay in material production [and] deprived Defendant of material evidence necessary to assess the merits and fairness of the plea." *Id.* Defendant also points to "Suspicious Activity Reports (SARs), Memoranda of Interview (MOIs) from April and December 2019, [and] the December 2019 Crypto Seizure Memo," which were allegedly not disclosed until years after the plea agreement was signed. *Id.* at 8. Lastly, Defendant states that he was never

provided documentation of an August 12, 2020 proffer session, during which the Government claims Defendant admitted his knowledge of BCN's fraudulent activities. *Id.* at 11.

As an initial matter, to the extent Defendant argues that he was entitled to government work product—for example, "plea considerations and prosecutorial framing"—a criminal defendant "may not examine Government work product in connection with his case." *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 257 (3d Cir. 2005) (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)). But in any event, Defendant provides no elaboration as to what each of the purported documents contain, how they are material to his guilt and favorable to his defense, why he did not have access to the information contained in the documents prior to his plea, or how the documents would have altered his plea entry. Instead, Defendant provides vague descriptions of the importance of the documents, such as describing documents as "central to discovery and plea evaluation," "significan[t]," "critical," and "indispensable." *Id.* at 10, 14–15. And even if Defendant did not receive these materials before entering his guilty plea, his submissions provide no indication that they constitute *Brady* or *Giglio* material. Without more, the Court cannot determine that Defendant's lack of access to these documents before signing his plea agreement is a "strong reason[]" to justify a withdrawal of a "solemn admission" of guilt. *King*, 604 F.3d at 139; *Ho-Man-Lee*, 664 F. App'x at 128.

Ninth, and lastly, Defendant argues that his prosecution violates an April 7, 2025 enforcement memorandum issued by the DOJ, which he believes "makes clear that digital asset cases should be pursued only when involving identifiable harm or criminal misuse." ECF No. 421 at 17, 28–29. The memorandum to which Defendant refers is an intra-office memorandum addressed to all DOJ employees from the Deputy Attorney General that outlines enforcement priorities. *See* ECF No. 421 at Ex. C. Setting aside that this memorandum was issued years after

Defendant's guilty plea, intra-office memorandums of this kind "are not binding authority." *Ralda v. Att'y Gen. of U.S.*, 441 F. App'x 101, 104 n.4 (3d Cir. 2011) (holding that internal documents like a U.S. Citizenship and Immigration Services memorandum directed to asylum officers are not binding authority); *Mercy Cath. Med. Ctr. v. Thompson*, 380 F.3d 142, 154 (3d Cir. 2004) ("Agency statements contained in opinion letters, policy statements, agency manuals, and enforcement guidelines lack the force of law."). Therefore, the cited DOJ memorandum does not justify a withdrawal of Defendant's guilty plea.

For these reasons, Defendant has not shown "strong reasons" to justify a withdrawal of a "solemn admission" of guilt. *King*, 604 F.3d at 139; *Ho-Man-Lee*, 664 F App'x at 128.

**3. Government Prejudice**

The third prong involves whether the plea withdrawal would prejudice the Government. "[I]f the defendant fails the first two prongs of the test for withdrawal of a guilty plea, there is no need to consider the third, prejudice to the Government." *United States v. Carroll*, 179 F. App'x 128, 132 (3d Cir. 2006). Defendant has not met his burden on the first two prongs of the three-pronged test to determine if there is a fair and just reason for withdrawing his guilty plea. Therefore, the Court need not consider the third prong. Nonetheless, withdrawal of a plea "almost invariably prejudices the government to some extent and wastes judicial resources." *United States v. Hough*, No. 02-649, 2010 WL 5250996, at *3 (D.N.J. Dec. 17, 2010). And here, prejudice would be particularly extreme, given that the Government would be required to mount a criminal trial nearly six years after the Indictment was lodged, and nearly five years after Defendant's guilty plea was entered. *See* ECF Nos. 1, 149; *see also Doe v. United States*, 112 F. Supp. 2d 398, 407 (D.N.J. 2000) (holding that "that the government would probably suffer prejudice by having to try

petitioner over four years after he was indicted"). Accordingly, the Court finds that a plea withdrawal would prejudice the Government.

