# EXHIBIT A

## Chronology table

| Date | Docket / Exhibit | Filing or Request | Principal Request |
|---|---|---|---|
| Mar. 22, 2024 | Ex. A | Letter from David Stone to AUSA Anthony Torntore | Requested return and identification of seized property and requested that the Government identify any property it believed should not be returned. |
| feb. 26, 2025 | Dkt. 402 | Motion to Compel Discovery | Requested records relating to seized cryptocurrency, digital assets, and supporting documentation. |
| June 6, 2025 | Dkt. 446 | Supplemental Motion for Return of Seized Property | Requested return of seized property and identification of Government-held assets. |
| aug. 29, 2025 | Dkt. 477 | Motion to Unseal Warrant Materials | Requested seizure records, inventories, chain-of-custody documentation, and forensic materials. |
| Sept. 3, 2025 | Dkt. 480 | Supplemental Declaration | Identified specific digital assets and devices requiring return or accounting. |
| Sept. 12, 2025 | Dkt. 486 | Motion to Compel Accounting | Requested a complete reconciled accounting of all seized digital assets and related records. |
| Oct. 7, 2025 | Ex. B | Memorandum to AUSAs Regarding Accounting Discrepancies | Identified specific discrepancies in the Government's inventories, seizure records, forensic materials, and digital asset accounting, and requested a consolidated reconciliation. |

| | | | |
|---|---|---|---|
| nov. 18, 2025 | Dkt. 520 | Supplemental Rule 41(g) Motion | Requested return and accounting of additional digital assets, including unresolved Bitcoin discrepancies. |
| | | | |
| June 26, 2026 | Ex. C | FOIA and Privacy Act Request to the IRS | Requested records identifying custody, transfers, inventories, and disposition of seized property transferred to IRS custody. |
| | | | |
| Present | D. Colo. Rule 41(g) | Motion Before This Court | Requests equitable relief requiring a complete accounting and identification of all seized property. |

# EXHIBIT B

Government response table

| | | |
|---|---|---|
| Table 2 – Government Responses | | |
| | | |
| **Government Filing** | **Government Position** | **Accounting Issues Left Unresolved** |
| Dkt. 417 (Apr. 2025) | Argued Plaintiff was not entitled to much of the requested discovery under Rule 16 and urged sentencing to proceed. | No reconciliation of seized cryptocurrency, no chain-of-custody records, and no accounting identifying the digital assets recovered from the seized devices. |
| | | |
| Dkt. 526 (Nov. 2025) | Argued the asset requests overlapped with other pending motions and should be denied on procedural grounds. | Did not dispute that accounting issues remained unresolved and did not provide the requested accounting. |
| | | |
| Defendant's Response (July 2026) | Argues Rule 41(g) is not a discovery device and relies on the subsequent IRS levy. | Still no complete accounting of the seized digital assets, hardware wallets, computers, telephones, USB devices, recovery materials, chain-of-custody records, or the disposition of all seized cryptocurrency-related property. |

# EXHIBIT C

October 7 memorandum

MEMORANDUM OF LAW

To: Whom It May Concern

From: Joby Weeks

Date: October 7, 2025

Re: Memorandum of Law in Support of my Position Regarding Seized Bitcoin (BTC)

Table of contents


I. Introduction 2
II. Government's Statements to the Court (Dkt. 24) 3
2.1 Wallet Flows Exceeding $560 Million 3
2.2 Admissions of $62 Million in a Single Year 3
2.3 Use of Hardware Wallets (Ledger and Trezor) 4
III. Evidence from the Government's Custody Records and 2025 Disclosure 5
3.1. Colorado Seizure (Arvada) 6
3.2 Florida Seizure (Palm Beach) 11
3.3 Cell Phone Wallet 13
3.4 Inventory Discrepancies (Control List vs. Schedule A) 13
3.5 Ledger Nano S (hardware) and Seed-Phrase Cards 16
3.6 Combined Overview – Cryptocurrency 18
3.7 Items Seized but Not Inventoried 20
3.8 Absence of a Consolidated Seizure Report 21
ALTERNATIVE 3.8 Absence of a Consolidated Seizure Report 22
3.9 Contradictions Between MoA Text and Attachments 22
3.10 Receiving Addresses and Transaction History 24
IV. Unclear Transfer Activity from Seized Wallets 25
4.1 Government's Own Admission of No Consent and Uncertainty 25
4.2 Contradictory Action: Colorado Memorandum of Activity 26
V. Conclusion 27
**VI. Path Forward – The Solution and Candid Admissions Required 30**
**VI. Exhibits 33**

Exhibit F – Annex: Seed Phrase Card #1 (Exodus Wallet / Restored Wallet Analysis) 34
**Exhibit G – Annex: Seed Phrase Card #2 (Technical Description & Evidentiary Significance) 39**
**Exhibit G – Missing-Item Notice & Request (drop-in language) 41**
Exhibit H – Annex: ETH/LTC/BCH Contradictions 42
**Annex – Supplementary Exhibits 45**

## I. Introduction

I write this memorandum to address the cryptocurrency assets seized from me on December 10, 2019, in Colorado and Florida. Based on the Government's own filings (the January 15, 2020 opposition brief, Dkt. 24), the contemporaneous seizure memoranda, and later custody correspondence, it is clear that multiple hardware wallets, cold storage instruments, and digital devices containing Bitcoin were taken into custody.

The records do not match. Dkt. 24 reports that my cryptocurrency balances were "unclear" and that agents found an "empty tube" in Colorado. The Colorado Memorandum of Activity, however, documents that agents **restored a seized handwritten seed phrase (Seed Phrase Card #1) off-device and used that restored wallet to transfer Bitcoin**, while other wallets and access media were seized for later review. The physical Ledger Nano S hardware remained locked on the record and was not shown to be unlocked. Separately, items listed on the on-site Control List do not appear in Schedule A (the IRS Denver depot list), and Schedule A contains crypto items absent from the on-site inventory. These inconsistencies are systemic and material. (See Exhibits F–H; Section VI for requested relief.)

From my perspective, the result is that the official custody record remains incomplete and difficult to follow. I know my wallets historically handled very large Bitcoin flows, and the Government's own reports describe specific devices — including a Jaxx wallet (~119 BTC) and a cellphone wallet (~23 BTC). Yet

no unified inventory has ever been provided that accounts for these devices or for the transfers that occurred.

I am not trying to assign blame; I am asking for clarity. The record suggests that cryptocurrency assets plausibly amounting to at least 1,000 BTC were seized, but the inconsistencies between the inventories and memoranda have left the true amounts unverified. My request is simple: that the Department of Justice reconcile these discrepancies in its custody records before further appellate intervention becomes necessary.

Under Fed. R. Crim. P. 41(g), the Court may order the return of property if its continued retention by the Government is unreasonable or inconsistent with due process. The rule "is rooted in equitable principles" and remains available even after conviction or sentencing. *See United States v. Chambers*, 192 F.3d 374, 376-77 (3d Cir. 1999); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (en banc).

## II. Government's Statements to the Court (Dkt. 24)

The Government's opposition brief filed on January 15, 2020 (Dkt. 24) contains multiple admissions confirming that my cryptocurrency activity involved wallets with extraordinary Bitcoin flows, the use of hardware cold storage devices, and the existence of substantial balances.

### 2.1 Wallet Flows Exceeding $560 Million

The Government admitted:

> *"On March 1, 2018, one of Weeks' bitcoin wallets had a final balance of approximately $3.6 million. Over its existence, that wallet had received more than approximately $560 million worth of bitcoin."*[1].

[1] Dkt. 24 at 18

Even conservatively, at Bitcoin prices ranging between $1,000 and $10,000 in 2017–2018, these flows correspond to thousands of BTC.

2.2 Admissions of $62 Million in a Single Year

The Government also cited my own words:

> *"In mid-2017, Weeks emailed an associate stating that more than approximately $62 million had passed through one of his bitcoin wallets in the previous year."* .[2]

At then-prevailing prices (~$1,000–$4,000 per BTC), this equates to between 15,000 and 60,000 BTC.

2.3 Use of Hardware Wallets (Ledger and Trezor)

The Government further confirmed my use of hardware cold storage:

> *"Weeks' records show that he kept Trezor and Ledger coins offline. He also received periodic emails from Trezor support."*.[3]

Agents also reported:

According to Dkt. 24, Weeks advised that he had a cold storage bitcoin wallet buried in a tube somewhere in Colorado. The filing then states: "*Agents searching Weeks's residence in Colorado found an empty tube that matched what Weeks described*." (Dkt. 24 at 22).

These admissions demonstrate that, as of the Government's own January 2020 filing, I was understood to control significant BTC holdings secured on hardware wallets and offline devices.

The subsequent seizure memoranda, discussed in Section III, confirm that these offline storage devices were in fact taken into custody but never properly inventoried or accounted for. (See **Exhibit A** for relevant excerpts from Dkt. 24.).

---

[2] Dkt. 24 at 18
[3] Dkt. 24 at 21

**III. Evidence from the Government's Custody Records and 2025 Disclosure**

Note on Evidence Storage:
It is standard procedure for property seized in different jurisdictions to be stored at the local field offices responsible for those searches — here, Denver for the Colorado seizure and West Palm Beach for the Florida seizure. What is not standard, however, is the Government's failure to produce a single consolidated inventory covering all seized property. Instead, the records are fragmented, inconsistent, and incomplete: items referenced in the December 10, 2019 Memoranda of Activity never appear in the official Schedule A inventories, dollar amounts are omitted or minimized, and no comprehensive accounting has ever been presented to the Court. This lack of a unified inventory — not the mere fact of dual storage locations — renders the Government's handling of evidence deficient under Rule 41 and DOJ policy.

The Government's own filings, including the January 15, 2020 Opposition (Dkt. 24), the Memoranda of Activity dated December 10, 2019 for Colorado and Florida, and the December 6, 2024 custody correspondence from AUSA Torntore, confirm that multiple cryptocurrency wallets, hardware devices, and cash assets were seized. Yet these materials also demonstrate that the seized property was never properly inventoried or valued, despite its capacity to hold substantial amounts of Bitcoin and U.S. currency.

### 3.1. Colorado Seizure (Arvada)

Government Statements of Uncertainty

In its January 15, 2020 filing, the Government represented to the Court:

> *"At present, it is unclear how much cryptocurrency Weeks maintains. During his custodial interview on December 10, 2019, Weeks declined to give consent to law enforcement to access his holdings. However, Weeks advised that he had a cold storage bitcoin wallet buried in a tube somewhere in Colorado, a cryptocurrency go-bag for emergency purposes. He refused to provide its exact location. Agents searching Weeks's residence in Colorado found an empty tube that matched what Weeks described."* (Dkt. 24 at 22).

The Government's claim was that the tube was empty, meaning no cold wallet was recovered there and no balance could be established. The tube appears only in Dkt. 24 (described as empty). It is absent from the Colorado Memorandum of Activity (See **Exhibit B** for the full Colorado MoA.) and from both the Control list and Schedule A inventories, meaning no official custody entry was ever made.

The Government described the tube as "empty" in Dkt. 24, but in fact the tube contained weapons, gold, cash, silver and cold wallets. Agents left the weapons on the bed when departing, and neither the weapons nor the cold wallets appear in the seizure inventories. The omission of the tube and its contents reinforces the broader pattern: significant cryptocurrency devices were seized but not recorded or reported. This leaves the record incomplete and prevents any accurate accounting of the assets taken from the Colorado property.

Ledger Nano S Access and Transfers

The Colorado MoA records:

> *"One Bitclub Club Coin Ledger Nano S was located."* (MoA, Dec. 10, 2019).

This hardware wallet does not appear anywhere in the official Schedule A inventory lists.

The Ledger Nano S has no external serial number, making proper inventory and documentation essential to maintaining chain of custody. Yet the device is absent from the Schedule A inventory. Without logging its unique hardware identifier or associated wallet addresses, the Government has provided no verifiable record that the Ledger Nano S seized in Colorado is the same device from which BTC was later transferred.[4]

This language confirms two things: (1) agents pre-designated seizure addresses for recovered funds, and (2) agents restored at least one seized recovery phrase and used the restored wallet to move cryptocurrency into those addresses. The MoA and attachments attribute the transfers to a **restored seed phrase**, not to an unlocked Ledger Nano S device: the record shows the physical Ledger remained locked (Ledger Live firmware/update errors prevented normal on-device operation) and that **Seed Phrase Card #1** was restored off-device (in Electrum) and used to effect transfers. The transfer should therefore be attributed to the restored seed material, not to unlocking the Ledger hardware.

The Colorado MoA and attachments indicate the wallet environment associated with the seized materials included Bitcoin, Ethereum, ClubCoin, and other tokens. Blockchain tracing attributable to the restored seed material and related wallet images shows materially more Bitcoin than the Government has acknowledged (approximately **8.670 BTC** traceable in the restored wallet versus ~**3.670 BTC** ever admitted in filings). Moreover, documentary

[4] A "BTC Cold Storage Coin" may refer to a Casascius coin or similar physical Bitcoin wallet. Casascius coins carry unique serial numbers engraved on the coin and logged by the manufacturer, which can be cross-checked to determine whether the coin was loaded with Bitcoin and in what amount. If such coins were seized, failure to record serial numbers renders them untraceable and prevents verification of their value. By contrast, a Ledger Nano S hardware wallet does not bear an external serial number, but it does contain a unique hardware identifier (chip/USB ID) and generates wallet addresses from its seed phrase. Proper forensic practice requires logging either the device identifier or the associated wallet addresses to establish chain of custody. The Government's inventories do neither, leaving both types of seized instruments without verifiable identification or valuation.

attachments labeled “ETH_Sending / ETH_Success,” “LTC_Sending / LTC_Success,” and “BCH_Sending / BCH_Success” indicate that Ethereum, Litecoin, and Bitcoin Cash transactions were initiated and completed; screenshots also show ERC-20 tokens (BAT, Augur, Aragon) in the session logs. Those non-Bitcoin transfers and token movements are reflected in the attachments but were not carried forward into the Control List or Schedule A inventories, demonstrating a failure to preserve a reliable custody trail for non-BTC holdings.