Given that the balance on each prong weighs decisively against Defendant, and the Court has found his arguments unpersuasive, Defendant's motion to withdraw his guilty plea is denied.

**B. The Forfeiture Motions**

Defendant has filed several motions seeking the return and accounting of his seized assets, including cryptocurrency, cash, and other physical personal property. *See* ECF Nos. 446, 448,[4] 486. Defendant brings these motions under Rule 41(g) of the Federal Rules of Criminal Procedure. *See id.* Rule 41(g) provides that a motion to return property "must be filed in the district where the property was seized." Fed. R. Crim. P. 41(g). As discussed below, Defendant's representations demonstrate that the property at issue was not seized in the District of New Jersey, and so his motion to return property seized outside of this district is denied.

Defendant states that on December 10, 2019, federal agents executed a search warrant at two locations—West Palm Beach, Florida, and Arvada, Colorado—and seized cryptocurrency held in wallets and hardware devices, precious metals, cash, stock certificates, business records, computers, phones, and digital storage devices. ECF No. 446 at 1; ECF No. 448 at 2. Defendant also notes that cash was seized directly from his person during his arrest at the Palm Beach County Jail in Florida. *Id.* Defendant does not assert than any of his property was seized within the District of New Jersey, and in fact, his motions indicate that the forfeitures occurred in Colorado and Florida. Therefore, Defendant's motions (ECF Nos. 446, 486) are denied. *See United States v. Payne*, No. 04-299-08, 2010 WL 11652392, at *2 (W.D. Pa. May 3, 2010) (denying motion to

[4] ECF No. 448 is not a pending motion. Rather, it was filed as a "supplemental notice of post-filing discrepancies and request for judicial relief." ECF No. 448. The Court incorporates its content and requests for relief in ECF Nos. 446 and 486.

return property filed in Western District of Pennsylvania because property at issue was not seized in that district); *United States v. Thomas*, No. 06-299, 2015 WL 13448019, at *2 (W.D. Pa. Sept. 8, 2015) (denying motion to return property filed in Western District of Pennsylvania because property was seized in the Northern District of Georgia). Additionally, Defendant's motions to compel a ruling on the motion to return property at ECF No. 446 (ECF Nos. 467, 469) are denied as moot, given the Court's instant decision denying the motion at ECF No. 446.

**C. The Continuance Motion**

Defendant filed a motion "to declare continuance order (DKT. 478) invalid as applied to Defendant Weeks." ECF No. 482. The Order for Continuance at ECF No. 478 was issued in response to a joint application of the United States and Defendant's co-defendant Matthew Brent Goettsche for an order granting a continuance of proceedings. *See* ECF No. 478. "[T]he [speedy trial] guarantee protects the accused from arrest or indictment through trial, but does not apply once a defendant has been found guilty at trial or has pleaded guilty to criminal charges." *Syed v. United States*, No. 15-5687, 2018 WL 3492151, at *5 (D.N.J. July 19, 2018) (quoting *Betterman v. Montana*, 578 U.S. 437, 439 (2016)). Here, Defendant has pleaded guilty to criminal charges, and for the reasons discussed above, the Court has denied his motion to withdraw his guilty plea. Accordingly, continuance orders, which exclude time from the speedy trial clock calculation, do not affect Defendant's case. Therefore, Defendant's motion to declare the continuance order invalid as to him is denied.

**D. Remaining Motions**

Defendant submitted several additional motions, including four motions to dismiss (ECF Nos. 396, 400, 451, 453), four motions to compel discovery (ECF Nos. 402, 403, 406, 477), a motion to expedite a decision on ECF No. 403 (ECF No. 404), a motion to stay the case (ECF No.

430), a motion to withdraw the motion at ECF No. 396 (ECF No. 442), a motion for leave to file supplemental memorandum on count two (ECF No. 452), a motion to seal (ECF No. 466), a motion to compel "prompt ruling on limited disclosure relief" (ECF No. 467), and a motion to compel a ruling on ECF No. 446 (ECF No. 469).