A detailed blockchain tracing and transaction flow for the restored wallet (the material restored from Seed Phrase Card #1 and the associated Exodus/SD image) is collected in **Exhibit F – Annex: Seed Phrase Card #1 (Exodus / Restored Wallet Analysis)** (Figure 1). The custody and provenance problems created by the unlogged recovery material and the locked hardware — including the unexamined second seed card — are analyzed in **Exhibit G – Annex: Seed Phrase Card #2 (Unexamined / Missing) and Seed-Phrase Restoration / Ledger Hardware Distinction** (Figure 2). A separate short hardware note regarding the seized Ledger Nano S (locked device, no serial/receipt in the depot records) appears in **Exhibit H – Ledger Nano S: Hardware Custody Note**.

December 2024 Disclosure of Missing BTC

On December 6, 2024, AUSA Anthony Torntore provided defense counsel with a report acknowledging that approximately **3.670 BTC** was transferred into a government wallet from the wallet restored using seized recovery material. Blockchain tracing attributable to the restored material, however, shows at least **8.670 BTC** associated with that restored wallet — leaving an unexplained discrepancy of **4.999 BTC**. In later December communications with former defense counsel, AUSA Torntore acknowledged that this **4.999 BTC** remained unaccounted for. (See Exhibit F for restored-wallet TXIDs and Section VI for requested production and certification.)

Unreported Cold Wallets and Contradictions

The Colorado MoA acknowledges that multiple physical cryptocurrency items were seized for later analysis, but the record contains no depot/inventory accounting of their balances.The MoA states:

> *"Other potential physical cryptocurrency assets were seized. Most of these were things like actual physical coins which contained either public or private Bitcoin keys, or both. Because of time constraints involved with the search, these items were physically seized, and no attempt was made to quantify their value, or to seize any potential funds which may be present. As such, a separate attempt should be made at a later date to determine whether there are any funds associated with these physically seized items."* (MoA, Dec. 10, 2019).

Despite that admission, Government filings (Dkt. 24) represented to the Court that the Government had "no idea" of my balances, and there remains no reported reconciliation of balances for the other cold wallets listed in the Colorado inventory or for any holdings potentially accessible via the seized recovery material. (See Exhibits F–H; Section VI.)

Additional Cryptocurrency Devices in the Inventory

The Government's own inventories also list multiple additional cryptocurrency-related storage devices that remain unexplained and unvalued:

Item 62 – Bitcoin Cold Storage Coin.

The inventory records the seizure of a single Bitcoin cold storage coin but provides no identifying details. If this was a Casascius coin or other funded cold storage instrument, it would have carried a unique serial number and a hologram concealing a private key. Such information is critical to determine whether the coin was loaded with Bitcoin and to verify chain of custody. No such details were recorded, leaving the coin's value unknown and its evidentiary integrity unverified.

Item 83 – 25 packages of silver-colored Bitcoin coins (~250 coins).

The inventory lists these coins in bulk with only an approximate count. If these were funded cold storage coins, each would carry a unique serial number and hologram, critical for verifying whether they contained Bitcoin. No such serials or identifiers were recorded. If they were unfunded novelty coins, Rule 41 still required precise documentation rather than an approximate tally. Either way, the bulk description prevents verification of their contents and leaves the record incomplete.

Item 88 – Trezor Bitcoin Hardware Wallet.

A Trezor hardware wallet secures Bitcoin holdings offline and can generate unlimited wallet addresses from its seed phrase. The inventory records its seizure but provides no unique device identifier, no reference to associated public addresses, and no indication that its balances were ever examined. Without such documentation, the Government cannot establish chain of custody or prove whether the device contained significant Bitcoin holdings at the time of seizure.

Item 89 – Ethereum Cold Storage Coin.

Item 89 – Ethereum cold-storage coin.

Like a Bitcoin cold-storage coin, an Ethereum cold-storage coin is a physical bearer instrument that exposes a public address while concealing a private key beneath a tamper-evident hologram. If funded, possession of the private key grants direct control over the associated ETH balance. The inventory entry for Item 89 contains no identifying detail — no photograph, no public address, no hologram condition report, and no indication that the coin was forensically examined or valued. Without those basic intake records, the coin's existence, provenance, and any on-chain balances cannot be independently traced or verified.

This item confirms that seized property was not limited to Bitcoin. The inventory and attachments therefore raise two separate problems: (1) the

Government identified non-Bitcoin assets (an Ethereum cold coin and token balances visible in session screenshots) but produced no forensic report or valuation for Item 89; and (2) for non-Bitcoin assets potentially linked to seized recovery material (seed phrases / SD images), the Government has not produced restoration logs, TXIDs, or depot receipts tying those assets to particular restoration sessions or custody entries. (Cross-refs: Exhibit F – Seed Phrase Card #1; Exhibit G – Seed Phrase Card #2; Exhibit H – Ledger Nano S Hardware Note.)

Control #21 – USB "Bitcoin" Storage Drive; Password Recovery Cards for Bitcoin; BTC Cryptocurrency Indicia Storage Cards.

These items are particularly sensitive: a USB drive may contain wallet files or private keys and carries an internal device identifier that should have been logged to preserve chain of custody, yet no such identifier is recorded. Recovery cards are effectively keys to restore cryptocurrency holdings, since each 12–24 word seed phrase is unique. Despite this, the inventory provides no descriptive detail, no forensic capture of their contents, and no indication whether these wallets were funded.

Control #22 – BTC Cryptocurrency Indicia Storage Cards.

These cards are effectively cryptocurrency wallets, each potentially containing unique private keys or QR codes that control Bitcoin balances. Unlike mere novelty items, indicia cards can hold real value if funded. The inventory provides no information on the number of cards, their denominations, or whether they were examined for balances. Without such detail, it is impossible to determine whether these cards represented active wallets or to verify what cryptocurrency, if any, they contained.

These items are capable of holding substantial amounts of cryptocurrency, yet there has been no disclosure of forensic imaging, blockchain tracing, or valuation. These items included not only hardware devices but also multiple recovery and indicia cards holding private keys — effectively direct access to online wallets. Yet the inventories record neither the number of cards, the balances they controlled, nor any follow-up analysis of their contents.

### 3.2 Florida Seizure (Palm Beach)

Seizure of Cryptocurrency-Related Devices

The Palm Beach Memorandum of Activity dated December 10, 2019 (See **Exhibit C** for the full Florida MoA.) documents the seizure of several digital devices, including:

> *"An Apple MacBook Pro laptop, a Huawei cellphone, and a Sandisk SD card."* (MoA, Dec. 10, 2019).

Devices Omitted from Asset Inventory

Despite being listed in the MoA, none of these devices appear in the official Schedule A inventory or the 1B-numbered custody lists. Their absence from the official records means their contents were never properly accounted for.

MacBook Access but Omission of Jaxx Wallet

Dkt. 24 itself acknowledges that investigators accessed the MacBook:

> *"Agents were able to access Weeks' Facebook account on the seized MacBook computer."* (Dkt. 24 at 19).

This confirms that the device was entered and used by investigators.

The MacBook also contained a Jaxx cold wallet holding approximately 119 BTC (valued at about $1 million in November 2019). This wallet was also reported in Weeks's contemporaneous financial affidavit (See **Exhibit E**, p.3). Later, in 2021, defense counsel confirmed to the Government that the Jaxx wallet, together with seized USB cold storage wallets and coins, was estimated at approximately $1 million in total, subject to verification. (See Exhibit E, Counsel Correspondence). Yet there is no mention of this wallet or its balances in the MoA, the Schedule A, or any custody documentation.

In Dkt. 24, the Court was simultaneously told that the Government had "no idea" about the amount of cryptocurrency I possessed, creating a direct contradiction between the investigative record and the Government's representations.

The Florida MoA also records: 'Agents placed WEEKS' personal effects, which he had at the time of his arrest, in a sealed evidence bag. WEEKS, S/A Qaqish, and S/A Helmstetter initialed the bag where it was sealed. WEEKS agreed to have these items returned to his attorney at his court appearance.' (See Exhibit C, Florida MoA, Dec. 10, 2019). These items — including keys, cards, and other effects — were the only ones for which a formal chain-of-custody procedure was noted. Yet, when received at the IRS depot, only the wedding band and U.S. currency appear in the custody record, while the remainder vanished. Other effects listed in the MoA, such as AUI Jim sunglasses, do not appear in either the Control List or the Schedule A at all. This means that even the only property explicitly documented for return through counsel was neither properly received nor returned, reinforcing the broader pattern of incomplete and inconsistent custody.

The Florida MoA identifies these digital devices only generically (MacBook, Huawei phone, iPhone, and Sandisk SD card) and provides no serial numbers or unique identifiers. The omission of serial numbers breaks chain-of-custody protocol, as it prevents any verification that the devices seized on-site are the same as those later held in custody or subject to forensic review. None of these devices appear in the Control List or Schedule A inventories, compounding the custody gap.

### 3.3 Cell Phone Wallet

The Huawei cellphone contained a wallet holding approximately 23 BTC. This balance was also disclosed in Weeks's financial affidavit as '23 Bitcoins – Phone BTC Wallet.' (See Exhibit E, p.4). Like the MacBook, however, this wallet is not described in any seizure report, inventory, or custody record.

### 3.4 Inventory Discrepancies (Control List vs. Schedule A)

A further problem arises from the Government's use of two parallel inventory systems. The "Inventory Listing of All Items Seized at Search Warrant Site" (the Control list) reflects what agents logged on-site during the Colorado seizure. By contrast, the "Schedule A" inventory is not a second seizure log but a receiving list, documenting only those items that were actually transported and booked into the IRS Denver Holding Office. The two inventories do not match.

Items seized at the residence never appear on the receiving list, while other items appear in custody that were never logged at the scene.

This dual system prevents a continuous chain of custody. Rule 41 requires a single, accurate inventory of all property seized. By maintaining inconsistent lists, the Government has created irreconcilable gaps that make it impossible to determine what was actually seized, what was transported, and what was retained.

Items on Control List but Not on Schedule A

The following devices and cryptocurrency-related instruments were logged on the on-site Control list but do not appear in the IRS Denver Schedule A. Their absence means they were seized at the residence but never receipted into IRS custody:

| Control # (Seizure-Site Inventory) | Description | Serial / Notes | Appears in Schedule A? |
|---|---|---|---|
| Control #5 | Western Digital MyBook USB Hard Drive | Serial: WCC7K1 LSFTTP | Missing |
| Control #6 | Generic USB Thumbdrive | Serial: Y1178-T48L-B52L-V 3 | Missing |
| Control #7 | Sandisk Extreme SD Card | Serial: BM1235222025G | Missing |
| Control #8 | Huawei Cellphone | Unknown serial number | Missing |
| Control #9 | Apple MacBook Pro | Serial: W8944JH766E | Missing |
| Control #11 | BTC Cold Storage Coin | No serial recorded | Present (Item 62) |
| Control #17 | U.S. Currency (cash in closet gun safe) | No denomination recorded | Present (Item 17 “United States |

| | | | |
|---|---|---|---|
| | | | Currency”) |
| Control #21 | USB “Bitcoin” Storage Drive; Password Recovery Cards for Bitcoin; Ring, Earrings, Chain | No identifiers recorded | Missing |
| Control #22 | BTC Cryptocurrency Indicia Storage Cards | No identifiers recorded | Missing |

These omissions include core digital devices (MacBook, Huawei cellphone, Western Digital drive, Sandisk SD card) that are natural repositories of wallet files and keys, as well as explicitly crypto-labeled items (USB “Bitcoin” drive, recovery cards, indicia storage cards). Their disappearance from the Schedule A custody record severs continuity and leaves their fate unaccounted for.

Conversely, several cryptocurrency instruments appear in the IRS Denver Schedule A but were never logged on the on-site Control list. Their presence in custody records without corresponding seizure entries raises questions about when and how they were recorded:

Items on Schedule A but Not on Control List

| Schedule A Item # | Description | Serial / Notes | Appears in Control Inventory? |
|---|---|---|---|
| Item 62 | Bitcoin Cold Storage Coin | No serial recorded | Not in Control List |
| Item 83 | 25 Packages of Silver-Colored Bitcoin Coins (~250) | Bulk count only | Not in Control List |
| Item 88 | Trezor Bitcoin Hardware Wallet | No device ID logged | Not in Control List |
| Item 89 | Ethereum Cold Storage Coin | No identifiers recorded | Not in Control List |

The appearance of these items only in Schedule A, without any corresponding Control number, raises the reverse problem: there is no evidence they were

logged on-site during the search. This suggests either a failure to record seizures at the scene, or post-hoc additions to the custody record.

Taken together, Exhibits E and F demonstrate that the Government has not produced a single reconciled inventory of seized property. Instead, it relies on two lists that cannot be reconciled with each other. Critical devices and cryptocurrency instruments either vanish from the record or appear without ever having been logged at seizure.

Even more striking, some cryptocurrency devices documented elsewhere do not appear in either inventory at all. The Ledger Nano S hardware wallet, expressly recorded in the Colorado MoA of December 10, 2019, is absent from both the Control list and Schedule A. Likewise, the tube appears only in Dkt. 24 (described as empty). It does not appear in the Colorado MoA or in either inventory, and no record was made of its reported contents (weapons, cold wallets, or cash). This means that key cold storage devices containing cryptocurrency were seized but never received into IRS custody. The absence of these items underscores the lack of a continuous chain of custody and prevents any reliable accounting of what cryptocurrency assets were actually taken.

Summary of Inventory Discrepancies:

Exhibits E and F make clear that the two government inventories cannot be reconciled. Items logged at the scene on the Control list never appear in the IRS Denver Schedule A, while other items show up in Schedule A without any record of being logged on-site. Even more significant, some cryptocurrency devices described in the Colorado MoA (such as the Ledger Nano S) and in Dkt. 24 (the tube said to contain a cold wallet) appear in neither list at all. This demonstrates that key cryptocurrency storage devices may have been seized but never receipted into IRS custody, leaving the chain of custody incomplete and preventing any reliable accounting of what digital assets were actually taken.