"[A] motion to dismiss an indictment cannot be lodged after the defendant has pled guilty." *United States v. Miller*, 197 F.3d 644, 647 (3d Cir. 1999); *United States v. Hoffman*, No. 17-80, 2025 WL 2581936, at *2 (D.N.J. Sept. 5, 2025) ("Since Defendant moved to dismiss the Indictment post-guilty plea, Defendant's Motion to Dismiss is untimely."). As discussed above, the Court has denied Defendant's motion to withdraw his guilty plea and has found that Defendant's testimony at his plea hearing was truthful. Furthermore, the Government has agreed to dismiss Count One of the Indictment at Defendant's sentencing. ECF No. 417-1 at 11:1–4. Accordingly, Defendant's motions to dismiss (ECF Nos. 396, 400, 451, 453) and motion for leave to file a supplemental memorandum for Defendant's motion to dismiss Count Two (ECF No. 452) are denied as moot. *See United States v. Tucker*, 511 F. App'x 166, 169 (3d Cir. 2013) (affirming district court's holding that motions to dismiss are moot after a guilty plea is entered). Defendant's motion to withdraw his motion to dismiss at ECF No. 396 (ECF No. 442) is also denied as moot because, as discussed, the Court has denied all of Defendant's motions to dismiss.

Likewise, Defendant's motions to compel discovery (ECF Nos. 402, 403, 406, 477) must also be denied as moot, because Defendant has pleaded guilty to the charges for which he seeks discovery. *See United States v. Harvey*, No. 12-113, 2014 WL 657595, at *1 n.1 (W.D. Pa. Feb. 20, 2014) (denying various pretrial motions as moot because defendant had pleaded guilty); *United States v. Robinson*, No. 05-443, 2007 WL 790013, at *12 (M.D. Pa. Mar. 14, 2007) (same). Given

that Defendant's motion to compel discovery at ECF No. 403 is denied, the motion to expedite a decision on ECF No. 403 (ECF No. 404) is likewise denied as moot.

Defendant's motion to stay or delay ruling on pending motions (ECF No. 430) is also denied as moot. Defendant requested that the Court defer its ruling on his pending motions until May 27, 2025, pending potential discussions with the Government. ECF No. 430 at 1. That date has passed, and Defendant informed the Court that the Government did not respond to his efforts to engage in discussions. *See* ECF No. 432, 445. Therefore, Defendant's motion at ECF No. 430 is denied as moot.

Lastly, Defendant has filed a motion to seal his filing at ECF No. 448. ECF No. 466. This motion appears to be superseded by Defendant's requests to unseal documents. *See* ECF Nos. 484, 489. Given the volume of submissions regarding sealing by Defendant, *see, e.g.*, ECF Nos. 448, 451, 452, 466, 467, 468, 484, 489, Defendant's position as to which documents should remain sealed is unclear to the Court. Accordingly, Defendant and the Government are directed to meet and confer and submit a joint letter stipulating which documents should be sealed or unsealed, or setting forth their respective positions on the issue. Defendant's motion to seal is administratively terminated pending receipt of the joint letter.

## III. CONCLUSION

For the aforementioned reasons, the Court hereby denies Defendant's pending motions.

Accordingly, IT IS on this 4th day of February, 2026:

**ORDERED** that Defendant's motions (ECF Nos. 396, 400, 401, 402, 403, 404, 406, 430, 442, 446, 451, 452, 453, 467, 469, 477, 482, 486) are **DENIED**; and it is further

**ORDERED** that the Government and Defendant shall submit a joint letter of no more than eight (8) pages, single-spaced, outlining any outstanding issues before the Court and/or among the

parties that must be resolved before sentencing. The joint letter shall also stipulate which documents should be sealed or unsealed, or set forth the parties' respective positions on the issue. The joint letter shall be submitted on or before October 31, 2025; and it is further

**ORDERED** that Defendant's motion to seal (ECF No. 466) is **ADMINISTRATIVELY TERMINATED** pending receipt of the parties' joint letter.