### 3.5 Ledger Nano S (hardware) and Seed-Phrase Cards

**Ledger Nano S / Seed cards (short statement).** The seized Ledger Nano S remained locked and was never unlocked on the record. Two handwritten seed-phrase cards were seized: **Seed Phrase Card #1** was restored off-device and used to transfer Bitcoin into government seizure addresses (see Exhibit F – Annex: Seed Phrase Card #1); **Seed Phrase Card #2** was seized but was not examined on the record and does not appear in depot/inventory records (see Exhibit G – Annex: Seed Phrase Card #2).

The Colorado Memorandum of Activity (Dec. 10, 2019) documents seizure of a device identified as a "Bitclub Club Coin Ledger Nano S" and two handwritten recovery (seed-phrase) cards. A seed-phrase (BIP-39 mnemonic) is a portable backup that deterministically regenerates a wallet's private keys and derived addresses; it is not tied to a single physical device and can be restored on any compatible hardware or software.

According to the MoA, agents attempted to operate the seized Ledger Nano S via Ledger Live but encountered firmware/update errors. The record does not show the physical device was ever unlocked with a PIN. Instead, the MoA documents that agents **restored Seed Phrase Card #1** in Electrum (i.e., they recreated the wallet from the mnemonic off-device) and used the restored wallet instance to transfer Bitcoin into pre-designated government seizure addresses. The MoA and attachments do not quantify the amount transferred; all wallet addresses, balances, and TXIDs attributable to the restoration are collected and traced in Exhibit F – Annex: Seed Phrase Card #1 (Restored Wallet Analysis).

The second handwritten seed-phrase card (Seed Phrase Card #2) was seized but, on the record, was not restored or examined. The MoA recommended restoring both seed phrases on a new Ledger device to identify holdings, but there is no documentation of any such follow-up for Seed Phrase Card #2 or for non-Bitcoin tokens described in the MoA.

Critically, neither the physical Ledger Nano S nor the two handwritten seed-phrase cards appear in the Control List, Schedule A, or IRS depot custody records. Because seed phrases permit off-device restoration, their omission from official intake and depot records prevents independent verification of (a) the exact mnemonic recovered, (b) what addresses and balances the phrase could derive, and (c) who had custody of the recovery material after seizure. In short, the record shows not only that restorations occurred off-device but also that the very recovery materials used for those restorations were never formally logged into the Government's custody system — a material chain-of-custody gap.

A detailed forensic and blockchain tracing analysis for the restored seed phrase is set out in **Exhibit F – Annex: Seed Phrase Card #1 (Restored Wallet Analysis)**. **Exhibit G** documents the unexamined/missing second seed card and requests production or sworn certification of any related custody/restoration records. A separate short hardware note regarding the seized Ledger Nano S

(locked device, no serial/receipt produced in the record) is provided in **Exhibit H – Ledger Nano S: Hardware Custody Note**.

### 3.6 Combined Overview – Cryptocurrency

**Colorado (Arvada).** The Colorado Memorandum of Activity (Dec. 10, 2019) documents seizure of a device identified as a "Bitclub Club Coin Ledger Nano S" and two handwritten recovery (seed-phrase) cards. The physical Ledger Nano S does **not** appear in the official Schedule A inventory or in the depot/custody records.

The MoA also reports: "For one of the two seed phrases, agents were successful in finding bitcoin. Agents transferred this bitcoin to the seizure addresses provided in advance of the enforcement action." (MoA, Dec. 10, 2019). The record shows that **Seed Phrase Card #1** was restored off-device (in Electrum) and the restored wallet instance was used to execute transfers; the physical Ledger Nano S remained locked on the record and was not shown to have been unlocked with a PIN. (See Exhibit F – Annex: Seed Phrase Card #1.)

AUSA Torntore's December 6, 2024 custody report acknowledges **3.6704622 BTC** as having been transferred into a government seizure address. Independent blockchain tracing attributable to the wallet restored from Seed Phrase Card #1, however, shows approximately **8.67041881 BTC** associated with that restoration — producing an unexplained difference of **4.99995661 BTC** (≈ 4.99996 BTC). The apparent remainder was moved to addresses that are not disclosed in the Government's custody accounting. (See Exhibit F for the restored-wallet TXIDs and tracing; see Section VI for requested production.)

The MoA and attachments further indicate the restored wallet environment and/or the seized materials included non-Bitcoin assets — specifically Ethereum, ClubCoin, and other tokens — yet no forensic reports, valuations, or depot entries for those non-BTC holdings have been produced. The MoA itself records that additional cold wallets, physical coins, and recovery indicia were seized for later analysis, but no reconciling inventory or depot reconciliation has

been filed (compare Colorado on-site Control List with Schedule A). In short: (1) the transfers traced in the record derive from restored recovery material (not from an unlocked Ledger device), (2) the Government's disclosed transfer total (3.6704622 BTC) does not reconcile to the blockchain tracing for the restored wallet (8.67041881 BTC), and (3) non-Bitcoin holdings and multiple other cold wallets seized in Colorado remain unaccounted for in the official custody records.

(Forensic and blockchain tracing for the restored wallet are collected in Exhibit F; the unexamined second seed card and missing custody items are documented in Exhibit G; the seized but locked Ledger hardware is noted in Exhibit H. See Section VI for the Government's required sworn reconciliation and certification of missing items.)

Florida (Palm Beach):
The Palm Beach MoA (Dec. 10, 2019) lists seizure of an Apple MacBook Pro, a Huawei cellphone, and a Sandisk SD card. None of these devices appear in the Schedule A or 1B inventories.

Dkt. 24 confirms that investigators accessed the MacBook to retrieve Facebook records, proving the device was entered. The MacBook also contained a Jaxx wallet holding approximately 119 BTC (~$1 million at November 2019 values).[5]

The Huawei cellphone contained a wallet with approximately 23 BTC.

Neither device, nor these balances, appear in any custody report or official inventory, with no disclosure of forensic imaging or blockchain tracing.

Summary – Cryptocurrency:
The Government seized multiple cryptocurrency storage devices and computers on December 10, 2019, including hardware wallets and systems capable of holding large sums of BTC. The seized Ledger Nano S hardware remained locked and was not shown on the record to have been unlocked; however, recovery material seized at the same time (Seed Phrase Card #1 and an SD/.png

[5] Exhibit C.

seed image) was restored off-device and used to move funds (see Exhibit F). The Government has only acknowledged partial Bitcoin receipts (≈3.6704622 BTC) despite blockchain tracing showing approximately **8.67041881 BTC** associated with the restored material. The Jaxx wallet (~119 BTC) and a phone wallet (~23 BTC) are documented in contemporaneous financial disclosures and counsel correspondence but were omitted from the official custody inventories. These disclosures and the tracing together show the Government never produced a reconciled custody record for the seized cryptocurrency. (See Exhibit E; Exhibit F.)

## 3.7 Items Seized but Not Inventoried

In addition to the specific discrepancies detailed above, the record shows entire categories of cryptocurrency devices and access media that were physically seized but never inventoried. The Colorado MoA and the Control List reference these items, yet they do not appear in the Schedule A inventories, nor are they carried forward into any chain-of-custody documentation.

This omission is critical. Hardware wallets, seed phrase cards, indicia cards, and cold storage coins are the functional equivalent of private keys. Their absence from the inventories prevents any reliable accounting of what cryptocurrency was seized, what was transferred, and what balances may remain under Government control.

**Table – Items Seized but Absent from Inventories**

| Item | Source (MoA / Control List / Dkt. 24) | Status in Inventories |
|---|---|---|
| Ledger Nano S (Bitclub edition) | Colorado MoA (Dec. 10, 2019) | Not listed in Control List or Schedule A |
| Seed Phrase Card #1 | Colorado MoA | Not listed |
| Seed Phrase Card #2 | Colorado MoA | Not listed |
| Exodus SD Card (.png seed) | Colorado MoA | Not listed |
| BTC Indicia Cards (Control #22) | Control List | Not carried forward into Schedule A |
| Password Recovery Cards (Control #21) | Control List | Not carried forward into Schedule A |

| | | |
|---|---|---|
| Ethereum Cold Storage Coin | Colorado Inventory, Item #89 | No address, no hologram status, no valuation |
| Bitcoin Cold Storage Coin | Colorado Inventory, Item #62 | No serial, no valuation |
| 25 packages of silver-colored Bitcoin coins (~250) | Colorado Inventory, Item #83 | No serials, bulk count only |
| Trezor Bitcoin Hardware Wallet | Colorado Inventory, Item #88 | Listed, but no device ID or valuation |

### Closing Observation

The absence of these items from both the Control List and the Schedule A confirms that the official inventories are incomplete. Taken together, the Ledger Nano S, seed phrase cards, Exodus SD card, indicia cards, and cold storage coins represent substantial cryptocurrency holdings. Without proper logging, imaging, and reconciliation of these items, there can be no verifiable accounting of the assets seized on December 10, 2019.

## 3.8 Absence of a Consolidated Seizure Report

Despite the number and complexity of cryptocurrency devices seized on December 10, 2019, no consolidated accounting has ever been provided. Standard practice requires a final seizure report reconciling all wallets, devices, recovery media, and coins, supported by blockchain transaction records and custody logs. Such a report should:

- Identify each seized item with unique details (device serial numbers, wallet addresses, seed phrase identifiers);
- Record all cryptocurrency balances observed, transferred, or left in place;
- Document transfers with blockchain transaction IDs and destination government seizure addresses;

- Track the chain of custody for each physical device or recovery medium, from seizure site to IRS-CI or FBI forensic units and ultimately to evidence storage.

Such a consolidated report should be prepared and maintained by the lead investigative agency. In digital asset cases this is typically **IRS-CI (Criminal Investigation)** if IRS was lead on the seizure, or **FBI CART (Computer Analysis Response Team)** if the FBI was responsible for forensic imaging. Ultimately, the **U.S. Attorney's Office (USAO)** bears the duty to maintain custody records and to certify to the Court the total balances seized.

In a matter involving digital assets, where value depends on precise chain-of-custody, the final seizure accounting should be submitted to the Court as a **sworn certification**, identifying the total balances seized and the government seizure addresses that hold them. No such certification has been made here.

Instead, the Court has been left with only preliminary Memoranda of Activity (Colorado and Florida), supplemented by incomplete inventories (Control List and Schedule A). These documents contain internal inconsistencies, omit entire categories of seized items, and fail to reconcile the cryptocurrency balances actually transferred to government wallets. Without a comprehensive, sworn report, neither the defense nor the Court can verify what cryptocurrency was actually taken, what was transferred, and what balances remain unaccounted for.

**ALTERNATIVE 3.8 Absence of a Consolidated Seizure Report**

The Government has never produced a single, sworn, consolidated accounting reconciling (a) each seized item, (b) the seed materials and software images derived from those items, (c) the wallet addresses generated or restored, (d) the blockchain transaction IDs (TXIDs) for transfers, and (e) the physical custody location and custodian for each item. Standard practice following complex digital-asset seizures requires a consolidated report that cross-references Control List entries, Schedule A items, MoA attachments, device identifiers (serials / images / forensic hashes), and blockchain evidence. No such consolidated reconciliation appears in the record. Without it, piecemeal inventories and incompatible logs cannot be used to verify what was seized, what was

transferred, or what remains unaccounted for. (See Section VI for the production and sworn certification we request.)

### 3.9 Contradictions Between MoA Text and Attachments

The Colorado MoA contains direct contradictions regarding the handling of non-Bitcoin cryptocurrency balances. The text asserts that these assets were not accessed, while the attachments show evidence of successful transfers.

**Government Statement 1:**

> *"Agents were successful in that they could see the device potentially contained Bitcoin, Ethereum, Club Coin, and possibly two other assets. However, access to the other potential cryptocurrencies was not attempted."*
> *(Colorado MoA, Dec. 10, 2019, p.__).*

**Government Statement 2:**

> *"Additionally, the dollar amounts were deemed to be below the threshold after speaking with the Command Post."*
> *(Colorado MoA, Dec. 10, 2019, p.__).*

**Factual Record (Attachments):**
Contrary to these assertions, the attachments include screenshots labeled *"ETH_Sending / ETH_Success," "LTC_Success," and "BCH_Success."* These demonstrate that Ethereum, Litecoin, and Bitcoin Cash transfers were initiated and completed. Additional ERC-20 tokens (BAT, Augur, Aragon) are also visible in the attachments.

**Analysis:**
If non-Bitcoin assets were not attempted because no government wallet addresses were available, then "sending" and "success" confirmations should not exist. If they were disregarded because their values were "below threshold," no transfer attempts should have been made. The only consistent reading is that non-Bitcoin assets were seized, but omitted from the inventories and never disclosed to the Court.

A detailed summary of these contradictions, including a comparative table of MoA text versus attachments and screenshots of the ETH/LTC/BCH transfers, is provided in **Exhibit H – Annex: ETH/LTC/BCH Contradictions.**

ALTERNATIVE **3.9 Contradictions Between MoA Text and Attachments**

The MoA narrative and the supporting session attachments often tell different stories. Examples include: the MoA text indicating certain non-Bitcoin assets were "not attempted" while attachments show completed ETH/LTC/BCH transactions; the MoA describing an "empty tube" while attachments and photographs indicate items were present; and the MoA stating no valuation was performed while session logs and screenshots show wallet activity and balances. These contradictions are not isolated; they recur across Colorado and Florida materials and materially undermine the reliability of the Government's custody record. Each such contradiction is catalogued in the annexes and cross-referenced in the exhibit list so that the Government must address them directly. (See Exhibits F–H and Exhibit I for specific screen captures and session logs.)

## 3.10 Receiving Addresses and Transaction History

The attachments to the Colorado MoA include screenshots labeled "Receiving" for multiple assets, including Bitcoin, Ethereum, Litecoin, and Bitcoin Cash. These screenshots show the wallet's "Receive" tab, which lists one or more public addresses used to fund the wallet.

**Significance:**

- To obtain these "Receiving" screenshots, agents necessarily accessed the wallet interface beyond simple balance checks. This contradicts the MoA's representation that non-Bitcoin assets were "not attempted."
- Receiving addresses demonstrate that the wallets were not dormant placeholders, but had previously been funded on the blockchain. This provides a direct means to trace past transactions and confirm whether additional balances remained under the control of the seized wallet.

- The presence of receiving addresses also indicates that agents had the ability to conduct a forensic trace of prior inflows and outflows. No such tracing report has been provided to the defense or the Court.