**SO ORDERED.**

*/s/ Claire C. Cecchi*
**CLAIRE C. CECCHI, U.S.D.J.**

# EXHIBIT 7

April 2, 2025 Email – AUSA Anthony Torntore

**Description:**
Government correspondence representing that seized assets would be returned.

**Purpose:**
To document Government correspondence regarding seized assets.

Gmail

Anthony.Torntore@usdoj.gov

Compose

Inbox 26
Starred
Snoozed
Sent
Drafts 17
More

Labels

33 of many

objection to exte...

**Torntore, Anthony (USANJ)** <Anthony.Torntore@usdoj.gov> Wed, Apr 2, 5:45 PM
to Ernesto, me

Received, thank you.

I also advised your standby counsel, cc'ed here, that I am working with the FBI/IRS agents in this matter to return personal property to you. We plan to provide that property to Mr. Cerimele who can arrange it's transfer to you.

Thanks,

Anthony P. Torntore
Chief, Cybercrime Unit
U.S. Attorney's Office, District of New Jersey
970 Broad Street, Newark, NJ 07102
Desk: 973.645.2726
Cell: 201.341.0398

---

**From:** Silence Weeks <silenceweeks1@gmail.com>
**Sent:** Wednesday, April 2, 2025 11:39 AM
**To:** Torntore, Anthony (USANJ) <Anthony.Torntore@usdoj.gov>
**Subject:** [EXTERNAL] Notice of Objection to Government's Extension Request – USA v. Goettsche, et al. (2:19-cr-00877)

# EXHIBIT 8

Reconciled Asset Overview

**Description:**
Cross-reference chart derived from Government-generated documentation comparing seizure records and custodial inventory records.

**Purpose:**
To facilitate reconciliation of custodial documentation.

# Exhibit 8 – Reconciled Asset Cross-Reference

(Derived Solely from Government Documentation)

| Item (Control / Item #) | Description (As Reflected in Government Records) | Where Referenced in Record |
|---|---|---|
| Seed Phrase Card #1 (handwritten) | Handwritten seed phrase card | Exhibit 4. |
| Seed Phrase Card #2 (handwritten) | Handwritten seed phrase card | Exhibit 4. |
| Exodus SD / .png seed image | SD card containing seed image | Exhibit 4. |
| Item 83 | 25 Silver-Colored "Bitcoin Coins" (~250) | Exhibit 4. |
| Item 89 (1B177) | Ethereum Cold Coin | Exhibit 4. |
| Control #21–22 | Indicia / Recovery Cards | Exhibit 4. |
| Apple MacBook Pro (Control #9, Colorado) | Laptop computer | Exhibit 4. |
| Control #5 | Western Digital MyBook | Exhibit 4. |
| Control #6 | Generic USB Thumbdrive | Exhibit 4. |
| Control #7 | SanDisk SD Card | Exhibit 4. |
| Control #8 | Huawei Cellphone | Exhibit 4. |
| Apple iPhone (Florida Seizure) | Cellular phone device | Exhibit 2. |
| Apple MacBook (Florida Seizure) | Laptop computer | Exhibit 2. |
| 2FA Phone (Florida – Seizure) | Authentication device | Exhibit 2. |
| SanDisk SD Card (Florida Seizure) | SD storage media | Exhibit 2. |
| Other Computers / Storage Boxes | Devices referenced in Control List / Schedule A | Exhibit 4. |

# EXHIBIT 9

Indictment – Forfeiture Allegations (Relevant Pages)

**Description:**
Portion of the Indictment containing forfeiture allegations.

**Purpose:**
To reflect the scope of forfeiture allegations.

**FORFEITURE ALLEGATION AS TO COUNT ONE**

1. As the result of committing the offense constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Count One of this Indictment, defendants

**MATTHEW BRENT GOETTSCHE,**
[redacted]
**JOBADIAH SINCLAIR WEEKS, and**
**SILVIU CATALIN BALACI,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the wire fraud conspiracy offense, and all property traceable thereto, including, but not limited to the Specific Property listed in Attachment A to this Indictment.