**Implication:**
The "Receiving" screenshots undermine the Government's assertion that access to non-Bitcoin assets was not pursued. In reality, agents accessed the wallet functions, revealed active blockchain addresses, and documented them. Yet the official inventories do not include these addresses, no blockchain tracing has been disclosed, and no valuations of prior inflows have been reported.

This omission deprives the Court of the ability to verify the full scope of cryptocurrency under Government control.

ALTERNATIVE **4.3 Receiving Addresses and Transaction History *(moved from old 3.10)***

The attachments contain screenshots, Electrum/Exodus session logs, and "Receiving" images that show public receiving addresses and completed transfers. Where restoration occurred from seized seed material, those receiving addresses and the corresponding TXIDs are the primary means of independently verifying the movement and disposition of funds. To date, the Government has produced only a partial set of TXIDs tied to one reported receipt (~3.6704622 BTC). The full set of TXIDs traceable to the restored wallet(s) (totaling ~8.67041881 BTC) appears in Exhibit I; the Government must identify which TXIDs it contends correspond to the 3.6704622 BTC it reported and must produce any other TXIDs and confirmations for transfers it performed or authorized. Absent full TXID production and matching custodian logs, the Court cannot reconcile the reported receipts with on-chain reality.

## IV. Unclear Transfer Activity from Seized Wallets

Rule 41(g) invokes the Court's equitable jurisdiction, which survives conviction and sentencing because it arises from the Court's supervisory power rather than the pendency of a criminal proceeding. Once criminal jurisdiction ends, a Rule 41(g) motion proceeds as a civil equitable action against the United States, and

the Court may fashion appropriate relief—including the return of property, an accounting, or an evidentiary hearing—whenever the Government's continued retention would be unreasonable or inconsistent with due process. *See United States v. Chambers*, 192 F.3d 374, 376–77 (3d Cir. 1999); *Rufu v. United States*, 20 F.3d 63, 65 (2d Cir. 1994); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (en banc). Because equitable jurisdiction depends on the Court's supervisory power rather than the pendency of criminal proceedings, this Court's discretion is guided by equitable factors such as the movant's clean hands, the Government's need to retain the property, and the availability of adequate remedies at law. *See United States v. Chambers*, 192 F.3d at 377; *Mora v. United States*, 955 F.2d 156, 158 (2d Cir. 1992).

The record further demonstrates that the Government's actions appear inconsistent with Rule 41(g) and standard DOJ asset seizure protocol, given that these transfers were not documented in the official inventory

4.1 Government's Own Admission of No Consent and Uncertainty

In its January 15, 2020 Opposition brief, the Government stated:

> *"At present, it is unclear how much cryptocurrency Weeks maintains. During his custodial interview on December 10, 2019, Weeks declined to give consent to law enforcement to access his holdings… Agents searching Weeks's residence in Colorado found an empty tube that matched what Weeks described."*

This representation conveyed to the Court that Weeks' cryptocurrency balances remained unknown, and that the alleged storage tube was empty.

4.2 Contradictory Action: Colorado Memorandum of Activity

Yet, the Memorandum of Activity for the December 10, 2019 search in Arvada, Colorado reveals that agents in fact accessed at least one wallet and transferred its cryptocurrency balances to a government-controlled wallet.

This action was taken:

1. Without Consent – I expressly refused consent to access his wallets.

2. Without Full Documentation – No contemporaneous chain of custody or inventory identifies the transferred balances. Indeed, later review revealed missing entries and an unexplained discrepancy of at least 4.999 BTC.

3. Without Judicial Oversight – The seizure warrant authorized the taking of devices, these transfers raise unresolved questions as to custody and authority, which should be clarified in the record.

These contradictions in the Government's own filings and memoranda highlight the need for a reconciled custody record.

## V. Conclusion

The combined record shows:

- **Extraordinary wallet flows.** My wallets historically reflected flows in the hundreds of millions of dollars in Bitcoin.

- **Seizures without valuation.** Agents seized multiple hardware wallets, cold storage devices, and digital instruments, while noting at the time that no valuation was made.

- **Minimum documented holdings.** At least **146.999 BTC** is documented, excluding additional cold wallets, coins, and recovery devices that remain unexamined.

- **Tube mischaracterization.** The tube described in Dkt. 24 as containing a cold wallet was reported as "empty," even though it actually contained weapons that were not inventoried, and it is not mentioned in the Colorado Memorandum of Activity. This mischaracterization highlights how significant items were omitted from the official record.

- **Ledger Nano S discrepancy.** wallet restored from **Seed Phrase Card #1** traces **~8.67041881 BTC**; Government acknowledges **~3.6704622 BTC** (≈**4.99995661 BTC** unexplained). Non-BTC holdings (ETH, ClubCoin, tokens) and device/forensic records not produced. (Exhibits F–H; Sec.

VI)

- **Absence of a consolidated seizure report.** Despite the number and complexity of cryptocurrency devices seized, no final accounting has ever been produced. Standard practice requires IRS-CI, FBI CART, or the U.S. Attorney's Office to prepare a consolidated report reconciling all devices, wallets, and transfers, supported by blockchain transaction IDs and custody logs. No such sworn certification has been filed with the Court. As a result, there is no verified total of cryptocurrency seized on December 10, 2019. (See Section 3.8).

- **Unreported recovery cards.** Multiple recovery and indicia cards seized in Colorado (Control #21 and #22) provided direct access to online wallets, yet the inventories record neither the number of cards, the balances they controlled, nor any follow-up analysis of their contents.

- **Ledger Nano S / seed cards.** The seized Ledger Nano S remained locked on the record. Two handwritten seed-phrase cards were seized: **Seed Phrase Card #1** was restored off-device and used to transfer Bitcoin into government seizure addresses (amount not specified in the MoA) while **Seed Phrase Card #2** was seized but not examined on the record. Neither the hardware nor the seed cards appear in the Control List or Schedule A, producing a material chain-of-custody gap for both the recovery material and any non-Bitcoin assets. (Exhibits F–H; Sec. VI)

- **Florida devices without identifiers.** The Florida MoA listed digital devices including a MacBook, Huawei phone, iPhone, and Sandisk SD card, but recorded no serial numbers or unique identifiers. These devices also do not appear in either the Control List or Schedule A. Without identifiers, there is no way to establish a reliable chain of custody or verify whether these devices were ever properly logged, analyzed, or returned.

- **Uninventoried devices and access media.** Entire categories of seized cryptocurrency devices and access instruments never appear in the

Control List or Schedule A. These include the Ledger Nano S, its two handwritten seed phrase cards, the Exodus SD card (.png seed), indicia and recovery cards (Controls #21–22), and multiple cold storage coins (Bitcoin and Ethereum). Without any inventory entries, there is no reliable chain of custody or accounting for these items, despite their direct role as private keys to cryptocurrency balances. (See Section 3.7).

**Unauthorized transfers of non-Bitcoin assets.** The Colorado MoA text claims that non-Bitcoin assets were not accessed or were deemed "below threshold," yet attachments show successful transfers of Ethereum, Litecoin, and Bitcoin Cash. If these assets were in fact transferred, they were not authorized by any court order or forfeiture proceeding. Absent judicial approval, liquidation or conversion of digital assets is not permitted under DOJ policy or Rule 41. This underscores the urgency of a complete and sworn accounting. (See Section 3.9).

**Unreported receiving addresses and prior inflows.** The attachments include "Receiving" screenshots for Bitcoin, Ethereum, Litecoin, and Bitcoin Cash, confirming that agents accessed wallet functions and revealed active blockchain addresses. These addresses prove the wallets had been funded, yet no blockchain tracing, inflow analysis, or valuations have been disclosed. This directly contradicts the MoA's assertion that non-Bitcoin assets were "not attempted" and further undermines the reliability of the Government's custody record. (See Section 3.10).

- **Contemporaneous sworn disclosures.** Financial affidavits filed at Pretrial's direction, as well as 2021 correspondence from defense counsel, corroborated the existence of the Jaxx wallet (**~119 BTC**), the phone wallet (**~23 BTC**), and additional cold storage wallets. Counsel noted these holdings were provisionally estimated at approximately $1 million, subject to confirmation. Their actual balances should have been established once the devices and coins were returned to the office and examined. Yet no such reconciliation has ever been disclosed to the Court.

- **Unaccounted U.S. currency.** More than $10,000 in U.S. currency was seized across Colorado and Florida, including $as concealed in a belt, and Items 13 and 17 ("Box of coins" and "U.S. currency"), none of which

were carried forward into the official inventories.

On this record, a complete accounting has not yet been provided. The available evidence establishes at least 146.999 BTC on documented devices, along with additional unreported cryptocurrency and unaccounted cash.

I respectfully invite the Government to reconcile these records. Doing so would resolve these discrepancies without the need for further appellate intervention in the **Third Circuit.**[6]

# VI. Path Forward – The Solution and Candid Admissions Required

The record cannot be corrected by altering contemporaneous inventories such as the Control List or Schedule A; those documents reflect what was written at the time of seizure. What is required now is a comprehensive reconciliation and a candid acknowledgement of what can never be reconstructed.

**1. Consolidated sworn accounting.**
The Government should be directed to file a sworn reconciliation that:

- Aligns each seized device, wallet, or access medium with its chain-of-custody log,
- Identifies serial numbers, forensic hashes, or unique identifiers where available,
- Lists all blockchain addresses and transaction IDs associated with transfers,

[6] I have repeatedly sought clarification of these custody discrepancies in prior motions, without response. A writ of mandamus is already pending before the Third Circuit. Nevertheless, I remain willing to resolve these issues cooperatively with the Government. The Government may wish to reconcile these discrepancies in its custody records before the Court of Appeals compels such an accounting.

- Reconciles balances and disposition for Bitcoin and all non-Bitcoin assets, and
- Cross-references the MoAs, Control List, and Schedule A into a single, unified record.

**2. Acknowledgement of irreparable gaps.**
Reconciliation alone cannot recover assets or data never inventoried. Examples include:

- **Handwritten seed cards**: seized in Colorado, one used to restore Bitcoin, one never examined, neither logged in IRS depot records. The wallets they controlled can never now be verified.
- **Indicia/recovery cards (Controls #21–22)**: seized but omitted from inventories; the online wallets they linked to remain unknown.
- **Unidentified devices**: Florida digital devices were logged without serials or unique IDs, preventing any reliable tracing of their analysis or return.
- **Unaccounted currency**: more than $10,000 in cash, including $7,500 concealed in a belt, was seized but not carried forward into inventories.

**3. Candid certification.**
The Government must therefore do more than file a numerical reconciliation. It must also certify, under oath, which assets and records exist, which are missing, and which can no longer be reconstructed. Without that acknowledgement, the Court and defense will never have a verified accounting of the December 10, 2019 seizures.

**4. Purpose.**
Such a filing would not only clarify the record but also prevent further reliance on incomplete or contradictory inventories. It would resolve what can be resolved, and admit what cannot, thereby closing the evidentiary gaps without prolonged appellate intervention.

5. Requested Relief & Certification

To cure the record and allow the Court and defense to verify what was seized, what was transferred, and what cannot now be reconstructed, the Government should, under oath, produce the following materials or certify under oath that no such materials exist:

1. **Blockchain transaction evidence.** Produce the complete set of blockchain transaction IDs (TXIDs) and block confirmations for every transfer the MoAs or attachments attribute to restored seed phrases or to any seized device, together with the receiving government seizure addresses. Where transfers went to non-government addresses, identify those addresses and explain the legal authority for such transfers.

2. **Seed-material custody records.** Produce depot intake receipts, item images/photographs, item tags, and intake timestamps for **all** seized seed-phrase cards, indicia/recovery cards, and SD/PNG seed files (including the two handwritten Ledger seed cards and the Exodus SD card). If no intake records exist, certify under oath that none exist and explain the steps taken to search for them.

3. **Custodian affidavits / restoration logs.** Produce sworn custodian affidavits identifying the agent(s) who restored seed phrases or accessed wallets (including dates, locations, software used, and the person(s) who witnessed or supervised restorations), together with any restoration logs, software logs, Electrum/Exodus exports (XPUBs or equivalent), and timestamps showing when restoration and transfers occurred.

4. **Device identifiers and forensic exports.** Produce serial numbers, hardware/chip/USB IDs, device images, forensic hashes (MD5/SHA-256) or full forensic exports for the seized Ledger Nano S, Trezor, cellphones, MacBook, and any cold-storage coins (including any manufacturer serials or hologram identifiers). If a device has no external serial, identify any internal hardware identifier or export that ties the device to derived addresses.

5. **Consolidated, cross-referenced reconciliation.** Provide a single sworn reconciliation table that cross-references: (a) each seized item (Control # / Schedule A item #), (b) the MoA reference and attachment where it appears, (c) serial / identifier / image reference, (d) derived wallet

addresses and XPUBs (if available), (e) the TXIDs for any transfers, (f) present balance (if held in government seizure addresses), and (g) the physical custody location and custodian for the item. The reconciliation should explicitly flag items for which no custody/export/log exists.

6. **Statement of missing / irreparable items.** If any seized items (seed cards, indicia cards, devices, cash) cannot be produced or never entered into depot custody, the Government must certify under oath: (a) which items are missing; (b) the steps taken to locate them; (c) whether any restoration or transfer was performed using such items; and (d) the date and custodian associated with their last known handling.

7. **Non-Bitcoin asset handling.** For any transfers of non-Bitcoin assets (ETH, LTC, BCH, ERC-20 tokens) shown in the attachments, produce TXIDs, restoration logs, and the legal authority relied upon for any conversion, transfer, or disposition of those assets.

If the Government cannot produce any item above, it should **so certify under oath** and explain the steps taken to search for the record or property and the reasons it does not exist. The defense reserves all rights to seek further relief — including motion practice or evidentiary hearings — should the Government fail to comply or if the certification reveals material, unrecoverable gaps.

## VI. Exhibits

Exhibit A – Government's January 15, 2020 Filing (Dkt. 24)

Exhibit B – Colorado Memorandum of Activity (Dec. 10, 2019)

Exhibit C – Florida Memorandum of Activity (Dec. 10, 2019)

Exhibit D – Inventory Lists (Schedule A and 1B Property Reports)

Exhibit E – Financial Disclosures & Counsel Correspondence.