**Substitute Assets Provision**

2. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

A True Bill.

CRAIG CARPENITO
United States Attorney

## ATTACHMENT A

a. RBC Wealth Management account number [redacted]2600 in the name of Getch Holdings LLC;

b. RBC Wealth Management account number [redacted]4535 in the name of Getch Foundation;

c. RBC Wealth Management account number [redacted]0125 in the name of Getch Holdings LLC Construction Fund; and

d. Any and all ownership interest held in the name, on behalf or for the benefit of Matthew Goettsche, Gobit LLC and/or Getch 2021 LLC in the assets of any and all corporations, partnerships or other entities, and/or their subsidiaries, affiliates and joint ventures, including but not limited to:

   i. Orbesehc Industrial LLC

   ii. HIIT Health LLC

(collectively, the "Specific Property").

# EXHIBIT 10

Plea Agreement – Forfeiture Provisions (Relevant Pages)

**Description:**
Portion of the Plea Agreement containing forfeiture provisions.

**Purpose:**
To reflect the scope of forfeiture language.

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*Craig Carpenito*
*United States Attorney*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*

*(973) 645-2700*

September 21, 2020

**VIA EMAIL**
Simon A. Gaugush, Esq.
Michael L. Yaeger, Esq.
Corporate Center Three at International Plaza
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, Florida 33607-5780
SGaugush@carltonfields.com
MYaeger@carltonfields.com

Re: Plea Agreement with Jobadiah Sinclair Weeks
19-cr-877 (CCC)-03

Dear Counsel:

This letter sets forth the plea agreement between your client, Jobadiah Sinclair Weeks ("Weeks"), and the United States Attorney for the District of New Jersey ("this Office"). This Office's offer to enter into this plea agreement will expire on September 25, 2020 if it is not accepted in writing by that date.

Charges

Conditioned on the understandings specified below, this Office will accept a guilty plea from Weeks to: (a) Count Two of the Indictment, (Crim. No. 19-877), which charges Weeks with conspiring to offer and sell unregistered securities, contrary to Title 15, United States Code, Sections 77e and 77x, in violation of Title 18, United States Code, Section 371; and (b) an Information charging Weeks with one count of tax evasion, in violation of Title 26, United States Code, Section 7201. If Weeks enters a guilty plea to, and is sentenced on the above, charges, this Office will not initiate any further criminal charges against Weeks based upon (a) his involvement in the BitClub Network, as further detailed in the Indictment; or (b) his non-filing of taxes during the taxable periods 2015 through 2018. In addition, if Weeks fully complies with all of the terms of this agreement, at the time of sentencing in this matter, this Office will move to dismiss Count One of the Indictment against Weeks. Further, in the event that a guilty plea in this matter is not entered for any reason or the judgment of conviction entered as a result of this guilty plea does not remain in full force and effect, Weeks agrees that any dismissed charges and any other charges that are

not time-barred by the applicable statute of limitations on the date this agreement is signed by Weeks may be commenced against him, notwithstanding the expiration of the limitations period after Weeks signs the agreement.

Sentencing

The violation of 18 U.S.C. § 371 alleged in Count Two to which Weeks agrees to plead guilty carries a statutory maximum prison sentence of five years and a statutory maximum fine equal to the greatest of: (1) $250,000; (2) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (3) twice the gross amount of any pecuniary loss sustained by any victims of the offense.

The violation of 26 U.S.C. § 7201 charged in Count One of the Information to which Weeks agrees to plead guilty carries a statutory maximum prison sentence of 5 years imprisonment and a statutory maximum fine of not more than $100,000.

The sentence on each count may run consecutively. Fines imposed by the sentencing judge may be subject to the payment of interest.