# EXHIBIT C

## PLAINTIFF'S OCTOBER 7, 2025 MEMORANDUM REGARDING SEIZED DIGITAL ASSETS ANDACCOUNTING DISCREPANCIES

## PURPOSE OF EXHIBIT

This exhibit demonstrates that Plaintiff specifically identified unresolved discrepancies concerning the seized digital assets and placed the Government on actual notice of those issues before filing the present action.

The memorandum compares, among other materials:

- the original seizure records;
- the Government's property-control records;
- Schedule A and related inventories;
- the later forensic report;
- blockchain information;
- wallet and device information; and
- financial disclosures concerning digital-asset balances.

The memorandum also requested reconciliation of the records and confirmation whether additional records existed.

MEMORANDUM OF LAW

To: Whom It May Concern

From: Joby Weeks

Date: October 7, 2025

Re: Memorandum of Law in Support of my Position Regarding Seized Bitcoin (BTC)

Table of contents


I. Introduction 2
II. Government's Statements to the Court (Dkt. 24) 3
2.1 Wallet Flows Exceeding $560 Million 3
2.2 Admissions of $62 Million in a Single Year 3
2.3 Use of Hardware Wallets (Ledger and Trezor) 4
III. Evidence from the Government's Custody Records and 2025 Disclosure 5
3.1. Colorado Seizure (Arvada) 6
3.2 Florida Seizure (Palm Beach) 11
3.3 Cell Phone Wallet 13
3.4 Inventory Discrepancies (Control List vs. Schedule A) 13
3.5 Ledger Nano S (hardware) and Seed-Phrase Cards 16
3.6 Combined Overview – Cryptocurrency 18
3.7 Items Seized but Not Inventoried 20
3.8 Absence of a Consolidated Seizure Report 21
ALTERNATIVE 3.8 Absence of a Consolidated Seizure Report 22
3.9 Contradictions Between MoA Text and Attachments 22
3.10 Receiving Addresses and Transaction History 24
IV. Unclear Transfer Activity from Seized Wallets 25
4.1 Government's Own Admission of No Consent and Uncertainty 25
4.2 Contradictory Action: Colorado Memorandum of Activity 26
V. Conclusion 27
**VI. Path Forward – The Solution and Candid Admissions Required 30**
**VI. Exhibits 33**

Exhibit F – Annex: Seed Phrase Card #1 (Exodus Wallet / Restored Wallet Analysis) 34
**Exhibit G – Annex: Seed Phrase Card #2 (Technical Description & Evidentiary Significance) 39**
**Exhibit G – Missing-Item Notice & Request (drop-in language) 41**
Exhibit H – Annex: ETH/LTC/BCH Contradictions 42
**Annex – Supplementary Exhibits 45**

## I. Introduction

I write this memorandum to address the cryptocurrency assets seized from me on December 10, 2019, in Colorado and Florida. Based on the Government's own filings (the January 15, 2020 opposition brief, Dkt. 24), the contemporaneous seizure memoranda, and later custody correspondence, it is clear that multiple hardware wallets, cold storage instruments, and digital devices containing Bitcoin were taken into custody.

The records do not match. Dkt. 24 reports that my cryptocurrency balances were "unclear" and that agents found an "empty tube" in Colorado. The Colorado Memorandum of Activity, however, documents that agents **restored a seized handwritten seed phrase (Seed Phrase Card #1) off-device and used that restored wallet to transfer Bitcoin**, while other wallets and access media were seized for later review. The physical Ledger Nano S hardware remained locked on the record and was not shown to be unlocked. Separately, items listed on the on-site Control List do not appear in Schedule A (the IRS Denver depot list), and Schedule A contains crypto items absent from the on-site inventory. These inconsistencies are systemic and material. (See Exhibits F–H; Section VI for requested relief.)

From my perspective, the result is that the official custody record remains incomplete and difficult to follow. I know my wallets historically handled very large Bitcoin flows, and the Government's own reports describe specific devices — including a Jaxx wallet (~119 BTC) and a cellphone wallet (~23 BTC). Yet

no unified inventory has ever been provided that accounts for these devices or for the transfers that occurred.

I am not trying to assign blame; I am asking for clarity. The record suggests that cryptocurrency assets plausibly amounting to at least 1,000 BTC were seized, but the inconsistencies between the inventories and memoranda have left the true amounts unverified. My request is simple: that the Department of Justice reconcile these discrepancies in its custody records before further appellate intervention becomes necessary.

Under Fed. R. Crim. P. 41(g), the Court may order the return of property if its continued retention by the Government is unreasonable or inconsistent with due process. The rule "is rooted in equitable principles" and remains available even after conviction or sentencing. *See United States v. Chambers*, 192 F.3d 374, 376-77 (3d Cir. 1999); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (en banc).

**II. Government's Statements to the Court (Dkt. 24)**

The Government's opposition brief filed on January 15, 2020 (Dkt. 24) contains multiple admissions confirming that my cryptocurrency activity involved wallets with extraordinary Bitcoin flows, the use of hardware cold storage devices, and the existence of substantial balances.

2.1 Wallet Flows Exceeding $560 Million

The Government admitted:

> *"On March 1, 2018, one of Weeks' bitcoin wallets had a final balance of approximately $3.6 million. Over its existence, that wallet had received more than approximately $560 million worth of bitcoin."*[1].

[1] Dkt. 24 at 18

Even conservatively, at Bitcoin prices ranging between $1,000 and $10,000 in 2017–2018, these flows correspond to thousands of BTC.

2.2 Admissions of $62 Million in a Single Year

The Government also cited my own words:

> *"In mid-2017, Weeks emailed an associate stating that more than approximately $62 million had passed through one of his bitcoin wallets in the previous year." .*[2]

At then-prevailing prices (~$1,000–$4,000 per BTC), this equates to between 15,000 and 60,000 BTC.

2.3 Use of Hardware Wallets (Ledger and Trezor)

The Government further confirmed my use of hardware cold storage:

> *"Weeks' records show that he kept Trezor and Ledger coins offline. He also received periodic emails from Trezor support.".*[3]

Agents also reported:

According to Dkt. 24, Weeks advised that he had a cold storage bitcoin wallet buried in a tube somewhere in Colorado. The filing then states: "*Agents searching Weeks's residence in Colorado found an empty tube that matched what Weeks described*." (Dkt. 24 at 22).

These admissions demonstrate that, as of the Government's own January 2020 filing, I was understood to control significant BTC holdings secured on hardware wallets and offline devices.

The subsequent seizure memoranda, discussed in Section III, confirm that these offline storage devices were in fact taken into custody but never properly inventoried or accounted for. (See **Exhibit A** for relevant excerpts from Dkt. 24.).

[2] Dkt. 24 at 18
[3] Dkt. 24 at 21

**III. Evidence from the Government's Custody Records and 2025 Disclosure**

Note on Evidence Storage:
It is standard procedure for property seized in different jurisdictions to be stored at the local field offices responsible for those searches — here, Denver for the Colorado seizure and West Palm Beach for the Florida seizure. What is not standard, however, is the Government's failure to produce a single consolidated inventory covering all seized property. Instead, the records are fragmented, inconsistent, and incomplete: items referenced in the December 10, 2019 Memoranda of Activity never appear in the official Schedule A inventories, dollar amounts are omitted or minimized, and no comprehensive accounting has ever been presented to the Court. This lack of a unified inventory — not the mere fact of dual storage locations — renders the Government's handling of evidence deficient under Rule 41 and DOJ policy.

The Government's own filings, including the January 15, 2020 Opposition (Dkt. 24), the Memoranda of Activity dated December 10, 2019 for Colorado and Florida, and the December 6, 2024 custody correspondence from AUSA Torntore, confirm that multiple cryptocurrency wallets, hardware devices, and cash assets were seized. Yet these materials also demonstrate that the seized property was never properly inventoried or valued, despite its capacity to hold substantial amounts of Bitcoin and U.S. currency.

### 3.1. Colorado Seizure (Arvada)

Government Statements of Uncertainty

In its January 15, 2020 filing, the Government represented to the Court:

> *"At present, it is unclear how much cryptocurrency Weeks maintains. During his custodial interview on December 10, 2019, Weeks declined to give consent to law enforcement to access his holdings. However, Weeks advised that he had a cold storage bitcoin wallet buried in a tube somewhere in Colorado, a cryptocurrency go-bag for emergency purposes. He refused to provide its exact location. Agents searching Weeks's residence in Colorado found an empty tube that matched what Weeks described."* (Dkt. 24 at 22).

The Government's claim was that the tube was empty, meaning no cold wallet was recovered there and no balance could be established. The tube appears only in Dkt. 24 (described as empty). It is absent from the Colorado Memorandum of Activity (See **Exhibit B** for the full Colorado MoA.) and from both the Control list and Schedule A inventories, meaning no official custody entry was ever made.

The Government described the tube as "empty" in Dkt. 24, but in fact the tube contained weapons, gold, cash, silver and cold wallets. Agents left the weapons on the bed when departing, and neither the weapons nor the cold wallets appear in the seizure inventories. The omission of the tube and its contents reinforces the broader pattern: significant cryptocurrency devices were seized but not recorded or reported. This leaves the record incomplete and prevents any accurate accounting of the assets taken from the Colorado property.

Ledger Nano S Access and Transfers

The Colorado MoA records:

> *"One Bitclub Club Coin Ledger Nano S was located."* (MoA, Dec. 10, 2019).

This hardware wallet does not appear anywhere in the official Schedule A inventory lists.

The Ledger Nano S has no external serial number, making proper inventory and documentation essential to maintaining chain of custody. Yet the device is absent from the Schedule A inventory. Without logging its unique hardware identifier or associated wallet addresses, the Government has provided no verifiable record that the Ledger Nano S seized in Colorado is the same device from which BTC was later transferred.[4]

This language confirms two things: (1) agents pre-designated seizure addresses for recovered funds, and (2) agents restored at least one seized recovery phrase and used the restored wallet to move cryptocurrency into those addresses. The MoA and attachments attribute the transfers to a **restored seed phrase**, not to an unlocked Ledger Nano S device: the record shows the physical Ledger remained locked (Ledger Live firmware/update errors prevented normal on-device operation) and that **Seed Phrase Card #1** was restored off-device (in Electrum) and used to effect transfers. The transfer should therefore be attributed to the restored seed material, not to unlocking the Ledger hardware.

The Colorado MoA and attachments indicate the wallet environment associated with the seized materials included Bitcoin, Ethereum, ClubCoin, and other tokens. Blockchain tracing attributable to the restored seed material and related wallet images shows materially more Bitcoin than the Government has acknowledged (approximately **8.670 BTC** traceable in the restored wallet versus **~3.670 BTC** ever admitted in filings). Moreover, documentary

---

[4] A "BTC Cold Storage Coin" may refer to a Casascius coin or similar physical Bitcoin wallet. Casascius coins carry unique serial numbers engraved on the coin and logged by the manufacturer, which can be cross-checked to determine whether the coin was loaded with Bitcoin and in what amount. If such coins were seized, failure to record serial numbers renders them untraceable and prevents verification of their value. By contrast, a Ledger Nano S hardware wallet does not bear an external serial number, but it does contain a unique hardware identifier (chip/USB ID) and generates wallet addresses from its seed phrase. Proper forensic practice requires logging either the device identifier or the associated wallet addresses to establish chain of custody. The Government's inventories do neither, leaving both types of seized instruments without verifiable identification or valuation.

attachments labeled “ETH_Sending / ETH_Success,” “LTC_Sending / LTC_Success,” and “BCH_Sending / BCH_Success” indicate that Ethereum, Litecoin, and Bitcoin Cash transactions were initiated and completed; screenshots also show ERC-20 tokens (BAT, Augur, Aragon) in the session logs. Those non-Bitcoin transfers and token movements are reflected in the attachments but were not carried forward into the Control List or Schedule A inventories, demonstrating a failure to preserve a reliable custody trail for non-BTC holdings.

A detailed blockchain tracing and transaction flow for the restored wallet (the material restored from Seed Phrase Card #1 and the associated Exodus/SD image) is collected in **Exhibit F – Annex: Seed Phrase Card #1 (Exodus / Restored Wallet Analysis)** (Figure 1). The custody and provenance problems created by the unlogged recovery material and the locked hardware — including the unexamined second seed card — are analyzed in **Exhibit G – Annex: Seed Phrase Card #2 (Unexamined / Missing) and Seed-Phrase Restoration / Ledger Hardware Distinction** (Figure 2). A separate short hardware note regarding the seized Ledger Nano S (locked device, no serial/receipt in the depot records) appears in **Exhibit H – Ledger Nano S: Hardware Custody Note**.

December 2024 Disclosure of Missing BTC

On December 6, 2024, AUSA Anthony Torntore provided defense counsel with a report acknowledging that approximately **3.670 BTC** was transferred into a government wallet from the wallet restored using seized recovery material. Blockchain tracing attributable to the restored material, however, shows at least **8.670 BTC** associated with that restored wallet — leaving an unexplained discrepancy of **4.999 BTC**. In later December communications with former defense counsel, AUSA Torntore acknowledged that this **4.999 BTC** remained unaccounted for. (See Exhibit F for restored-wallet TXIDs and Section VI for requested production and certification.)

Unreported Cold Wallets and Contradictions

The Colorado MoA acknowledges that multiple physical cryptocurrency items were seized for later analysis, but the record contains no depot/inventory accounting of their balances.The MoA states:

> *"Other potential physical cryptocurrency assets were seized. Most of these were things like actual physical coins which contained either public or private Bitcoin keys, or both. Because of time constraints involved with the search, these items were physically seized, and no attempt was made to quantify their value, or to seize any potential funds which may be present. As such, a separate attempt should be made at a later date to determine whether there are any funds associated with these physically seized items."* (MoA, Dec. 10, 2019).

Despite that admission, Government filings (Dkt. 24) represented to the Court that the Government had "no idea" of my balances, and there remains no reported reconciliation of balances for the other cold wallets listed in the Colorado inventory or for any holdings potentially accessible via the seized recovery material. (See Exhibits F–H; Section VI.)