The sentence to be imposed upon Weeks is within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act, 18 U.S.C. §§ 3551-3742, and the sentencing judge's consideration of the United States Sentencing Guidelines. The United States Sentencing Guidelines are advisory, not mandatory. The sentencing judge may impose any reasonable sentence up to and including the statutory maximum term of imprisonment and the maximum statutory fine. This Office cannot and does not make any representation or promise as to what guideline range may be found by the sentencing judge, or as to what sentence Weeks ultimately will receive.

Further, in addition to imposing any other penalty on Weeks, the sentencing judge: (1) pursuant to 18 U.S.C. § 3013, will order Weeks to pay an assessment of $100 per count ($200 total), which assessment must be paid by the date of sentencing; (2) with respect to both counts, must order Weeks to pay restitution pursuant to 18 U.S.C. § 3663 et seq.; (3) with respect to Count One of the Information, may order Weeks to pay the costs of prosecution and; (4) pursuant to 18 U.S.C. § 3583 may require Weeks to serve a term of supervised release for each count of conviction of not more than three years for Count Two of the Indictment and Count One of the Information, which terms will begin at the expiration of any term of imprisonment imposed. Should Weeks be placed on a term of supervised release and subsequently violate any of the conditions of supervised release before the expiration of its terms, Weeks may be sentenced to not more than two years' imprisonment on the supervised release for Count

# Exhibit 11.

March 22, 2024 Letter from Prior Counsel Regarding Return of Seized Assets

**Description:**
Correspondence from prior counsel to the Government requesting return of seized digital assets.

**Purpose:**
To document early notice and Government acknowledgment regarding return of seized property.

STONE MAGNANINI

COMPLEX LITIGATION

March 22, 2024

**VIA EMAIL**
AUSA Anthony Torntore
United States Attorney's Office
for the District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

David Hernandez
Senior U.S. Pretrial Services Officer
United States Pretrial Services Agency
District of New Jersey
50 Walnut Street, Room 1018
Newark, New Jersey 07102
David_Hernandez@njpt.uscourts.gov

Re: United States v. Jobadiah Weeks (19-cr-877-CCC)

Dear AUSA Torntore and Sr. PTS Officer Hernandez:

Yesterday the Court imposed certain conditions on Mr. Weeks's release and I made clear to Mr. Weeks that any violation would almost certainly result in his bail being revoked. The Court also set forth a process by which we should address any ambiguities, confusion or disagreement between the Government, Pretrial Services, and Mr. Weeks about those conditions. The Court explained that the process was to first disclose to the Government and Pretrial Services our interpretation of the conditions in light of what actions Mr. Weeks intends to take in order to determine whether the Government and Pretrial Services agree that the intended actions would not violate the release conditions. Should the parties not agree on whether the intended action would violate the release conditions, Mr. Weeks shall file a motion with the Court to resolve the dispute. We intend to follow that process.

Consistent with that, we have represented to the Government, Pretrial Services and the Court that Mr. Weeks needs to pay for usual and customary expenses, including the mortgage on the ranch where his wife and daughter reside. We also pointed out that the Government has seized all of Mr. Weeks' liquid assets, including cash, silver, coins, jewelry and other property. We also pointed out that the counts to which Mr. Weeks pleaded guilty to do not include forfeiture. As you know, we asked AUSA Jamie Hoxie for a return of such property almost six months ago.

We were told that the Government would be returning much of that property although it might take the position that some of that property would not be returned. At this point, no property has been returned and none of that property is available to Mr. Weeks to pay his ordinary expenses.

The government represented to the Court yesterday in chambers that it knows where Mr. Weeks' property is and that Mr. Weeks' property has not been lost. We propose that the government return such property within the next ten (10) days. To the extent that the Government believes that certain property should not be returned, please identify that property so that we can consider whether to make a motion to the Court to compel the return of such property.

In the meantime, Mr. Weeks' only potential source of liquid funds remains his stock in BitFury-related entities and a relatively small amount of cryptocurrency that was not seized by the Government. Since Mr. Weeks is not permitted by his release conditions to directly or indirectly access the Internet, liquidating this cryptocurrency poses a difficult problem. In order to permit Mr. Weeks to access his remaining cryptocurrency funds, we propose the following.