Additional Cryptocurrency Devices in the Inventory

The Government's own inventories also list multiple additional cryptocurrency-related storage devices that remain unexplained and unvalued:

Item 62 – Bitcoin Cold Storage Coin.

The inventory records the seizure of a single Bitcoin cold storage coin but provides no identifying details. If this was a Casascius coin or other funded cold storage instrument, it would have carried a unique serial number and a hologram concealing a private key. Such information is critical to determine whether the coin was loaded with Bitcoin and to verify chain of custody. No such details were recorded, leaving the coin's value unknown and its evidentiary integrity unverified.

Item 83 – 25 packages of silver-colored Bitcoin coins (~250 coins).

The inventory lists these coins in bulk with only an approximate count. If these were funded cold storage coins, each would carry a unique serial number and hologram, critical for verifying whether they contained Bitcoin. No such serials or identifiers were recorded. If they were unfunded novelty coins, Rule 41 still required precise documentation rather than an approximate tally. Either way, the bulk description prevents verification of their contents and leaves the record incomplete.

Item 88 – Trezor Bitcoin Hardware Wallet.

A Trezor hardware wallet secures Bitcoin holdings offline and can generate unlimited wallet addresses from its seed phrase. The inventory records its seizure but provides no unique device identifier, no reference to associated public addresses, and no indication that its balances were ever examined. Without such documentation, the Government cannot establish chain of custody or prove whether the device contained significant Bitcoin holdings at the time of seizure.

Item 89 – Ethereum Cold Storage Coin.

Item 89 – Ethereum cold-storage coin.

Like a Bitcoin cold-storage coin, an Ethereum cold-storage coin is a physical bearer instrument that exposes a public address while concealing a private key beneath a tamper-evident hologram. If funded, possession of the private key grants direct control over the associated ETH balance. The inventory entry for Item 89 contains no identifying detail — no photograph, no public address, no hologram condition report, and no indication that the coin was forensically examined or valued. Without those basic intake records, the coin's existence, provenance, and any on-chain balances cannot be independently traced or verified.

This item confirms that seized property was not limited to Bitcoin. The inventory and attachments therefore raise two separate problems: (1) the

Government identified non-Bitcoin assets (an Ethereum cold coin and token balances visible in session screenshots) but produced no forensic report or valuation for Item 89; and (2) for non-Bitcoin assets potentially linked to seized recovery material (seed phrases / SD images), the Government has not produced restoration logs, TXIDs, or depot receipts tying those assets to particular restoration sessions or custody entries. (Cross-refs: Exhibit F – Seed Phrase Card #1; Exhibit G – Seed Phrase Card #2; Exhibit H – Ledger Nano S Hardware Note.)

Control #21 – USB "Bitcoin" Storage Drive; Password Recovery Cards for Bitcoin; BTC Cryptocurrency Indicia Storage Cards.

These items are particularly sensitive: a USB drive may contain wallet files or private keys and carries an internal device identifier that should have been logged to preserve chain of custody, yet no such identifier is recorded. Recovery cards are effectively keys to restore cryptocurrency holdings, since each 12–24 word seed phrase is unique. Despite this, the inventory provides no descriptive detail, no forensic capture of their contents, and no indication whether these wallets were funded.

Control #22 – BTC Cryptocurrency Indicia Storage Cards.

These cards are effectively cryptocurrency wallets, each potentially containing unique private keys or QR codes that control Bitcoin balances. Unlike mere novelty items, indicia cards can hold real value if funded. The inventory provides no information on the number of cards, their denominations, or whether they were examined for balances. Without such detail, it is impossible to determine whether these cards represented active wallets or to verify what cryptocurrency, if any, they contained.

These items are capable of holding substantial amounts of cryptocurrency, yet there has been no disclosure of forensic imaging, blockchain tracing, or valuation. These items included not only hardware devices but also multiple recovery and indicia cards holding private keys — effectively direct access to online wallets. Yet the inventories record neither the number of cards, the balances they controlled, nor any follow-up analysis of their contents.

### 3.2 Florida Seizure (Palm Beach)

Seizure of Cryptocurrency-Related Devices

The Palm Beach Memorandum of Activity dated December 10, 2019 (See **Exhibit C** for the full Florida MoA.) documents the seizure of several digital devices, including:

> *"An Apple MacBook Pro laptop, a Huawei cellphone, and a Sandisk SD card."* (MoA, Dec. 10, 2019).

Devices Omitted from Asset Inventory

Despite being listed in the MoA, none of these devices appear in the official Schedule A inventory or the 1B-numbered custody lists. Their absence from the official records means their contents were never properly accounted for.

MacBook Access but Omission of Jaxx Wallet

Dkt. 24 itself acknowledges that investigators accessed the MacBook:

> *"Agents were able to access Weeks' Facebook account on the seized MacBook computer."* (Dkt. 24 at 19).

This confirms that the device was entered and used by investigators.

The MacBook also contained a Jaxx cold wallet holding approximately 119 BTC (valued at about $1 million in November 2019). This wallet was also reported in Weeks's contemporaneous financial affidavit (See **Exhibit E**, p.3). Later, in 2021, defense counsel confirmed to the Government that the Jaxx wallet, together with seized USB cold storage wallets and coins, was estimated at approximately $1 million in total, subject to verification. (See Exhibit E, Counsel Correspondence). Yet there is no mention of this wallet or its balances in the MoA, the Schedule A, or any custody documentation.

In Dkt. 24, the Court was simultaneously told that the Government had "no idea" about the amount of cryptocurrency I possessed, creating a direct contradiction between the investigative record and the Government's representations.

The Florida MoA also records: 'Agents placed WEEKS' personal effects, which he had at the time of his arrest, in a sealed evidence bag. WEEKS, S/A Qaqish, and S/A Helmstetter initialed the bag where it was sealed. WEEKS agreed to have these items returned to his attorney at his court appearance.' (See Exhibit C, Florida MoA, Dec. 10, 2019). These items — including keys, cards, and other effects — were the only ones for which a formal chain-of-custody procedure was noted. Yet, when received at the IRS depot, only the wedding band and U.S. currency appear in the custody record, while the remainder vanished. Other effects listed in the MoA, such as AUI Jim sunglasses, do not appear in either the Control List or the Schedule A at all. This means that even the only property explicitly documented for return through counsel was neither properly received nor returned, reinforcing the broader pattern of incomplete and inconsistent custody.

The Florida MoA identifies these digital devices only generically (MacBook, Huawei phone, iPhone, and Sandisk SD card) and provides no serial numbers or unique identifiers. The omission of serial numbers breaks chain-of-custody protocol, as it prevents any verification that the devices seized on-site are the same as those later held in custody or subject to forensic review. None of these devices appear in the Control List or Schedule A inventories, compounding the custody gap.

### 3.3 Cell Phone Wallet

The Huawei cellphone contained a wallet holding approximately 23 BTC. This balance was also disclosed in Weeks's financial affidavit as '23 Bitcoins – Phone BTC Wallet.' (See Exhibit E, p.4). Like the MacBook, however, this wallet is not described in any seizure report, inventory, or custody record.

### 3.4 Inventory Discrepancies (Control List vs. Schedule A)

A further problem arises from the Government's use of two parallel inventory systems. The "Inventory Listing of All Items Seized at Search Warrant Site" (the Control list) reflects what agents logged on-site during the Colorado seizure. By contrast, the "Schedule A" inventory is not a second seizure log but a receiving list, documenting only those items that were actually transported and booked into the IRS Denver Holding Office. The two inventories do not match.

Items seized at the residence never appear on the receiving list, while other items appear in custody that were never logged at the scene.

This dual system prevents a continuous chain of custody. Rule 41 requires a single, accurate inventory of all property seized. By maintaining inconsistent lists, the Government has created irreconcilable gaps that make it impossible to determine what was actually seized, what was transported, and what was retained.

Items on Control List but Not on Schedule A

The following devices and cryptocurrency-related instruments were logged on the on-site Control list but do not appear in the IRS Denver Schedule A. Their absence means they were seized at the residence but never receipted into IRS custody:

| Control # (Seizure-Site Inventory) | Description | Serial / Notes | Appears in Schedule A? |
|---|---|---|---|
| Control #5 | Western Digital MyBook USB Hard Drive | Serial: WCC7K1 LSFTTP | Missing |
| Control #6 | Generic USB Thumbdrive | Serial: Y1178-T48L-B52L-V 3 | Missing |
| Control #7 | Sandisk Extreme SD Card | Serial: BM1235222025G | Missing |
| Control #8 | Huawei Cellphone | Unknown serial number | Missing |
| Control #9 | Apple MacBook Pro | Serial: W8944JH766E | Missing |
| Control #11 | BTC Cold Storage Coin | No serial recorded | Present (Item 62) |
| Control #17 | U.S. Currency (cash in closet gun safe) | No denomination recorded | Present (Item 17 “United States |

| | | | |
|---|---|---|---|
| | | | Currency") |
| Control #21 | USB "Bitcoin" Storage Drive; Password Recovery Cards for Bitcoin; Ring, Earrings, Chain | No identifiers recorded | Missing |
| Control #22 | BTC Cryptocurrency Indicia Storage Cards | No identifiers recorded | Missing |

These omissions include core digital devices (MacBook, Huawei cellphone, Western Digital drive, Sandisk SD card) that are natural repositories of wallet files and keys, as well as explicitly crypto-labeled items (USB "Bitcoin" drive, recovery cards, indicia storage cards). Their disappearance from the Schedule A custody record severs continuity and leaves their fate unaccounted for.

Conversely, several cryptocurrency instruments appear in the IRS Denver Schedule A but were never logged on the on-site Control list. Their presence in custody records without corresponding seizure entries raises questions about when and how they were recorded:

Items on Schedule A but Not on Control List

| Schedule A Item # | Description | Serial / Notes | Appears in Control Inventory? |
|---|---|---|---|
| Item 62 | Bitcoin Cold Storage Coin | No serial recorded | Not in Control List |
| Item 83 | 25 Packages of Silver-Colored Bitcoin Coins (~250) | Bulk count only | Not in Control List |
| Item 88 | Trezor Bitcoin Hardware Wallet | No device ID logged | Not in Control List |
| Item 89 | Ethereum Cold Storage Coin | No identifiers recorded | Not in Control List |

The appearance of these items only in Schedule A, without any corresponding Control number, raises the reverse problem: there is no evidence they were

logged on-site during the search. This suggests either a failure to record seizures at the scene, or post-hoc additions to the custody record.

Taken together, Exhibits E and F demonstrate that the Government has not produced a single reconciled inventory of seized property. Instead, it relies on two lists that cannot be reconciled with each other. Critical devices and cryptocurrency instruments either vanish from the record or appear without ever having been logged at seizure.

Even more striking, some cryptocurrency devices documented elsewhere do not appear in either inventory at all. The Ledger Nano S hardware wallet, expressly recorded in the Colorado MoA of December 10, 2019, is absent from both the Control list and Schedule A. Likewise, the tube appears only in Dkt. 24 (described as empty). It does not appear in the Colorado MoA or in either inventory, and no record was made of its reported contents (weapons, cold wallets, or cash). This means that key cold storage devices containing cryptocurrency were seized but never received into IRS custody. The absence of these items underscores the lack of a continuous chain of custody and prevents any reliable accounting of what cryptocurrency assets were actually taken.

Summary of Inventory Discrepancies:

Exhibits E and F make clear that the two government inventories cannot be reconciled. Items logged at the scene on the Control list never appear in the IRS Denver Schedule A, while other items show up in Schedule A without any record of being logged on-site. Even more significant, some cryptocurrency devices described in the Colorado MoA (such as the Ledger Nano S) and in Dkt. 24 (the tube said to contain a cold wallet) appear in neither list at all. This demonstrates that key cryptocurrency storage devices may have been seized but never receipted into IRS custody, leaving the chain of custody incomplete and preventing any reliable accounting of what digital assets were actually taken.

### 3.5 Ledger Nano S (hardware) and Seed-Phrase Cards

**Ledger Nano S / Seed cards (short statement).** The seized Ledger Nano S remained locked and was never unlocked on the record. Two handwritten seed-phrase cards were seized: **Seed Phrase Card #1** was restored off-device and used to transfer Bitcoin into government seizure addresses (see Exhibit F – Annex: Seed Phrase Card #1); **Seed Phrase Card #2** was seized but was not examined on the record and does not appear in depot/inventory records (see Exhibit G – Annex: Seed Phrase Card #2).

The Colorado Memorandum of Activity (Dec. 10, 2019) documents seizure of a device identified as a "Bitclub Club Coin Ledger Nano S" and two handwritten recovery (seed-phrase) cards. A seed-phrase (BIP-39 mnemonic) is a portable backup that deterministically regenerates a wallet's private keys and derived addresses; it is not tied to a single physical device and can be restored on any compatible hardware or software.

According to the MoA, agents attempted to operate the seized Ledger Nano S via Ledger Live but encountered firmware/update errors. The record does not show the physical device was ever unlocked with a PIN. Instead, the MoA documents that agents **restored Seed Phrase Card #1** in Electrum (i.e., they recreated the wallet from the mnemonic off-device) and used the restored wallet instance to transfer Bitcoin into pre-designated government seizure addresses. The MoA and attachments do not quantify the amount transferred; all wallet addresses, balances, and TXIDs attributable to the restoration are collected and traced in Exhibit F – Annex: Seed Phrase Card #1 (Restored Wallet Analysis).

The second handwritten seed-phrase card (Seed Phrase Card #2) was seized but, on the record, was not restored or examined. The MoA recommended restoring both seed phrases on a new Ledger device to identify holdings, but there is no documentation of any such follow-up for Seed Phrase Card #2 or for non-Bitcoin tokens described in the MoA.

Critically, neither the physical Ledger Nano S nor the two handwritten seed-phrase cards appear in the Control List, Schedule A, or IRS depot custody records. Because seed phrases permit off-device restoration, their omission from official intake and depot records prevents independent verification of (a) the exact mnemonic recovered, (b) what addresses and balances the phrase could derive, and (c) who had custody of the recovery material after seizure. In short, the record shows not only that restorations occurred off-device but also that the very recovery materials used for those restorations were never formally logged into the Government's custody system — a material chain-of-custody gap.