Mr. Weeks' has an associate who created a "crypto wallet" for him which contains approximately $17,000 of Mr. Weeks' cryptocurrency. This associate also applied for a "crypto credit card" that is backed by the cryptocurrency. We propose that, in the short term and until other funds become available to Mr. Weeks, that Mr. Weeks will utilize a physical copy of that credit card to pay his basic expenses such as food delivery, grocery delivery, utility bills, etc. Mr. Weeks' associate will also provide a virtual crypto credit card to one or more of Mr. Weeks' custodians and, at Mr. Weeks' request, the custodian(s) will pay for certain of Mr. Weeks' expenses that he cannot pay for himself using his physical credit card (*i.e.*, Uber Eats, Fresh Direct, etc.). It is impractical to give 72 hours' advance notice to Pretrial Services before these types of routine expenses are incurred.

We further propose that Mr. Weeks' custodians will provide counsel with a monthly statement of charges on this crypto credit card. Counsel will retain the monthly statements and will provide them to the Government or Pretrial Services at their request. We believe that this satisfies the intent of the conditions that require that the Government and Pretrial Services be notified as to Mr. Weeks' use of cryptocurrency. As you are aware, Mr. Weeks does not have a bank account and this would be the only way that Mr. Weeks can pay for many of his basic expenses as many vendors will only accept online payments (*i.e.*, Uber Eats). Please advise whether the Government and PTS approve of these procedures.

Further, Mr. Weeks intends to liquidate certain stock as previously disclosed to, and discussed with, the Government and Pretrial Services. Part of that stock is in a subsidiary of BitFury called "Hut 8." Mr. Weeks previously attempted to send the physical stock certificates to a broker to sell his interest, but that transaction was blocked by some government agency. We ask the Government to remove the block on this transaction so that Mr. Weeks can sell that stock to obtain funds needed to pay his basic expenses, particularly the mortgage on the ranch where his wife and daughter reside.

As you are aware, Mr. Weeks also intends to sell other stock shares (maintained by this firm) which has not yet occurred. In the event that we intend to sell those shares, we will promptly let the Government and Pretrial Services know. As we previously advised you, it is expected that the company will issue a dividend on those shares, which this firm will receive, but that dividend has not yet been issued by the company or received by this firm.

We also discussed with Pretrial Services our goal to find a reasonable way to communicate with Mr. Weeks in order to provide legal advice to him in this case. It is our understanding that Pretrial Services has agreed that we can send emails and documents to one of Mr. Weeks' custodians, who can then print out physical copies of those communications and provide them to Mr. Weeks. We presume and expect that the Government will not later take the position that this procedure in any way waives Mr. Weeks' privilege to not disclose attorney-client communications would otherwise be privileged but for the disclosure to Mr. Weeks' custodians.

We would appreciate it if the Government and Pretrial Services would promptly respond to our questions and proposals so we can ensure that Mr. Weeks' continues to comply with his release conditions and to ensure that there are no misunderstandings about whether he is complying properly.

Respectfully submitted,

*/s/ David Stone*
David S. Stone
Managing Partner

cc: John Zach, Esq.
Eric Cohen, Esq.

# EXHIBIT 12

September 5, 2024 Letter from Prior Counsel Requesting Update on Digital Assets

**Description:**
Correspondence dated September 5, 2024 requesting updates regarding the 8.6704622 BTC, the JAXX wallet, and other seized hardware wallets.

**Purpose:**
To document continued written requests for custodial clarification and return of identified digital assets.

STONE SM MAGNANINI

COMPLEX LITIGATION

September 5, 2024

**VIA EMAIL**
AUSA Anthony Torntore
United States Attorney's Office
for the District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102
Anthony.Torntore@usdoj.gov

Re: United States v. Jobadiah Weeks (19-cr-877-CCC)

Dear AUSA Torntore:

As you are aware, we are currently preparing to meet with you to discuss our position on Mr. Weeks' sentencing matters, including reaching an amicable resolution regarding restitution. To that end, we are investigating the underlying calculations referenced in Mr. Weeks' plea agreement pertaining to the relevant loss amounts as well as investigating the value of Mr. Weeks' assets that were seized by the government that remain in its possession.