A detailed forensic and blockchain tracing analysis for the restored seed phrase is set out in **Exhibit F – Annex: Seed Phrase Card #1 (Restored Wallet Analysis)**. **Exhibit G** documents the unexamined/missing second seed card and requests production or sworn certification of any related custody/restoration records. A separate short hardware note regarding the seized Ledger Nano S

(locked device, no serial/receipt produced in the record) is provided in **Exhibit H – Ledger Nano S: Hardware Custody Note**.

### 3.6 Combined Overview – Cryptocurrency

**Colorado (Arvada).** The Colorado Memorandum of Activity (Dec. 10, 2019) documents seizure of a device identified as a "Bitclub Club Coin Ledger Nano S" and two handwritten recovery (seed-phrase) cards. The physical Ledger Nano S does **not** appear in the official Schedule A inventory or in the depot/custody records.

The MoA also reports: "For one of the two seed phrases, agents were successful in finding bitcoin. Agents transferred this bitcoin to the seizure addresses provided in advance of the enforcement action." (MoA, Dec. 10, 2019). The record shows that **Seed Phrase Card #1** was restored off-device (in Electrum) and the restored wallet instance was used to execute transfers; the physical Ledger Nano S remained locked on the record and was not shown to have been unlocked with a PIN. (See Exhibit F – Annex: Seed Phrase Card #1.)

AUSA Torntore's December 6, 2024 custody report acknowledges **3.6704622 BTC** as having been transferred into a government seizure address. Independent blockchain tracing attributable to the wallet restored from Seed Phrase Card #1, however, shows approximately **8.67041881 BTC** associated with that restoration — producing an unexplained difference of **4.99995661 BTC** (≈ 4.99996 BTC). The apparent remainder was moved to addresses that are not disclosed in the Government's custody accounting. (See Exhibit F for the restored-wallet TXIDs and tracing; see Section VI for requested production.)

The MoA and attachments further indicate the restored wallet environment and/or the seized materials included non-Bitcoin assets — specifically Ethereum, ClubCoin, and other tokens — yet no forensic reports, valuations, or depot entries for those non-BTC holdings have been produced. The MoA itself records that additional cold wallets, physical coins, and recovery indicia were seized for later analysis, but no reconciling inventory or depot reconciliation has

been filed (compare Colorado on-site Control List with Schedule A). In short: (1) the transfers traced in the record derive from restored recovery material (not from an unlocked Ledger device), (2) the Government's disclosed transfer total (3.6704622 BTC) does not reconcile to the blockchain tracing for the restored wallet (8.67041881 BTC), and (3) non-Bitcoin holdings and multiple other cold wallets seized in Colorado remain unaccounted for in the official custody records.

(Forensic and blockchain tracing for the restored wallet are collected in Exhibit F; the unexamined second seed card and missing custody items are documented in Exhibit G; the seized but locked Ledger hardware is noted in Exhibit H. See Section VI for the Government's required sworn reconciliation and certification of missing items.)

Florida (Palm Beach):
The Palm Beach MoA (Dec. 10, 2019) lists seizure of an Apple MacBook Pro, a Huawei cellphone, and a Sandisk SD card. None of these devices appear in the Schedule A or 1B inventories.

Dkt. 24 confirms that investigators accessed the MacBook to retrieve Facebook records, proving the device was entered. The MacBook also contained a Jaxx wallet holding approximately 119 BTC (~$1 million at November 2019 values).[5]

The Huawei cellphone contained a wallet with approximately 23 BTC.

Neither device, nor these balances, appear in any custody report or official inventory, with no disclosure of forensic imaging or blockchain tracing.

Summary – Cryptocurrency:
The Government seized multiple cryptocurrency storage devices and computers on December 10, 2019, including hardware wallets and systems capable of holding large sums of BTC. The seized Ledger Nano S hardware remained locked and was not shown on the record to have been unlocked; however, recovery material seized at the same time (Seed Phrase Card #1 and an SD/.png

[5] Exhibit C.

seed image) was restored off-device and used to move funds (see Exhibit F). The Government has only acknowledged partial Bitcoin receipts (≈3.6704622 BTC) despite blockchain tracing showing approximately **8.67041881 BTC** associated with the restored material. The Jaxx wallet (~119 BTC) and a phone wallet (~23 BTC) are documented in contemporaneous financial disclosures and counsel correspondence but were omitted from the official custody inventories. These disclosures and the tracing together show the Government never produced a reconciled custody record for the seized cryptocurrency. (See Exhibit E; Exhibit F.)

## 3.7 Items Seized but Not Inventoried

In addition to the specific discrepancies detailed above, the record shows entire categories of cryptocurrency devices and access media that were physically seized but never inventoried. The Colorado MoA and the Control List reference these items, yet they do not appear in the Schedule A inventories, nor are they carried forward into any chain-of-custody documentation.

This omission is critical. Hardware wallets, seed phrase cards, indicia cards, and cold storage coins are the functional equivalent of private keys. Their absence from the inventories prevents any reliable accounting of what cryptocurrency was seized, what was transferred, and what balances may remain under Government control.

**Table – Items Seized but Absent from Inventories**

| Item | Source (MoA / Control List / Dkt. 24) | Status in Inventories |
|---|---|---|
| Ledger Nano S (Bitclub edition) | Colorado MoA (Dec. 10, 2019) | Not listed in Control List or Schedule A |
| Seed Phrase Card #1 | Colorado MoA | Not listed |
| Seed Phrase Card #2 | Colorado MoA | Not listed |
| Exodus SD Card (.png seed) | Colorado MoA | Not listed |
| BTC Indicia Cards (Control #22) | Control List | Not carried forward into Schedule A |
| Password Recovery Cards (Control #21) | Control List | Not carried forward into Schedule A |

| | | |
|---|---|---|
| Ethereum Cold Storage Coin | Colorado Inventory, Item #89 | No address, no hologram status, no valuation |
| Bitcoin Cold Storage Coin | Colorado Inventory, Item #62 | No serial, no valuation |
| 25 packages of silver-colored Bitcoin coins (~250) | Colorado Inventory, Item #83 | No serials, bulk count only |
| Trezor Bitcoin Hardware Wallet | Colorado Inventory, Item #88 | Listed, but no device ID or valuation |

Closing Observation

The absence of these items from both the Control List and the Schedule A confirms that the official inventories are incomplete. Taken together, the Ledger Nano S, seed phrase cards, Exodus SD card, indicia cards, and cold storage coins represent substantial cryptocurrency holdings. Without proper logging, imaging, and reconciliation of these items, there can be no verifiable accounting of the assets seized on December 10, 2019.

## 3.8 Absence of a Consolidated Seizure Report

Despite the number and complexity of cryptocurrency devices seized on December 10, 2019, no consolidated accounting has ever been provided. Standard practice requires a final seizure report reconciling all wallets, devices, recovery media, and coins, supported by blockchain transaction records and custody logs. Such a report should:

- Identify each seized item with unique details (device serial numbers, wallet addresses, seed phrase identifiers);
- Record all cryptocurrency balances observed, transferred, or left in place;
- Document transfers with blockchain transaction IDs and destination government seizure addresses;

- Track the chain of custody for each physical device or recovery medium, from seizure site to IRS-CI or FBI forensic units and ultimately to evidence storage.

Such a consolidated report should be prepared and maintained by the lead investigative agency. In digital asset cases this is typically **IRS-CI (Criminal Investigation)** if IRS was lead on the seizure, or **FBI CART (Computer Analysis Response Team)** if the FBI was responsible for forensic imaging. Ultimately, the **U.S. Attorney's Office (USAO)** bears the duty to maintain custody records and to certify to the Court the total balances seized.

In a matter involving digital assets, where value depends on precise chain-of-custody, the final seizure accounting should be submitted to the Court as a **sworn certification**, identifying the total balances seized and the government seizure addresses that hold them. No such certification has been made here.

Instead, the Court has been left with only preliminary Memoranda of Activity (Colorado and Florida), supplemented by incomplete inventories (Control List and Schedule A). These documents contain internal inconsistencies, omit entire categories of seized items, and fail to reconcile the cryptocurrency balances actually transferred to government wallets. Without a comprehensive, sworn report, neither the defense nor the Court can verify what cryptocurrency was actually taken, what was transferred, and what balances remain unaccounted for.

**ALTERNATIVE 3.8 Absence of a Consolidated Seizure Report**

The Government has never produced a single, sworn, consolidated accounting reconciling (a) each seized item, (b) the seed materials and software images derived from those items, (c) the wallet addresses generated or restored, (d) the blockchain transaction IDs (TXIDs) for transfers, and (e) the physical custody location and custodian for each item. Standard practice following complex digital-asset seizures requires a consolidated report that cross-references Control List entries, Schedule A items, MoA attachments, device identifiers (serials / images / forensic hashes), and blockchain evidence. No such consolidated reconciliation appears in the record. Without it, piecemeal inventories and incompatible logs cannot be used to verify what was seized, what was

transferred, or what remains unaccounted for. (See Section VI for the production and sworn certification we request.)

### 3.9 Contradictions Between MoA Text and Attachments

The Colorado MoA contains direct contradictions regarding the handling of non-Bitcoin cryptocurrency balances. The text asserts that these assets were not accessed, while the attachments show evidence of successful transfers.

**Government Statement 1:**

> *"Agents were successful in that they could see the device potentially contained Bitcoin, Ethereum, Club Coin, and possibly two other assets. However, access to the other potential cryptocurrencies was not attempted."*
> *(Colorado MoA, Dec. 10, 2019, p.__).*

**Government Statement 2:**

> *"Additionally, the dollar amounts were deemed to be below the threshold after speaking with the Command Post."*
> *(Colorado MoA, Dec. 10, 2019, p.__).*

**Factual Record (Attachments):**
Contrary to these assertions, the attachments include screenshots labeled *"ETH_Sending / ETH_Success," "LTC_Success," and "BCH_Success."* These demonstrate that Ethereum, Litecoin, and Bitcoin Cash transfers were initiated and completed. Additional ERC-20 tokens (BAT, Augur, Aragon) are also visible in the attachments.

**Analysis:**
If non-Bitcoin assets were not attempted because no government wallet addresses were available, then "sending" and "success" confirmations should not exist. If they were disregarded because their values were "below threshold," no transfer attempts should have been made. The only consistent reading is that non-Bitcoin assets were seized, but omitted from the inventories and never disclosed to the Court.

A detailed summary of these contradictions, including a comparative table of MoA text versus attachments and screenshots of the ETH/LTC/BCH transfers, is provided in **Exhibit H – Annex: ETH/LTC/BCH Contradictions.**

ALTERNATIVE **3.9 Contradictions Between MoA Text and Attachments**

The MoA narrative and the supporting session attachments often tell different stories. Examples include: the MoA text indicating certain non-Bitcoin assets were "not attempted" while attachments show completed ETH/LTC/BCH transactions; the MoA describing an "empty tube" while attachments and photographs indicate items were present; and the MoA stating no valuation was performed while session logs and screenshots show wallet activity and balances. These contradictions are not isolated; they recur across Colorado and Florida materials and materially undermine the reliability of the Government's custody record. Each such contradiction is catalogued in the annexes and cross-referenced in the exhibit list so that the Government must address them directly. (See Exhibits F–H and Exhibit I for specific screen captures and session logs.)

## 3.10 Receiving Addresses and Transaction History

The attachments to the Colorado MoA include screenshots labeled "Receiving" for multiple assets, including Bitcoin, Ethereum, Litecoin, and Bitcoin Cash. These screenshots show the wallet's "Receive" tab, which lists one or more public addresses used to fund the wallet.

**Significance:**

- To obtain these "Receiving" screenshots, agents necessarily accessed the wallet interface beyond simple balance checks. This contradicts the MoA's representation that non-Bitcoin assets were "not attempted."

- Receiving addresses demonstrate that the wallets were not dormant placeholders, but had previously been funded on the blockchain. This provides a direct means to trace past transactions and confirm whether additional balances remained under the control of the seized wallet.

- The presence of receiving addresses also indicates that agents had the ability to conduct a forensic trace of prior inflows and outflows. No such tracing report has been provided to the defense or the Court.

**Implication:**
The "Receiving" screenshots undermine the Government's assertion that access to non-Bitcoin assets was not pursued. In reality, agents accessed the wallet functions, revealed active blockchain addresses, and documented them. Yet the official inventories do not include these addresses, no blockchain tracing has been disclosed, and no valuations of prior inflows have been reported.

This omission deprives the Court of the ability to verify the full scope of cryptocurrency under Government control.

ALTERNATIVE **4.3 Receiving Addresses and Transaction History *(moved from old 3.10)***

The attachments contain screenshots, Electrum/Exodus session logs, and "Receiving" images that show public receiving addresses and completed transfers. Where restoration occurred from seized seed material, those receiving addresses and the corresponding TXIDs are the primary means of independently verifying the movement and disposition of funds. To date, the Government has produced only a partial set of TXIDs tied to one reported receipt (~3.6704622 BTC). The full set of TXIDs traceable to the restored wallet(s) (totaling ~8.67041881 BTC) appears in Exhibit I; the Government must identify which TXIDs it contends correspond to the 3.6704622 BTC it reported and must produce any other TXIDs and confirmations for transfers it performed or authorized. Absent full TXID production and matching custodian logs, the Court cannot reconcile the reported receipts with on-chain reality.

**IV. Unclear Transfer Activity from Seized Wallets**

Rule 41(g) invokes the Court's equitable jurisdiction, which survives conviction and sentencing because it arises from the Court's supervisory power rather than the pendency of a criminal proceeding. Once criminal jurisdiction ends, a Rule 41(g) motion proceeds as a civil equitable action against the United States, and

the Court may fashion appropriate relief—including the return of property, an accounting, or an evidentiary hearing—whenever the Government's continued retention would be unreasonable or inconsistent with due process. *See United States v. Chambers*, 192 F.3d 374, 376–77 (3d Cir. 1999); *Rufu v. United States*, 20 F.3d 63, 65 (2d Cir. 1994); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (en banc). Because equitable jurisdiction depends on the Court's supervisory power rather than the pendency of criminal proceedings, this Court's discretion is guided by equitable factors such as the movant's clean hands, the Government's need to retain the property, and the availability of adequate remedies at law. *See United States v. Chambers*, 192 F.3d at 377; *Mora v. United States*, 955 F.2d 156, 158 (2d Cir. 1992).