On July 22, 2024, you emailed me an IRS memorandum, dated October 8, 2020, described as "[e]valuation of grand jury expansion request and special agent's report." Page 6 of the memorandum explains in a footnote that "[a] streamlined SAR was created and supplemented with documents which corroborate the allegations in the SAR…" which includes "copies of… interviews…." A footnote on page 8 references a "tax loss appendix." We respectfully request that you kindly produce to us a copy of the following items referenced in the October 8 memorandum:

1. The "streamlined SAR."

2. The tax loss appendix.

3. "[C]opies of… interviews" in whatever form, including, but not limited to, transcripts, summaries or other reports.

To gain an understanding of the IRS's interpretation of the transfers and payments reflected in the cryptocurrency wallets owned by Mr. Weeks we respectfully further request the following information:

1. A detailed transaction history for the cryptocurrency wallets identified as belonging to Mr. Weeks, specifically "1Joby" and "19rFx." We believe that this should include all incoming and outgoing transactions, along with corresponding dates, transaction amounts and the parties involved.

2. Among the items seized by the government is a computer containing a JAXX wallet. Please provide us with all records that set forth the current status of the cryptocurrency stored in the JAXX wallet and other wallets and hardware seized by the government (*e.g.*, Trezor and Ledger), including the wallet addresses associated with the seized hardware.

3. All records documenting the results of "blockchain tracing analysis" conducted on the transactions involving Mr. Weeks' cryptocurrency wallets.

4. On the day of Mr. Weeks' arrest two wallets on Mr. Weeks' computer were seized. The first, beginning "1Bzq5" had a balance of approximately 3.67 BTC. The second, beginning "1A9D3" had a balance of 5.00 BTC. It appears that on November 17, 2022, approximately 8.67 BTC was transferred from Mr. Weeks' wallets to a wallet beginning with "14YyA." Could you kindly indicate if this is a government controlled crypto-wallet and, if so, please provide any documents setting forth the procedures followed by the government to transfer these funds and, if the Bitcoin was liquidated, please provide us with the amounts recovered.

In order to determine the validity and the underlying basis for the analysis in the IRS memorandum, we request documents sufficient to show the following:

1. BCN membership list.

2. BCN membership agreements.

3. Records indicating how the IRS viewed the relationship between BCN leadership and its members in terms of tax liability and responsibility.

4. Records indicating how the IRS classified BCN and on what basis.

5. Records that BCN applied for or organized under a specific tax classification, such as a for-profit or non-profit organization.

6. Records that indicate how the IRS determined the tax obligations of BCN, particularly in relation to its business activities.

7. Records indicating whether the IRS classified earnings from BCN as wages, commissions, or other forms of taxable income for its members.

8. Records related to any audits or other reviews of BCN before Mr. Weeks was arrested.

9. Records indicating whether the IRS considered Mr. Weeks an employee, independent contractor, or other classification, within BCN.

10. Records that support the classification of Mr. Weeks' earnings from BCN as taxable income.

11. Records indicating whether the IRS determined that BCN was responsible for withholding and payment of employment taxes for individuals such as Mr. Weeks.

12. Records relating to BCN policies or practices for paying employment taxes or classifying its members and leadership correctly for tax purposes.

13. Underlying records used to support the IRS assessment of Mr. Weeks' tax liability.

14. Correspondence or other communications between the IRS and BCN, or its members, discussing their tax obligations or the IRS's expectations.

15. Third party information or reports used to determine the tax obligations of BCN and its members.

We also request the following records:

1. Any and all interview (*e.g.*, proffer sessions) transcripts and/or interview summaries or reports from any co-defendant in this matter.

Thank you for your attention to this matter and please do not hesitate to contact me if you require any additional information to assist us with this request.

Respectfully submitted,

*/s/ David Stone*
David S. Stone
Managing Partner