The record further demonstrates that the Government's actions appear inconsistent with Rule 41(g) and standard DOJ asset seizure protocol, given that these transfers were not documented in the official inventory

4.1 Government's Own Admission of No Consent and Uncertainty

In its January 15, 2020 Opposition brief, the Government stated:

> *"At present, it is unclear how much cryptocurrency Weeks maintains. During his custodial interview on December 10, 2019, Weeks declined to give consent to law enforcement to access his holdings… Agents searching Weeks's residence in Colorado found an empty tube that matched what Weeks described."*

This representation conveyed to the Court that Weeks' cryptocurrency balances remained unknown, and that the alleged storage tube was empty.

4.2 Contradictory Action: Colorado Memorandum of Activity

Yet, the Memorandum of Activity for the December 10, 2019 search in Arvada, Colorado reveals that agents in fact accessed at least one wallet and transferred its cryptocurrency balances to a government-controlled wallet.

This action was taken:

1. Without Consent – I expressly refused consent to access his wallets.

2. Without Full Documentation – No contemporaneous chain of custody or inventory identifies the transferred balances. Indeed, later review revealed missing entries and an unexplained discrepancy of at least 4.999 BTC.

3. Without Judicial Oversight – The seizure warrant authorized the taking of devices, these transfers raise unresolved questions as to custody and authority, which should be clarified in the record.

These contradictions in the Government's own filings and memoranda highlight the need for a reconciled custody record.

## V. Conclusion

The combined record shows:

- **Extraordinary wallet flows.** My wallets historically reflected flows in the hundreds of millions of dollars in Bitcoin.

- **Seizures without valuation.** Agents seized multiple hardware wallets, cold storage devices, and digital instruments, while noting at the time that no valuation was made.

- **Minimum documented holdings.** At least **146.999 BTC** is documented, excluding additional cold wallets, coins, and recovery devices that remain unexamined.

- **Tube mischaracterization.** The tube described in Dkt. 24 as containing a cold wallet was reported as "empty," even though it actually contained weapons that were not inventoried, and it is not mentioned in the Colorado Memorandum of Activity. This mischaracterization highlights how significant items were omitted from the official record.

- **Ledger Nano S discrepancy.** wallet restored from **Seed Phrase Card #1** traces **~8.67041881 BTC**; Government acknowledges **~3.6704622 BTC** (≈**4.99995661 BTC** unexplained). Non-BTC holdings (ETH, ClubCoin, tokens) and device/forensic records not produced. (Exhibits F–H; Sec.

VI)

- **Absence of a consolidated seizure report.** Despite the number and complexity of cryptocurrency devices seized, no final accounting has ever been produced. Standard practice requires IRS-CI, FBI CART, or the U.S. Attorney's Office to prepare a consolidated report reconciling all devices, wallets, and transfers, supported by blockchain transaction IDs and custody logs. No such sworn certification has been filed with the Court. As a result, there is no verified total of cryptocurrency seized on December 10, 2019. (See Section 3.8).

- **Unreported recovery cards.** Multiple recovery and indicia cards seized in Colorado (Control #21 and #22) provided direct access to online wallets, yet the inventories record neither the number of cards, the balances they controlled, nor any follow-up analysis of their contents.

- **Ledger Nano S / seed cards.** The seized Ledger Nano S remained locked on the record. Two handwritten seed-phrase cards were seized: **Seed Phrase Card #1** was restored off-device and used to transfer Bitcoin into government seizure addresses (amount not specified in the MoA) while **Seed Phrase Card #2** was seized but not examined on the record. Neither the hardware nor the seed cards appear in the Control List or Schedule A, producing a material chain-of-custody gap for both the recovery material and any non-Bitcoin assets. (Exhibits F–H; Sec. VI)

- **Florida devices without identifiers.** The Florida MoA listed digital devices including a MacBook, Huawei phone, iPhone, and Sandisk SD card, but recorded no serial numbers or unique identifiers. These devices also do not appear in either the Control List or Schedule A. Without identifiers, there is no way to establish a reliable chain of custody or verify whether these devices were ever properly logged, analyzed, or returned.

- **Uninventoried devices and access media.** Entire categories of seized cryptocurrency devices and access instruments never appear in the

Control List or Schedule A. These include the Ledger Nano S, its two handwritten seed phrase cards, the Exodus SD card (.png seed), indicia and recovery cards (Controls #21–22), and multiple cold storage coins (Bitcoin and Ethereum). Without any inventory entries, there is no reliable chain of custody or accounting for these items, despite their direct role as private keys to cryptocurrency balances. (See Section 3.7).

**Unauthorized transfers of non-Bitcoin assets.** The Colorado MoA text claims that non-Bitcoin assets were not accessed or were deemed "below threshold," yet attachments show successful transfers of Ethereum, Litecoin, and Bitcoin Cash. If these assets were in fact transferred, they were not authorized by any court order or forfeiture proceeding. Absent judicial approval, liquidation or conversion of digital assets is not permitted under DOJ policy or Rule 41. This underscores the urgency of a complete and sworn accounting. (See Section 3.9).

**Unreported receiving addresses and prior inflows.** The attachments include "Receiving" screenshots for Bitcoin, Ethereum, Litecoin, and Bitcoin Cash, confirming that agents accessed wallet functions and revealed active blockchain addresses. These addresses prove the wallets had been funded, yet no blockchain tracing, inflow analysis, or valuations have been disclosed. This directly contradicts the MoA's assertion that non-Bitcoin assets were "not attempted" and further undermines the reliability of the Government's custody record. (See Section 3.10).

- **Contemporaneous sworn disclosures.** Financial affidavits filed at Pretrial's direction, as well as 2021 correspondence from defense counsel, corroborated the existence of the Jaxx wallet (~**119 BTC**), the phone wallet (~**23 BTC**), and additional cold storage wallets. Counsel noted these holdings were provisionally estimated at approximately $1 million, subject to confirmation. Their actual balances should have been established once the devices and coins were returned to the office and examined. Yet no such reconciliation has ever been disclosed to the Court.

- **Unaccounted U.S. currency.** More than $10,000 in U.S. currency was seized across Colorado and Florida, including $as concealed in a belt, and Items 13 and 17 ("Box of coins" and "U.S. currency"), none of which

were carried forward into the official inventories.

On this record, a complete accounting has not yet been provided. The available evidence establishes at least 146.999 BTC on documented devices, along with additional unreported cryptocurrency and unaccounted cash.

I respectfully invite the Government to reconcile these records. Doing so would resolve these discrepancies without the need for further appellate intervention in the **Third Circuit.**[6]

# VI. Path Forward – The Solution and Candid Admissions Required

The record cannot be corrected by altering contemporaneous inventories such as the Control List or Schedule A; those documents reflect what was written at the time of seizure. What is required now is a comprehensive reconciliation and a candid acknowledgement of what can never be reconstructed.

**1. Consolidated sworn accounting.**
The Government should be directed to file a sworn reconciliation that:

- Aligns each seized device, wallet, or access medium with its chain-of-custody log,
- Identifies serial numbers, forensic hashes, or unique identifiers where available,
- Lists all blockchain addresses and transaction IDs associated with transfers,

[6] I have repeatedly sought clarification of these custody discrepancies in prior motions, without response. A writ of mandamus is already pending before the Third Circuit. Nevertheless, I remain willing to resolve these issues cooperatively with the Government. The Government may wish to reconcile these discrepancies in its custody records before the Court of Appeals compels such an accounting.

- Reconciles balances and disposition for Bitcoin and all non-Bitcoin assets, and
- Cross-references the MoAs, Control List, and Schedule A into a single, unified record.

**2. Acknowledgement of irreparable gaps.**
Reconciliation alone cannot recover assets or data never inventoried. Examples include:

- **Handwritten seed cards**: seized in Colorado, one used to restore Bitcoin, one never examined, neither logged in IRS depot records. The wallets they controlled can never now be verified.
- **Indicia/recovery cards (Controls #21–22)**: seized but omitted from inventories; the online wallets they linked to remain unknown.
- **Unidentified devices**: Florida digital devices were logged without serials or unique IDs, preventing any reliable tracing of their analysis or return.
- **Unaccounted currency**: more than $10,000 in cash, including $7,500 concealed in a belt, was seized but not carried forward into inventories.

**3. Candid certification.**
The Government must therefore do more than file a numerical reconciliation. It must also certify, under oath, which assets and records exist, which are missing, and which can no longer be reconstructed. Without that acknowledgement, the Court and defense will never have a verified accounting of the December 10, 2019 seizures.

**4. Purpose.**
Such a filing would not only clarify the record but also prevent further reliance on incomplete or contradictory inventories. It would resolve what can be resolved, and admit what cannot, thereby closing the evidentiary gaps without prolonged appellate intervention.

5. Requested Relief & Certification

To cure the record and allow the Court and defense to verify what was seized, what was transferred, and what cannot now be reconstructed, the Government should, under oath, produce the following materials or certify under oath that no such materials exist:

1. **Blockchain transaction evidence.** Produce the complete set of blockchain transaction IDs (TXIDs) and block confirmations for every transfer the MoAs or attachments attribute to restored seed phrases or to any seized device, together with the receiving government seizure addresses. Where transfers went to non-government addresses, identify those addresses and explain the legal authority for such transfers.

2. **Seed-material custody records.** Produce depot intake receipts, item images/photographs, item tags, and intake timestamps for **all** seized seed-phrase cards, indicia/recovery cards, and SD/PNG seed files (including the two handwritten Ledger seed cards and the Exodus SD card). If no intake records exist, certify under oath that none exist and explain the steps taken to search for them.

3. **Custodian affidavits / restoration logs.** Produce sworn custodian affidavits identifying the agent(s) who restored seed phrases or accessed wallets (including dates, locations, software used, and the person(s) who witnessed or supervised restorations), together with any restoration logs, software logs, Electrum/Exodus exports (XPUBs or equivalent), and timestamps showing when restoration and transfers occurred.

4. **Device identifiers and forensic exports.** Produce serial numbers, hardware/chip/USB IDs, device images, forensic hashes (MD5/SHA-256) or full forensic exports for the seized Ledger Nano S, Trezor, cellphones, MacBook, and any cold-storage coins (including any manufacturer serials or hologram identifiers). If a device has no external serial, identify any internal hardware identifier or export that ties the device to derived addresses.

5. **Consolidated, cross-referenced reconciliation.** Provide a single sworn reconciliation table that cross-references: (a) each seized item (Control # / Schedule A item #), (b) the MoA reference and attachment where it appears, (c) serial / identifier / image reference, (d) derived wallet

addresses and XPUBs (if available), (e) the TXIDs for any transfers, (f) present balance (if held in government seizure addresses), and (g) the physical custody location and custodian for the item. The reconciliation should explicitly flag items for which no custody/export/log exists.

6. **Statement of missing / irreparable items.** If any seized items (seed cards, indicia cards, devices, cash) cannot be produced or never entered into depot custody, the Government must certify under oath: (a) which items are missing; (b) the steps taken to locate them; (c) whether any restoration or transfer was performed using such items; and (d) the date and custodian associated with their last known handling.

7. **Non-Bitcoin asset handling.** For any transfers of non-Bitcoin assets (ETH, LTC, BCH, ERC-20 tokens) shown in the attachments, produce TXIDs, restoration logs, and the legal authority relied upon for any conversion, transfer, or disposition of those assets.

If the Government cannot produce any item above, it should **so certify under oath** and explain the steps taken to search for the record or property and the reasons it does not exist. The defense reserves all rights to seek further relief — including motion practice or evidentiary hearings — should the Government fail to comply or if the certification reveals material, unrecoverable gaps.

## VI. Exhibits

Exhibit A – Government's January 15, 2020 Filing (Dkt. 24)

Exhibit B – Colorado Memorandum of Activity (Dec. 10, 2019)

Exhibit C – Florida Memorandum of Activity (Dec. 10, 2019)

Exhibit D – Inventory Lists (Schedule A and 1B Property Reports)

Exhibit E – Financial Disclosures & Counsel Correspondence.

# EXHIBIT D

## Summary of Cryptocurrency-Related Property and Outstanding Accounting Issues

| The chronology below summarizes the principal requests relevant to this action. | | |
|---|---|---|
| | | |
| **Date** | **Filing / Exhibit** | **Principal Request** |
| Mar. 22, 2024 | Exhibit A – Letter from David Stone to AUSA Anthony Torntore | Requested identification and return of seized property and requested that the Government identify any property it contended should not be returned. |
| feb. 26, 2025 | Dkt. 402 – Motion to Compel Discovery | Requested records concerning seized cryptocurrency, digital assets, and related documentation. |
| June 6, 2025 | Dkt. 446 – Supplemental Motion for Return of Seized Property | Requested return of seized property together with identification of Government-held assets. |
| aug. 29, 2025 | Dkt. 477 – Motion to Unseal Warrant Materials | Requested seizure records, inventories, chain-of-custody records, and forensic materials. |
| Sept. 3, 2025 | Dkt. 480 – Supplemental Declaration | Identified specific digital assets and hardware requiring return or accounting. |
| Sept. 12, 2025 | Dkt. 486 – Motion to Compel Accounting | Requested a complete reconciled accounting of all seized digital assets and related records. |
| Oct. 7, 2025 | Exhibit B – Memorandum to AUSAs | Identified discrepancies within inventories, forensic reports, seizure records, and cryptocurrency accounting, and requested a consolidated reconciliation. |
| nov. 18, 2025 | Dkt. 520 – Supplemental Rule 41(g) Motion | Requested return and accounting of additional digital assets, including unresolved Bitcoin discrepancies. |
| June 26, 2026 | Exhibit H – FOIA / Privacy Act Request (Assets) | Requested records identifying custody, transfers, inventories, chain of custody, and disposition of property transferred to IRS custody. |
| [Date] | Exhibit I – FOIA Request (Tax Records) | Requested IRS records relating to the tax investigation, tax-loss determinations, assessments, and records relevant to the alleged tax-evasion determination. |
| Present | Rule 41(g) proceeding, D. Colo. | Requests equitable relief requiring identification and accounting of all seized property presently or formerly held by the United States. |